No. 2015-1585, -1586

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

PRIDE MOBILITY PRODUCTS CORPORATION,

Appellant,

v.

PERMOBIL, INC.,

Appellee.

**Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2013-00407 and IPR2013-00411.**

**CORRECTED BRIEF OF APPELLANT PRIDE MOBILITY PRODUCTS CORPORATION**

Gary H. Levin
Harold H. Fullmer
Daniel J. Goettle
BAKER & HOSTETLER LLP
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA  19104
(215) 568-3100

June 25, 2015

# CERTIFICATE OF INTEREST

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Pride Mobility Products Corp.  v. Permobil, Inc.

No. 2015-1585

### CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party) Pride Mobility Products Corp. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

Pride Mobility Products Corporation

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

n/a

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

n/a

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Baker Hostetler LLP:  Gary H. Levin, Harold H. Fullmer, Daniel J. Goettle; and Jake W. Soumis, formerly of Baker Hostetler LLP

| May 7, 2015 | /s/ Gary H. Levin |
|---|---|
| Date | Signature of counsel |
| | Gary H. Levin |
| | Printed name of counsel |

Please Note: All questions must be answered
cc: All counsel of record via ECF

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF CONTENTS ...................................................................... ii

STATEMENT OF RELATED CASES ................................................ vi

STATEMENT OF JURISDICTION................................................... viii

INTRODUCTION ................................................................................1

STATEMENT OF THE ISSUES.........................................................7

STATEMENT OF THE CASE.............................................................9

   I.   The Pride Patents ......................................................................9

      A.  U.S. Patent 8,408,598 ("the 598 patent")............................9

      B.  U.S. Patent 8,408,343 ("the 343 patent").........................12

   II.  Prior Art Applied in the IPRs ...............................................14

      A.  Goertzen (WO/2002/34190) – a curb-climbing wheelchair with a *high pivot*...............................................................................14

      B.  Hosino (U.S. Patent 6,454,286) – a travel chair without active suspension..............................................................................16

      C.  Mulhern (U.S. 2003/0205420) – a low-pivot power wheelchair without active suspension ................................................................18

   III. The IPRs and the Board's Decisions ...................................20

      A.  Procedural History..............................................................20

      B.  IPR2013-00407 – U.S. Patent 8,408,598 ("the 598 IPR")....................20

      C.  IPR2013-00411 – U.S. Patent 8,408, 343 ("the 343 IPR").................22

      D.  The Board Determines Its Own Level of Skill......................25

      E. Instability of the Goertzen Chair from Lowering the Pivot....................26

SUMMARY OF THE ARGUMENT .................................................34

ARGUMENT ....................................................................................36

   I.   Standard of Review...............................................................36

II.  The Board's Obviousness Conclusion is Wrong – There Was No Proper Motivation to Modify the Primary Goertzen Reference ................................ 36

    A.  The Secondary References Do Not Motivate Lowering Goertzen's Pivot ................................................................................................ 37

        1.    Hosino's "comfortable ride" is irrelevant to Goertzen and its features provide no benefit ........................................................ 37

        2.    The Mulhern reference adds nothing to Goertzen ................... 41

    B.  The Board's "Design Choice" Rationale for Obviousness is Wrong ... 42

    C.  The Additional Work Needed to Stabilize a Modified Goertzen Chair Would Have Been Seen by the Artisan as Not Worth the Effort .......... 46

III. No Combination of References Provides a Wheelchair within Correctly Interpreted Claim 7 .......................................................................... 48

    A.  The Board's Interpretation is an Unreasonable Attempt to Cover the Prior Art ............................................................................................ 48

    B.  Without Its Unsupportable Interpretation, the Board's Combination of References Does Not Create a Structure within the Claim ................... 56

CONCLUSION ........................................................................................ 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Applied Materials, Inc.*,
  692 F.3d 1289 (Fed. Cir. 2012) ........................................................36

*Bd. of Regents v. BENQ Am. Corp.*,
  533 F.3d 1362 (Fed.Cir. 2008) .........................................................56

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LLP*,
  616 F.3d 1249 (Fed. Cir. 2010) ..................................................55, 56

*In re Dembiczak*,
  175 F.3d 994 (Fed.Cir.1999) ............................................................46

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000) ........................................................36

*K/S HIMPP v. Hear-Wear Tech. LLC*,
  751 F.3d 1362 (Fed. Cir. 2014) ..................................................57, 58

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
  688 F.3d 1342 (Fed. Cir. 2012) ........................................................47

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) ....................................................................7, 45

*Microsoft Corp. v. Proxyconn, Inc.*,
  No. 2014-1542, -1543, slip op. (Fed. Cir. June 16, 2015) .................54

*Okajima v. Bourdeau*,
  261 F.3d 1350 (Fed. Cir. 2001) ........................................................45

*In re Omeprazole Patent Litigation*,
  536 F.3d 1361 (Fed. Cir. 2008) ..................................................40, 47

*Phillips v. AWH Corp.*,
  415,d 1303, 1316 (Fed. Cir. 2005) ...................................................54

*S.E.C. v. Chenery Corp.*,
  332 U.S. 194 (1947) ..........................................................................36

*Teva Pharmaceuticals U.S.A., Inc. v. Sandoz, Inc.*,
   135 S. Ct. 831 (2015) ...........................................................................36

## STATEMENT OF RELATED CASES

No other appeal from these IPRs has previously been before this or any other appellate court.  The civil action[1] in which the patents were asserted, stayed for the IPRs, will be directly affected by this appeal.

The parent of the U.S. Patent 8,408,598 at issue here (U.S. Patent 8,881,992) is in *ex parte* reexamination[2] in which it is rejected on the same combination of references at issue in this appeal against the 598 patent; the examiner claims to be bound by the Board decision in the IPR on appeal here and the reexamination may therefore be affected by the decision here.

The 992 patent was also subjected to an *inter partes* reexamination[3] in which patentability was confirmed; Permobil's appeal from that decision is now before this Court[4] but has been stayed pending the *ex parte* reexamination.  The decision in that appeal may be affected by the decision here.

The reexaminations arise from Pride's suit against Permobil for infringement of the 992 patent.[5]  That action, stayed for the reexaminations, may be affected by the decision on this appeal.

---

[1]  *Pride Mobility Products Corp. v. Permobil, Inc.*, No. 2:13-cv-01999 (E.D.Pa)
[2]  Control No. 90/013,376
[3]  Control No. 95/002,355
[4]  *Permobil, Inc. v. Pride Mobility Products Corp.*, Appeal No. 2015-1278
[5]  *Pride Mobility Products Corp. v. Permobil, Inc.*, No. 2:12-cv-03931 (E.D.Pa)

Counsel is aware of no other cases pending in this or any other court that will directly affect or be directly affected by this Court's decision here.

## STATEMENT OF JURISDICTION

The PTO issued its final decisions under 35 U.S.C. § 318(a) in IPR2013-00407 and IPR2013-00411, canceling claims of Pride's U.S. Patent 8,408,598 and 8,408,343, respectively, on December 31, 2014.  Pride filed Notices of Appeal in the PTO on March 2, 2015.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(4).

**INTRODUCTION**

In this consolidated appeal, patent owner Pride seeks reversal of PTAB decisions in two IPRs holding unpatentable all claims of Pride's U.S. Patent Nos. 8,408,343 and 8,408,598 covering power wheelchairs having a particular suspension system. The Board applied the same combination of references, in the same way, in both IPRs. The Board found obviousness by modifying the primary reference to incorporate features of secondary references that were unnecessary, because they addressed a need that the primary reference did not have. Moreover, the modification, if made, would have adversely affected the suspension system of the primary reference.

These IPRs should not have been instituted in the first place. The petitions in neither one set forth the level of skill in the art, a necessary *Graham* factor. The skill level was particularly important here because the skilled artisan would have appreciated something the petitions did not – the unintended adverse consequences of the asserted modification of the primary reference.

The Board erred in particular in its treatment of claim 7 of the 343 patent, whose patentability was separately argued, and its ultimate conclusion of obviousness of that claim. The Board erroneously interpreted a claim limitation requiring a "perpendicular" orientation to read on a *parallel* orientation in the prior art. The Board's interpretation is contrary to plain meaning and inconsistent with

1

every embodiment and relevant description in the specification. Without that incorrect interpretation, no prior art meets that claim limitation. The Board's legal conclusions of obviousness of the claims, and in particular the 343 patent's claim 7, are wrong.

This case involves "mid-wheel-drive" power wheelchairs, which are a mainstay for wheelchair-bound patients having moderate to severe rehabilitation needs.  Mid-wheel chairs generally have six wheels: a pair of drive wheels; two rear-wheels for stability; and front anti-tip wheels that are usually on suspension arms that extend forward of the main structure of the chair to keep the chair frame and seat from tilting or pitching forward, such as when the chair is on an incline. [JA1012]  Mid-wheel chairs are designed with several dynamic features in mind. The occupant's center of gravity is just rearward of the axles of the drive wheels, to provide stability and maneuverability as well as advanced mobility.  [ JA865, JA1013]  Pride was the first to develop and commercialize mid-wheel chairs with a suspension in which the front arms are mounted to the chair at a pivot point and designed to rotate upwardly, about the pivot point, and elevate the front anti-tip wheels in response to torque generated as the motors forwardly rotate the drive wheels.  [JA1012, JA2596 at 1:43-50] Such a suspension is referred to here as an "active suspension."  Active suspension chairs are specifically designed for outdoor use, with the ability to overcome and climb relatively large obstacles, such

as curbs, because of their ability to elevate the front wheels.  The mid-wheel design, with high maneuverability, gives it the versatility to operate in confined indoor spaces as well. [JA1015-16]

The invention of the 598 patent is an active suspension system in which the forward arms are pivotally mounted to the chair frame and have caster wheels attached to their free, front ends; the arms are structurally associated with the motors such that they rotate upwardly about the pivot when the chair forwardly accelerates.  The point around which the front arms pivot, as recited in the claims of both patents, is vertically spaced below a line defined by the drive wheel axis and the anti-tip wheel axis when the wheels are on level ground.  The location of the pivot point below the axis-to-axis line is referred to as a "low pivot."  As illustration, Figure 2 of the 598 patent is set out below, modified to show the line defined by the drive wheel axis $P_A$ and front wheel axis $16_A$.  Pivot $24_A$ around which arm 24 rotates is below the line.



3

The 343 patent covers the suspension system of a particular curb-climbing chair in which each drive wheel is associated with a mounting plate, to which both the forward suspension arm and motor for that drive wheel are attached, such that the plate (with the attached arm and motor) rotates about a "low pivot" point when the chair forwardly accelerates.  Upward rotation of the front arms that occurs when the drive motor is forwardly engaged enables the chair to climb curbs.  In the particular embodiment of claim 7, the mounting plate is "planar" and is "oriented perpendicular to the drive wheel axis."   In such a configuration, the plane of the plate is basically at a right angle to the ground.

Pride was not only the first to commercialize any mid-wheel drive chair in the United States, but also the first (in 1996) with a mid-wheel chair having an active suspension. [JA1012]  By 2002, Pride and another competitor, Invacare Corporation, both had active-suspension, mid-wheel chairs on the U.S. market. [JA1016]  Pride then became the first to add a low pivot to such chairs, introducing its "Q6" series chairs embodying the 598 patent for the complex rehab market in 2004.  [JA1008-09, JA1017]  Invacare thereafter introduced a low-pivot version of its mid-wheel chairs in 2006.  [JA1019-20]   (Pride and Invacare entered into broad cross-licenses in 2006, which included rights to Pride's low-pivot patents and pending applications.)  Pride's first chair specifically embodying the 343 patent –

4

with the claimed mounting plate in an active suspension with low pivot – was the Jazzy Select-6 chair, introduced in 2007.  [JA1010]

Petitioner Permobil first entered the U.S. market with an active-suspension mid-wheel chair in 2011, Permobil's M-series chair.  In 2012, Permobil introduced a second design in that series.  Like Pride's Select-6 chair, Permobil's M-series chairs incorporate a flat mounting plate to which both the front caster arm and motor are attached and which is rotated (by motor torque) about a low-pivot connection to the chair. [JA1023]  Pride accused Permobil of infringing the 343 and 598 patents in the Eastern District of Pennsylvania (2:13-cv-1999) in 2013, shortly after the patents issued.  Permobil petitioned for IPR proceedings against both patents.

All combinations of references advanced in both IPRs relied primarily on the same reference, Goertzen, which teaches a mid-wheel chair with active suspension, but as Permobil admitted, lacks the claimed low pivot.  The IPRs were instituted, however, on the conclusion of Permobil's declarant, that it would have been obvious to lower the pivot of Goertzen, because there are a "limited number of design choices" for the pivot – above, at, or below the line – and any one of them would have been "a routine design choice."  The Board found that low pivots were shown in secondary references (albeit not active-suspension chairs) and concluded that lowering the Goertzen pivot would have been obvious. [JA016, JA045-046]

5

Pride's expert had pointed out that Permobil, and the Board in instituting the IPR, had failed to recognize both the unacceptable reduction in stability that would have occurred from the purportedly "routine" lowering of the Goertzen pivot as well as the substantial redesign that would have been needed to rectify that issue. The Board found that such work would have been within the skill in the art. [JA018-019, JA048-049]  The Board did not comment on the record evidence that the alleged benefit of the lower pivot in one of the secondary references – overcoming small obstacles – would not have enhanced the Goertzen wheelchair, since its active suspension already enabled it to climb curbs.  [JA906-907 at ¶123] Despite the remedial work that the "routine" lowering of the Goertzen pivot would require, for no additional benefit, the Board erroneously concluded that this modification would have been obvious.

The Board's treatment of claim 7 in particular is unsupportable.  The claim defines two structural elements – a "planar" mounting plate and the axis of the associated drive wheel – as "perpendicular" to each other.  The Board distorted that limitation to shoehorn in a reference in which the purportedly corresponding elements – a flat plate and a drive-wheel axis that are both oriented  horizontally to the ground – are *parallel* to each other, which is as opposite from "perpendicular" as a line and a plane can be.  When claim 7 is correctly interpreted, no asserted combination of references meets it.

6

# STATEMENT OF THE ISSUES

(1)    Under *KSR*, the level of skill in the art is relevant to determine whether proper motivation to combine references existed, particularly where claimed subject matter involves more than simple substitution of one known element for another.  The wheelchair of the primary Goertzen reference has a suspension arm pivotally connected to the frame at a relatively high point and actuated by motor torque.  In the secondary references, a non-motor-actuated suspension element is pivotally connected lower on the frame.  A skilled chair designer would have recognized that lowering the pivot in Goertzen would make its wheelchair unstable and unsafe.  Did the Board err in determining there was motivation to modify the Goertzen chair by lowering the pivot of its suspension arm?

(2)    Where devices of two references independently accomplish similar functions effectively, there is no reason to combine the features of both into a single device. The low-pivot suspension element of the secondary Hosino reference aids the wheelchair to traverse ground "projections."  The wheelchair of the primary Goertzen reference, because of the motor-torque actuation of its suspension arm, was already able to traverse larger, curb-like obstacles.  Did the Board err in determining there was motivation to modify Goertzen with the pivot location of Hosino?

(3)    Where an asserted modification of the wheelchair of one reference in view of another would have unintended adverse consequences, requiring additional effort to remedy, and where the modification would not enhance the function of the first wheelchair, did the Board err in ignoring the relationship between these facts and concluding that the modification would have been obvious?

(4)    Claim terms must be interpreted in the context of the specification and in a way that gives meaning to all claim language.  The Board interpreted "perpendicular"– in the context of the relative orientation of two recited claim elements – so broadly as to cover prior art whose purportedly analogous elements are parallel to each other.  Is the Board's interpretation of the claim unreasonable and incorrect?

## STATEMENT OF THE CASE

This consolidated appeal arises from Inter Partes Reviews ("IPRs")

instituted by Permobil against two U.S. patents that Pride had accused Permobil of

infringing:  IPR2013-00407 on U.S. Patent 8,408,598 ("the 598 IPR") and

IPR2013-00411 on U.S. Patent 8,408,343 ("the 343 IPR").  The IPRs resulted in

final decisions holding that all claims of both patents were unpatentable as

obvious.

### I.    The Pride Patents

The Pride patents are both directed to mid-wheel drive wheelchairs having

six wheels, all on the ground when the chair is operating normally on level ground.

The wheelchairs, as claimed, have active suspensions and "low" placement of the

pivotal attachment of their front suspension arms to the chair body.

### A.    U.S. Patent 8,408,598 ("the 598 patent")

The 598 patent describes an anti-tip suspension system for improved curb-

climbing ability and stability of a powered wheelchair.   [JA149 at 1:22-25]  The

drive motors are pivotally mounted to the chair frame; in reaction to their

application of torque to the drive wheels, the motors rotate about their pivots.

[JA150 at 4:49-52]  A front suspension arm is pivotally mounted to the frame at

one end and has a front wheel at the forward end.  [JA150 at 4:58-62].  Figure 2,

below, shows an embodiment of the chair as claimed with the low pivot $24_A$ of the

9

suspension arm 24 located below a line that would connect the axis $16_A$ of the front

wheel and drive wheel axis $P_A$.  A linkage between the motor and the suspension

arm translates the pivoting action of the motor to the arm, thus causing the arm to

rotate in response to the motor torque.  [JA150 at 4:56-66]  Figure 4, below, shows

the chair during forward acceleration, which rotates the arms upwardly, causing the

front wheels to rise and enabling the chair to climb a curb. [JA151 at 5:41-55;

JA153 at 9:31-43]



FIG. 2          FIG. 4

The 598 patent has two independent claims:

1.    A wheelchair comprising:
a frame;
a pair of drive wheels defining a drive wheel axis;

10

a drive assembly operatively coupled to at least one drive wheel of the pair of drive wheels, the drive assembly configured to rotate the at least one drive wheel about the drive wheel axis to thereby cause the wheelchair to move relative to a surface that defines a ground plane;

an arm pivotably mounted to the frame at an arm pivot axis; and

a caster wheel coupled to the arm, the caster wheel defining a rotational axis about which the caster wheel rotates,

wherein the vertical position of the arm pivot axis with respect to the ground plane when the caster wheel and the drive wheel are in contact with the surface is spaced from and positioned relatively below a straight line drawn between the drive wheel axis and the rotational axis of the caster wheel, and

wherein the arm is operatively coupled to the drive assembly such that the arm is configured to pivot about the arm pivot axis in response to torque created by rotation of the at least one drive wheel by the drive assembly so as to cause a responsive vertical movement of the caster wheel.

7.     A wheelchair comprising:

 a frame;

a pair of drive wheels defining a drive wheel axis;

a drive assembly operatively coupled to at least one drive wheel of the pair of drive wheels, the drive assembly configured to provide power to the at least one drive wheel to rotate the drive wheel about the drive wheel axis to thereby cause the wheelchair to move relative to a surface that defines a ground plane;

an arm pivotably mounted to the frame at an arm pivot axis; and

a caster wheel coupled to the arm, the caster wheel defining a rotational axis about which the caster wheel rotates,

wherein the vertical position of the arm pivot axis with respect to the ground plane when the caster wheel and drive wheel are in contact with the surface is spaced from and positioned relatively below a straight line drawn between the drive wheel axis and the rotational axis of the caster wheel, and

wherein the arm is operatively coupled to the drive assembly such that (i) the arm is configured to pivot about the arm pivot axis in response to torque

created by rotation of the at least one drive wheel by the drive, and (ii) the arm is configured to pivot about the arm pivot axis in response to braking.

**B.    U.S. Patent 8,408,343 ("the 343 patent")**

The 343 patent is also directed to suspension systems for powered six-wheel chairs that are adapted for stable curb-climbing. [JA2596 at 1:19-21, 2:16-18]  In relevant part, the chair has drive wheels coupled to the chair frame, a mounting plate associated with each drive wheel pivotably coupled to each side of the frame at a pivot axis, and a motor affixed to each mounting plate to power the associated drive wheel.  As shown in Figures 3A and 3B below, the mounting plate 56, having parts 57A and B, is planar and oriented perpendicular to the drive wheel axis.  [JA2599 at 7:60-65, 8:27-35]  The perpendicularity is evident from the fact the axis extends directly away from the plane of the plate at a right angle.  The wheelchair further includes front arms extending forwardly from the mounting plates, each arm having a front wheel coupled to its forward end.  The mounting plate, motor, and front arm are together configured to pivot about the plate's pivot axis 29 on the chair frame   [JA2599 at 8:33-35, 8:58-62]

12



FIG. 3A    FIG.3B

Pivot 29 is located forward of the drive wheel axis and vertically spaced below the line between the drive-wheel axis and the front-wheel axis when the wheels are on level ground.  [JA2600 at 10:54-63]  The location of the pivot and the structural interconnection of the mounting plate, drive, and front arm enhance the chair's stability and curb-climbing capability; forward motor torque biases the arm and front wheel upward, thereby allowing the chair to climb curbs.  [JA2596 at 2:26-31; JA2597 at 3:3:42-56, 4:1-16; JA2600 at 10:4-16, 10:64-11:3]

The 343 patent has one independent claim:

1.    A wheelchair comprising:
a frame;
a drive wheel defining a drive wheel axis
 a mounting plate pivotally coupled to the frame at a pivot axis, the pivot
    axis being positioned forward of the drive wheel axis;[6]

---

[6] Through a double inclusion in an examiner's amendment during prosecution, this sentence appears twice in the printed patent.

13

a drive operatively coupled to the drive wheel and affixed to the mounting plate;

a forward-extending front arm rigidly extending from the mounting plate such that the mounting plate, drive, and front arm are together configured to pivot about the pivot axis;

a front wheel rotatably coupled to the front arm, the front wheel defining a front wheel axis;

wherein a vertical position of the pivot axis with respect to the ground plane is spaced from and positioned relatively below a line drawn between the drive wheel axis and the front wheel axis when the drive wheels and front wheels are on level ground;

whereby motor torque biases the front wheel.

Dependent claim 7, which was separately addressed in the IPR, further defines the mounting plate:

7.    The wheelchair of claim 1 wherein the mounting plate is substantially planar and is oriented perpendicular to the drive wheel axis.

## II.    Prior Art Applied in the IPRs

No reference discloses a power wheelchair having an active suspension with low-pivot attachment of front anti-tip arms.

### A.    Goertzen (WO/2002/34190) – a curb-climbing wheelchair with a *high* pivot

Goertzen [JA200-245], the primary reference in all the IPR rejections, discloses an active suspension wheelchair for traversing curbs. [JA201:4-5; JA209:3-8; JA212:10-13][7]   As shown in Figures 4A and 5A  [JA229, JA232]

---

[7]  Citation to "JAx:__" in Goertzen refers to its appendix page and line(s).

below, the wheelchair includes a frame, at least one rear caster rigidly attached to the frame, and a pair of forwardly extending suspension arms pivotably coupled to either side of the chair frame at pivot 330, and having caster wheels at their forward ends. Each arm 132 has a drive motor 136 connected at its rear, with pivot connection 330 located between the motor and the extension of the forward arm. Each motor is associated with a drive wheel 104. [JA202:15-22, JA206:4-15, JA207:3-27]. As Permobil admitted and the Board acknowledged, Goertzen does not have a low pivot; rather, the arm pivot (labeled 330 in 5A) is above the line defined by the axle of caster wheel 106 and the drive wheel axis, as shown in red. [JA015-016; JA045]



The combined center-of-gravity of the passenger and batteries is located at a point behind the vertical centerline 402 that passes through the pivotal connection, providing a particular weight distribution over the drive wheels. This weight distribution facilitates raising and lowering the front casters in a stable manner in response to the acceleration and deceleration of the wheelchair. [JA208:10-17, JA215:29–JA216:5]   As the wheelchair accelerates, the moment generated by the torque of the motors will cause rotation of the motor/arm assembly around pivot 330, causing arms 132 to rotate upwardly to lift the front casters off the ground. It is preferable that the front casters rise up to 6 inches to be able to traverse a high curb. [JA208:25–JA209:8, JA216:11-26]

### B.    Hosino (U.S. Patent 6,454,286) – a travel chair without active suspension.

Hosino [JA246-JA258] was combined with Goertzen in both IPRs. Hosino teaches a hand- or motor-assisted wheelchair whose wheels conform to ground contour to facilitate comfortable travel. [JA254 at 1:50-55]. Hosino has no suspension arms. Instead, it has a small caster wheel attached to the front end of a flexible frame comprising halves 2a and 2b joined at a "bendable portion" 5. [JA255 at 3:36-60]  Hosino's Figures 1 and 2 are shown below with the frame portions highlighted in blue shading:



The sides of the frame parts are supported by two main wheels, through a pair of supporting sticks 6 connecting the frame, at bendable portion 5, with the rotation axis 7 of the main wheels at the sticks' upper ends.  Small caster wheels 3a/b support the front and back of the frame. [JA254 at 1:58-2:9; JA255 at 3:60-4:23]. The chair is designed to "guarantee a constant contact of the [caster wheels and main wheels] to the ground."  [JA355 at 3:52-54]

When the frame flexes excessively, the caster wheels or other support wheels can leave their intended ground position, making the device unstable.  The device is most stable with all wheels on the ground and when its center-of-gravity located generally above the central part of the frame; it is less stable when the center-of-gravity falls outside that space, which occurs when the device is on an incline.  [JA256 at 6:6-39 and JA880 at ¶66]

17

Bendable portion 5 is located below a line between the axis of main wheel 4 and axis of caster 3a, which is said to help the caster roll over a small obstacle. [JA256 at 6:50-65]  Pride's expert calculated the distribution of passenger weight in a Hosino device to be approximately 50% over the drive wheels and 25% on each of the front and rear casters.  Because of the high weight distributed over the front caster (compared with the lower weight over the Goertzen front wheels), the bendable portion of Hosino's frame must be beneath (or lower than) the rotational axis of the main wheels to keep the casters in ground contact as they traverse ground projections.  [JA881 at ¶69)]  Permobil's expert admitted that Hosino is not able to climb curbs.  [JA992 at 190-191]

### C.    Mulhern (U.S. 2003/0205420) – a low-pivot power wheelchair without active suspension

Mulhern [JA258-276] was combined with Goertzen in one rejection in the 343 IPR.  As shown in Figures 1 and 2A below, Mulhern describes a power wheelchair having anti-tip wheels at the free ends of forwardly extending arms 24 and a releasable retaining mechanism for keeping the anti-tip wheels in a near-ground position; the front wheels can be raised from this position through a dedicated motor or by a quick-release feature of the retaining mechanism that allows the wheels to be pulled upward by spring 44 (shown in extended, locked position in Fig. 1).  [JA267 at ¶¶ 0004-05; JA268 at ¶¶ 0023-25; JA053-054]

18



**FIG. 1**        FIG. 2A

The forwardly extending arm 24 is pivotally connected to the chair frame at point 32, which is located below a line between the axis of drive wheel 62 and anti-tip wheel 22. This first embodiment does not have an active suspension; the forward arms are not affected by motor torque.

Mulhern's Figures 4 A-C depict a second embodiment in which the arm pivot is above the axis-to-axis line. [JA262-263; JA 271 at ¶¶0050-52; JA272 at ¶¶0061-64] The suspension of this embodiment is active at least to the extent that the anti-tip wheels are forced downward by deceleration. [JA272 at ¶0062] But there is no teaching that forward acceleration would cause the suspension arms to rise. The only means taught for elevating the arms – requiring release of the retaining mechanism – are contraction of the spring connecting the arm to the frame or the force exerted by an encountered obstacle. [JA272 at ¶¶ 0063-64]

19

### III.    The IPRs and the Board's Decisions

#### A.    Procedural History

Permobil's original petitions set forth no level of ordinary skill in the art, one of the necessary Graham factors to evaluate the obviousness contentions. [JA008, JA038]  The IPRs were instituted despite this failure, which made the petitions legally insufficient to demonstrate the required likelihood of unpatentability.  The IPRs were consolidated for discovery and argument.

The Board's final decisions in both IPRs issued on December 31, 2014. Pride timely appealed the decisions, which were separately docketed in this Court on April 23, 2015.  Following Permobil's unopposed motion, the appeals were consolidated by the Court's Order of May 21, 2015.

#### B.    IPR2013-00407 – U.S. Patent 8,408,598 ("the 598 IPR")

The 598 IPR was instituted primarily on a combination of Goertzen and Hosino, rejecting claims 1, 4-8, and 11-13.  The remaining dependent claims were rejected on this combination further in view of U.S. Patent 6,129,165 (Schaffner). Pride did not argue this rejection separately; this rejection should fall with the underlying Goertzen/Hosino combination.

Permobil's petition argued (1) that Goertzen disclosed everything in independent claims 1 and 7 except the low pivot; (2) that Hosino disclosed a pivot below the claimed axis-to-axis line and suggested that this location helped the front

20

wheel ride over an encountered obstacle; and (3) that it would have been a "routine design choice" to lower the Goertzen pivot as in Hosino because "there are a limited number of design choices for the vertical position of the arm pivot axis: above the line, at the line, or below the line."[8]  The Board's final decision adopted this reasoning. [JA015-016]

Pride asserted that Permobil had failed to appreciate that lowering the pivot in Goertzen would make the chair unstable, thus demonstrating that the location was not "routine."  Permobil's expert had not discussed chair stability in his original declaration [JA965-966 at 24:7-28:20], nor had he considered any particular low-pivot location for the purported modified Goertzen chair [JA1824 at 48:8-49:1], but he ultimately agreed with Pride's expert that the pivot could not simply be lowered without destabilizing the Goertzen chair.  [JA1824 at 46:13-47:7; JA988 at 171:2-8]  The Board accepted that lowering the pivot would engender instability, but further found that a skilled artisan would have known how to compensate for it, noting that Goertzen identified ways to increase stability. [JA019]  The Board did not address the fact that these Goertzen teachings were in the context of Goertzen's existing *high* pivot, making them irrelevant because they

---

[8] Permobil had cited additional secondary low-pivot references with the same "routine design choice" argument for combination with Goertzen, but review was instituted only on Hosino.

were not directed to new instability that would be engendered by lowering the pivot.

The Board also did not address the combined significance of the related facts that (1) the primary Goertzen reference used a different mechanism to overcome obstacles than Hosino – proactively lifting the front wheels via its active suspension, as opposed to passively allowing the wheels to roll over an obstacle upon contact with it; and (2) Goertzen was already able to overcome larger obstacles (curbs) than Hosino was intended to or able to traverse; so that (3) Goertzen did not need the lesser obstacle-traversing ability that Hosino's low pivot was purported to provide. [JA201:4-5; JA209:3-8; JA212:10-13; JA216:11-26; JA992 at 190:21-191:9]  Despite the substantial work necessary to both modify Goertzen to lower the pivot and then rectify the resulting instability, and despite the lack of any additional capability to the Goertzen chair from doing so, the Board erroneously concluded that there was motivation to modify Goertzen from Hosino and that their combination made claims 1-13 obvious.

### C.    IPR2013-00411 – U.S. Patent 8,408, 343 ("the 343 IPR")

The 343 IPR was instituted on two grounds.  In the first ground, all ten claims of the patent were rejected under a combination of Goertzen and Hosino, applied in exactly the same manner, and rebutted by Pride in the same manner, as

in the 598 IPR; the Board's conclusions were also the same. [*Compare* JA040-046

and JA048-050 (343 IPR) *with* JA010-016 and JA018-020 (598 IPR).]

In the second ground, claims 1 and 4-10 were rejected under a combination

of Goertzen and Mulhern.  Permobil's petition asserted that that it would have been

"a routine design choice" to modify Goertzen by lowering its pivot, based on the

low pivot of Mulhern.  [JA053]  But that was it; neither Permobil nor the Board

pointed to any reason why one would have modified Goertzen in light of Mulhern

or what the purported benefit might have been from doing so.  Pride rebutted this

asserted combination on the same bases – including instability resulting from

lowering Goertzen's pivot – as raised against the Goertzen/Hosino combination.[9]

Again, despite the substantial work involved for no benefit, the Board erroneously

concluded that Mulhern supplied motivation to modify the Goertzen chair and that

the Goertzen/Mulhern combination rendered the claims obvious.

Pride argued patentability of dependent claim 7 separately.  This claim

requires that the pivoting mounting plate of claim 1 be "substantially planar" and

be "oriented perpendicular to the drive wheel axis."  The only pivoting mounting

plate described in the 343 patent that is connected to a motor and anti-tip arm, as

---

[9]  Pride's rebuttal, including instability, was not limited to Hosino or Mulhern but
more broadly addressed the asserted combination of Goertzen with any of
Permobil's so-called "low-pivot" secondary references.   (Response of 3/20/2014,
pages 26-49)

required by independent claim 1, is plate 56. This plate, having parts 57a and 57b, is shown in the specification to be planar with the plane *perpendicular* to the wheel axis; that is, the axis extends directly away from the plane of the plate at 90º. [JA2571, JA2572 (Figs. 3A and 3B); JA2599 at 8:27-29; JA2602 at 13:21-23] The orientation of plate 56 to the wheel axis is not depicted in any other way.



FIG. 3A          FIG.3B

The Board, however, ignored the plain language of the claim limitation. Without giving any actual interpretation, the Board stated that "perpendicular to the drive wheel axis" covers orientations "*other than* the orientation of mounting plate 56." [JA037, emphasis added]. Extrapolating without explanation from this vague pronouncement, the Board purported to find a mounting plate and wheel axis satisfying the limitations of claim 7 in the Goertzen reference. Pointing to Goertzen's Figure 3 (below), the Board characterized plate 308 as "perpendicular" to wheel axis 311. [JA051-052]  Goertzen Figure 3 is reproduced in relevant part

24

below with an expanded view of the relationship of Goertzen's plate 308 to wheel axis 311.



The figure plainly shows the error in the Board's characterization of the Goertzen suspension and its application of Goertzen to claim 7. The plane of Goertzen's plate is clearly parallel, *not* perpendicular, to the wheel axis.

### D.    The Board Determines Its Own Level of Skill

In the IPRs, the Board determined and applied a level of skill that was lower than either party posited.

Permobil did not include a proposed level of skill in its petition for either IPR.  In its Responses, Pride proposed a level of at least three years' experience in designing, developing, and testing curb-climbing power wheelchairs.  In reply,

Permobil proposed an undergraduate degree in mechanical engineering and either at least one year experience if in conjunction with grad school studies, or at least three years if no grad school.  [JA008-009, JA038-039]  The Board, however, determined that the skilled artisan would have had either a mechanical engineering degree *or* three years' experience designing powered chairs.   [JA009, JA040]

Thus, the Board allowed for a level of skill that did not require any real experience in design/development/testing, despite the fact that both parties' proposals included at least some actual experience with powered wheelchairs.

### E.    Instability of the Goertzen Chair from Lowering the Pivot

Common to both IPRs is the issue of the stability of curb-climbing wheelchairs, such as Goertzen's, and in particular the *in*stability engendered in the Goertzen chair if the pivot is lowered.[10]

Consistent with the industry's concern for stability, Goertzen emphasizes weight distribution and explains the importance of the net rotational moment about

---

[10] Although the problem of instability from lowering the Goertzen pivot is seemingly established and not disputed, its description is included here because it is instructive to see how the effects of even purportedly "routine" design changes in curb-climbing wheelchairs are deceptively complex and significant.  This complexity also demonstrates that the Board's level of skill is too low; someone with no real experience in designing power wheelchairs would not have the skill or judgment to recognize the problem and/or address it.

the arm pivot P, whose vertical position is at the center of the present obviousness

issue.  Referring to Fig. 4A [JA229], Goertzen states:

> [I]t is possible to obtain between approximately 80% to 95% weight
> distribution on drive wheels **102** and **104**, with the remainder of the
> weight being distributed between the front casters **106** and **108** and the
> rear caster **110** . . . [S]uch an arrangement facilitates the raising and
> lowering of the front casters **106** and **108** during acceleration and
> deceleration of the wheelchair **100**.

> Under static equilibrium such as, for example, when the chair is at rest or
> not accelerating or decelerating as shown in FIG. 4A, the net rotational
> moment around pivotal connection P and pivot arms **132** and **134** is zero
> (0) (i.e., $\Sigma F_n r_n = 0$, where F is a force acting at a distance r from the
> pivotal connection P and n is the number of forces acting on the
> wheelchair). Hence, pivot arms **132** and **134** do not tend to rotate or
> pivot.

[JA208 at 14-22]

Pride's expert Neal Curran had first-hand experience during the relevant

time period with the engineering of curb-climbing wheelchairs with active

suspensions.  Mr. Curran explained that stability of a curb-climbing wheelchair is a

serious issue.  Slight instability, or even a momentary feeling of instability, such as

when a wheelchair unduly rocks or lurches, can be unreasonably disturbing for the

passenger.

Mr. Curran's analysis as presented to the Board – Curran Declaration,

Exhibit 2012 to Pride's Response of March 20, 2014 – is summarized in relevant

part below.  Mr. Curran explained the stability issues affecting curb-climbing

27

power wheelchairs that a person of ordinary skill in the art should have understood

at the relevant time, and focused in particular on the dynamics of the chair of

Goertzen's Figure 4A.  [JA229, JA873-877]



Mr. Curran's analysis of Goertzen begins with identifying two substantially

rigid "bodies" making up the wheelchair that are moveable about the pivot P with

respect to the other.  [JA889-890]   The two bodies are shown in the drawing

below, which is Mr. Curran's adaptation of Figure 4A.   [JA937] (Exhibit B12

from Curran declaration filed with Pride's Responses of March 20, 2014, in both

IPRs.)

28



The yellow body RGB1 is built around the chair frame. Referring to the numerals of Goertzen Figure 4A, it includes the seat (124), a frame (142) that contains brackets (unnumbered) for the pivot P  (326 & 328), batteries, a rear caster mounting arm (140) and at least one rear caster (110). Blue body RGB2 is built around the suspension of the Goertzen chair. It includes a drive motor (136), drive wheel (102), front pivot arm (132) with caster (106), and the couplings for pivot P. RGB1 and RGB2 can pivot relative to each other around pivot coupling P. [JA889-890]

Spring 144 in Goertzen Figure 4A resiliently couples RGB1 & RGB2, urging RGB1 to rotate in a counterclockwise direction and RGB2 to rotate in a clockwise direction around pivot P. The clockwise rotation of RGB2 urges the

front caster downward to maintain contact with the drive surface. [JA891-893] Permobil's expert agreed that the pivot and the spring are the only structural connections between the bodies. [J978 at 129:2-15]

Exhibit B23 [JA948] from the Curran declaration, reproduced below, demonstrates the effect of lowering the pivot on the Goertzen chair. It depicts a Goertzen Figure 4 chair, but with the pivot having been lowered to a point below the axis-to-axis line, descending a conventional curb. The symbol $F_{SYS}$ represents the downward force of the combined weight of batteries and occupant. The center-of-gravity symbol in the diagram, located just above the seat and over the drive wheel axis (311), represents the combined center of gravity of the batteries plus the passenger. [JA891] Permobil's expert agreed that the chair as shown in this diagram exemplifies a low-pivot version of Goertzen [JA980-981 at 140:14-142:4, with JA 998] and that it reasonably estimates the location of the center of gravity. [JA978-979 at 129:16-131:9]



Curran decl, Ex. B at 23

Although on *level* ground the lowered pivot appears to have little effect on stability of this chair [JA892-893], one of true ordinary skill understood that wheelchairs like Goertzen are not intended to operate solely on level ground, but also are intended to ascend and descend curbs. It is here that the stability issue is manifested.  The diagram shows that as a Goertzen chair with a lowered pivot descends a conventional curb, the downward force of the combined weight $F_{SYS}$ acts from either directly above or forward of the pivot, depending on the steepness of the decline; this overpowers the countering moment created by force $F_{SP}$ exerted by the spring, thus biasing the chair to tip forward when the rear caster is still on

31

the curb.  [JA896-898].  The same dangerous instability occurs when the Goertzen chair with the lowered pivot decelerates while on a decline.  [JA899-902][11]

In contrast, the *unmodified* Goertzen chair, with the existing high pivot, does not suffer these issues.  As shown in the below drawing from Mr. Curran's declaration, in the high-pivot chair, the combined weight $F_{SYS}$ acts to the *rear* of the pivot, even when the chair is descending a curb.  The moment created by this force, together with the complementary moment of the spring, causes the frame and seat portion of the chair (the "yellow body") to remain in a normal position. [JA895-896 with JA945]

---

[11]  Mr. Curran explained that this instability would occur with a spring of any workable strength.  A spring presumably strong enough to counter the "tipping" moment created by $F_{SYS}$ in a low-pivot Goertzen chair would be too strong for other intended functions of the chair.  [JA903-904].



None of these now-admitted-to instability issues was mentioned in Permobil's petition or in its expert's accompanying declaration. Although Permobil's expert later stated, on cross-examination, that the Goertzen pivot could be lowered with no adverse effect "if done properly" [JA966 at 27:6-28:20], his opening declaration was completely silent on the stability issue.

## SUMMARY OF THE ARGUMENT

The Board erred in finding that there was motivation to modify the wheelchair of the primary Goertzen reference, by lowering the pivot of the suspension arm of that chair, in view of the either of the secondary references applied in the IPRs.  Modifying the Goertzen chair in accordance with either secondary reference would not have added any capability that the Goertzen chair did not already have.  Further, one of ordinary skill in the art would have realized that lowering the pivot on the Goertzen chair would have rendered the chair unstable, requiring further remedial work to restore stability.

The Board further erred in its ultimate conclusion of obviousness by failing to consider the significance of these two impediments to the modification. The skilled artisan would not have taken on the stability problems and the necessary remedial work when the chair as modified would not have had any added benefit or capability.  There is no obviousness where an asserted modification adds extra work for no benefit.

The Board's reliance on the supposed "routine" nature of the design of the pivot location or the modification is demonstrably incorrect.  The instability of the modified Goertzen chair, which Permobil's expert did not originally appreciate but later admitted to be an issue, shows the design choices and implementation to be anything but routine.

34

Claim 7 of Pride's 343 patent is separately patentable, even if there otherwise were proper motivation to modify the Goertzen chair. The claim adds two related limitations involving spatial relationships that the Board interpreted incorrectly – defying both the specification and ordinary meaning, as understood not only within any art field but also in grade-school geometry. No reference shows the added elements in a power wheelchair in the relationship as claimed, so no combination of references provides or suggests a chair within claim 7. The holding of obviousness is incorrect and its underlying findings are not supported.

## ARGUMENT

### I.    Standard of Review

The Court reviews the Board's determination of obviousness *de novo* and the Board's underlying factual findings for substantial evidence. *In re Applied Materials, Inc*., 692 F.3d 1289, 1294 (Fed. Cir. 2012). The Board's judgment is reviewed on the grounds on which the Board relied. *Id*., citing *S.E.C. v. Chenery Corp*., 332 U.S. 194, 196 (1947). An ultimate claim construction by the Board as well as underlying fact findings based on intrinsic evidence are reviewed *de* novo, but fact determinations based on extrinsic evidence are reviewed for substantial evidence . *Teva Pharmaceuticals U.S.A., Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841-842 (2015); *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).

### II.    The Board's Obviousness Conclusion is Wrong – There Was No Proper Motivation to Modify the Primary Goertzen Reference

Modification of the Goertzen chair, whether in view of Hosino or Mulhern, is the underpinning of all rejections of both patents. The record does not support a finding that either reference provided motivation to modify Goertzen in the first place. And in further view of the fact that a person of ordinary skill would have recognized that lowering the Goertzen pivot would destabilize the Goertzen chair, there was no legal basis for the Board's resulting obviousness conclusion. Even if the instability could have been overcome by further redesign of the chair, the truly skilled artisan would not have made the modification, only to take on these

36

problems and the necessary remedial work, because lowering the pivot on the

Goertzen chair would not have added any functionality that the chair did not

already have.

The Board failed to consider the significance of those facts.  Even if the

secondary references would otherwise have motivated a modification of Goertzen,

the ultimate legal conclusion of obviousness is incorrect. There is no proper

motivation when the asserted modification adds extra work for no benefit.

## A.     The Secondary References Do Not Motivate Lowering Goertzen's Pivot

Additional considerations, both related to the instability issue and not,

demonstrate that the Board's reliance on the secondary references to support a

conclusion on obviousness was leally incorrect.

### 1. Hosino's "comfortable ride" is irrelevant to Goertzen and its features provide no benefit

In both IPRs, the Board finds that one of skill in the art "would have looked

to Hosino, to modify the teachings of Goertzen," presumably for the "comfortable"

driving that Hosino's "low pivot" purportedly provides.   [JA012, JA020 (598

IPR); JA042, JA050 (343 IPR)]   In its simplest terms, the Board adopts the

incorrect view that the skilled artisan, despite appreciating that Goertzen's active-

suspension already enhances curb-climbing ability, would rely on a reference

(Hosino) that is not directed to a curb-climbing wheelchair at all.  Hosino is

directed to a vastly different device and addresses a need that is inherent in that device but that the primary reference does not have. The much more rugged and sophisticated Goertzen chairs are already built to overcome much larger obstacles, such as standard curb heights, than were ever contemplated by Hosino.

Hosino is a different device with a different purpose. Fundamentally, the element the Board alleges to be a "suspension arm" is actually an integral part of the structural frame. In fact, what is referred to throughout the Board decisions as a suspension arm is referred to by Hosino as "front half-frame 2a." [JA255 at 3:58-4:16] There is no separate suspension arm, as required by the present claims or the Goertzen reference, let alone one that is pivotally mounted to a separate frame.

Permobil's Dr. Richter agreed, testifying that what his declaration identifies as Hosino's "pivot arm" is actually the frame: "Hosino is a little bit unusual in that the arm and the frame are in many ways one." [JA992 at 192:7-9] Dr. Richter and the Board say that Hosino is asserted only to teach the existence of a low pivot, thus to argue that the rest of the structure and its dissimilarity from Goertzen do not matter. [JA992 at 192:13-16; JA019; JA050] But the rest of the structure cannot be ignored. Hosino does not teach a pivot in the sense of the Pride patent claims or Goertzen. What the Board asserts to be a pivot – Hosino's "bendable portion 5" – is not a pivot at all, but rather a flexible joint at which the front frame portion 2a

38

and rear frame portion 2b can bend relative to each other while keeping all wheels on the ground.

This is consistent with Hosino's different focus from Goertzen or the Pride patents of providing a device that is simply concerned with conforming to ground unevenness to give a smooth ride.  Hosino's caster wheels are not attached to any arm, but instead are attached to the loop frame.  If the front caster encounters a bump, the caster wheel will follow the contours of that bump; at no time, however, is the caster intended to lift off the ground.  [JA255 at 3:52-55; JA881-882 at ¶70]

Thus, Hosino emphasizes that its configuration is for traveling over uneven ground – *e.g.,* "projections" – as distinguished from larger obstacles such as curbs, which are never mentioned in Hosino.  Indeed, Permobil's expert admitted that Hosino has no curb-climbing ability.  [JA992 at 190:24-191:9]  In contrast, the active-suspension of Goertzen was already designed with more versatility, specifically to enable curb climbing through the operative connection between the drive motor and the front suspension arm:

> Hence, as the wheelchair 100 accelerates forward and the moment created by accelerating force $F_a$ increases over the moment created by spring force $F_s$, pivot arms 132 and 134 begin to rotate or pivot thereby raising front casters 106 and 108 off the ground.  As described, it is preferable that front casters 106 and 108 rise between 1 and 6 inches . . . so as to be able to traverse a curb or other obstacle of the same or similar height.

[JA209:4-8; See also JA212:10-13]

The active suspension, which causes the front arms to pivot upwardly in response to forward motor torque, was Goertzen's mechanism for overcoming obstacles as great as normal curb heights. Hosino's technical solution is at best a poor alternative, and not one even applicable to a chair meant to climb curbs. Nowhere does Goertzen teach or suggest, nor is there any finding, that Goertzen's active suspension is not itself already sufficient to do everything Hosino does. If Hosino's low pivot allows it to roll-over small projections, Goertzen's larger wheels and active suspension already enable that and more. [JA907-910 at ¶¶ 123, 126-128] The Hosino-based modification asserted by the Board addresses a need that Goertzen did not have.

The Board thus ignores MPEP guidelines, based on this Court's precedent, that warn against combinations whose supposed motivation for being made is to address a non-existent problem:

> Office personnel should note that in this case the modification of the prior art that had been presented as an argument for obviousness was an extra process step that added an additional component to a known, successfully marketed formulation. The proposed modification thus amounted to extra work and greater expense for no apparent reason. This is not the same as combining known prior art elements A and B when each would have been expected to contribute its own known properties to the final product.

MPEP § 2143 (citing *In re Omeprazole Patent Litigation,* 536 F.3d 1361 (Fed. Cir. 2008)). Here, one skilled in the art would *not* have expected any greater property or capability from a Goertzen/Hosino combination because the property for which

40

Hosino was offered by the Board – rolling over obstacles – was already subsumed by Goertzen's greater curb-climbing ability.  Thus, Hosino as a whole does not provide motivation to incorporate its teachings into Goertzen in the manner found by the Board.

### 2.  The Mulhern reference adds nothing to Goertzen

Mulhern was combined with Goertzen as the basis to cancel claims 1 and 4-10 of the 343 patent.  [JA053-056].  As with Hosino, the Board finds motivation to lower the Goertzen pivot based on Mulhern's low pivot, but Mulhern, like Hosino, provides nothing of additional value to Goertzen.

Mulhern is a curb-climbing wheelchair having a low pivot, but it is not an active suspension chair like Goertzen.  Rather, as explained earlier, Mulhern raises its front anti-tip wheels to traverse curbs by a completely different mechanism.  There was no assertion by Permobil, nor any finding by the Board, of any reason to modify Goertzen in light of Mulhern other than the mere existence of the low pivot in Mulhern and the possibility that, despite their differing wheel-raising mechanisms, one might have been capable of physically combining them.

For example, the Board states that "A person of ordinary skill in the art would recognize that Mulhern '420 does *not* prevent its arm from pivoting upward when it is *not* held in the near ground position."  [JA055, emphasis original]  But that is not motivation.  It is rationalization. But without a reasoned motivation to

lower the Goertzen pivot, the Board's reliance on the fact that it is possible to combine the features of both chairs only emphasizes the hindsight in its analysis and conclusion.

Goertzen could already climb curbs.  There was no finding that Mulhern's design, low pivot or not, could do it any better or provide any other benefit.  Thus, for the same reasons as discussed in connection with Hosino above – including the instability that would be engendered – there was no reason to change Goertzen's design to incorporate features from Mulhern that would merely duplicate a function it already had.

## B.    The Board's "Design Choice" Rationale for Obviousness is Wrong

The essential theory of obviousness of both Permobil and the Board is that lowering the Goertzen pivot would have been a "routine design choice . . . yielding predictable results."  [JA016, JA045-046].  Permobil's Dr. Richter admitted that his basic reasoning on obviousness – developed without awareness of the concept of hindsight – was that the vertical position of the pivot was a routine design choice.  [JA967-968 at 56:12-60:12]   In this theory, the secondary references are peripheral, relied on simply for the idea that placing an arm pivot – or in the case of Hosino, a bendable joint – in a relatively low position was known.

But a person of proper skill in this field would have recognized that the pivot location of Goertzen was not a simple routine choice.  To the contrary, it would

have been appreciated that the modification would sacrifice stability.  As admitted by Permobil's expert:  "Lowering the pivot of Goertzen, without compensating for that change, could result in instability."  [JA988 at 171:6-8]  *That* would have been the *actual* "predictable result" of an artisan who understood the dynamics of these systems.  Instability could not be said to provide motivation to make this change.

Dr. Richter's notion of "predictable results" of an allegedly simple "design choice," and the Board's reliance on it, are called into question by the fact that he did not originally recognize the instability problem:

- *Compare* Dr. Richter's testimony *before* being asked to address the counter declaration:

    > Q. But lowering the pivot in Goertzen really has no ramification on the stability of the wheelchair in terms of not tipping?
    > A. If done properly, you should be fine.  [JA966 at 28:6-20]

- with his testimony *after* considering the counter declaration:

    > Q. And so moving the pivot does have an effect on the stability of the Goertzen chair?
    > A. If not accounted for, yes."  [generally JA983-984 at  153:19-154:20]

    > A.  [A]s a designer, there is no way in the world I would drop a pivot, just because it has better obstacle climbing characteristics, without taking into account its effect on stability.  [generally JA 157:19-159:14]

43

Only in response to the counter declaration of Pride's expert did Dr. Richter admit that this could occur. His original declarations did not mention it. This belated appreciation of instability, and the need to rectify it if possible, belie his notion and the Board's decision that lowering the pivot was simple or routine.

The related concept of some "limited" – but unspecified – "number of design choices" variously proposed in the petitions likewise fails as a viable basis for the obviousness conclusion: Goertzen's as-is suspension, with the pivot location above the axis-to-axis line, is stable; Goertzen's suspension as Permobil and the Board would modify it is not. There are complex nuances in the design choice that a skilled artisan would have appreciated, even if Dr. Richter originally did not.[12]

*KSR* recognizes that some cases require deeper analysis than those in which a straight-forward substitution of one element for another can be made, but rather can be deceptively complex and therefore do not lend themselves to the "routine" thinking, involving allegedly limited choices, that the Board engaged in:

> Following these principles may be more difficult in other cases than it is here because the claimed subject matter may involve more than the simple substitution of one known element for another or the mere application of a known technique to a piece of prior art ready for the improvement. Often, it will be necessary for a court to look to interrelated teachings of multiple

---

[12] After his admission, Dr.Richter listed all the design criteria one would review in order to attempt a pivot lowering. [JA990-991 at 185:16-189:20]

patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

*KSR Int'l Co.  v. Teleflex Inc.*, 550 U.S. 398, 418 (2007).  This is one of those cases. Here, "the background knowledge possessed by a person having ordinary skill in the art" indicated that lowering the pivot of the primary reference was not a simple proposition, but would have engendered its own set of problems.

It is here that the Board's unduly low level of skill allowed it to see as "routine," design criteria that clearly are not.   In contrast, a true level of skill provides a "reference point that prevents [a judge, jury, or the Board] from using their own insight or, worse yet, hindsight, to gauge obviousness."  *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001).  The Board here lacked the proper reference point.

Consistent with the admission of Permobil's expert that he was unaware of the concept of hindsight [JA967 at 56:12-57:9], Dr. Richter also described his understanding of obviousness, as used in his conclusions, to be whether a claimed invention could be "replicated" from the prior art.   [JA972 at 96:3-10]  But implicit in "replication" from the prior art – as opposed to properly motivated original development – is use of the claimed invention as a blueprint.  That is the

45

essence of hindsight. *In re Dembiczak*, 175 F.3d 994, 999 (Fed.Cir. 1999). The Board's conclusions in reliance are equally tainted with hindsight.

### C.    The Additional Work Needed to Stabilize a Modified Goertzen Chair Would Have Been Seen by the Artisan as Not Worth the Effort

Affecting virtually every part of the obviousness analysis is the fact that simply lowering the pivot of the Goertzen chair makes the chair unstable. Although there seems no dispute on that point, the effect of this instability – the problems it engenders and the work necessary to remedy it – were not properly weighed in the Board's consideration of obviousness. The instability and the effort necessary to overcome it, together coupled with the fact that the modified Goertzen chair would be only marginally improved, if at all, prevent a proper legal conclusion of obviousness.

The active-suspension Goertzen chair already had greater obstacle-traversing capability than Hosino. Its curb-climbing ability was likewise at least as good as Mulhern's; there is no finding, nor even any assertion, that Mulhern's suspension provided any benefit over Goertzen.

The Court has already noted that there is no reason to combine references that provide only overlapping or duplicative function:

> In addition, both of these references independently accomplish similar functions, namely, draining fluids. Because each device independently operates effectively, a person having ordinary skill in the art, who was

46

merely seeking to create a better device to drain fluids from a wound, would have no reason to combine the features of both devices into a single device.

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012) (considering district court's legal conclusion and reversing its JMOL of obviousness).[13] Here, too, one seeking to create a better curb-climbing chair from Goertzen would have no reason to incorporate the lesser-functioning feature of Hosino, or the no-better feature of Mulhern.

The Board failed to consider the combined significance of this lack of additional benefit coupled with the extra effort, engendered by the instability, that would have been necessary to make the combination. The Board's failure contravenes the PTO's own guideline that counsels against making a combination or modification that "amount[s] to extra work and greater expense for no apparent reason." MPEP § 2143 (citing *In re Omeprazole Patent Litigation,* 536 F.3d 1361 (Fed. Cir. 2008)).

One skilled in this art would not have been motivated to undertake the modification at the heart of the Board's decision. The degree of extra work would have been seen as too high in view of the lack of any apparent return.

---

[13] There were additional bases for the reversal of the JMOL, but as to the references in question, the panel noted that "hindsight provides the only discernible reason to combine the prior art references." *Id.*

47

### III.    No Combination of References Provides a Wheelchair within Correctly Interpreted Claim 7

Even if there were motivation to lower the pivot on the primary reference, claim 7 of the 343 patent is separately patentable.   This claim adds the two limitations that "the mounting plate is substantially planar and is oriented perpendicular to the drive wheel axis."  The Board's view of "perpendicular" in the context of these limitations – finding elements that are plainly parallel to be "perpendicular" – is wrong; it is contrary to ordinary meaning, the specification, and grade-school geometry.  Under the correct interpretation, the holding of unpatentability of this claim cannot stand.  No reference shows a planar mounting plate that is "perpendicular," in the correct sense, to the drive wheel axis, so no combination of references could have provided a chair within claim 7.

### A.    The Board's Interpretation is an Unreasonable Attempt to Cover the Prior Art

The Board tortured the ordinary meaning of "perpendicular" in the claim to encompass a prior art element that is, instead, parallel.

The correct meaning of the limitations of claim 7 is clear from the specification. The orientation of the mounting plate to the drive axis is referenced only twice, in identical language:  "Mounting plate 56/56ʹ preferably is planar and oriented perpendicular to rotational axis C-DW of drive wheels 58/58ʹ." JA2599 at

48

8:27-29. Figure 3B below is representative of the figures associated with this excerpt.



Each mounting plate 56, having portions 57a and 57b, is substantially planar, and the plane defined by each plate is perpendicular to the drive wheel's rotational axis, shown in extension as line $A_{DW}$. The claim language is virtually identical to the specification language and describes this figure, which is representative of the sole depiction of this plate/axis relationship in the patent: "the mounting plate is substantially planar and is oriented perpendicular to drive wheel axis."[14]

The language of the specification and the corresponding figures are consistent with the common understanding, in geometry and otherwise, of a line perpendicular to a plane: From any perspective, the line extends directly away

---

[14] See also, JA2579-80 and JA2602 at 13:21-23.

from the plane and intersects the plane or it is extension at a right angle.  That is precisely what the figures show -- the drive wheel axis extends directly away from the plane defined by the planar plate and intersects it at a right angle.  That is the broadest *reasonable* interpretation of the claim phrase.  Another example of this relationship is a pencil upright on a table:  From any seat at the table, the longitudinal line of the candle (the "drive wheel axis") looks to extend at a right angle directly away from the plane of the flat surface of the table (the "planar mounting plate").  *That* is perpendicularity between a line and plane or between an axis and plate.  It is very basic geometry.[15]

The Board, however, reads "planar plate oriented perpendicular to the wheel axis" unreasonably broadly so as to shoehorn into its obviousness analysis the differently oriented mounting plate of the Goertzen reference.   Goertzen's Fig. 3 [JA228, in relevant part below] shows the plate (#308) that the Board asserts to be perpendicular to the drive axis (#311).   [JA051-052]

---

[15] http://www.mathsisfun.com/geometry/parallel-perpendicular-lines-planes.html



But as is evident, although the plate is planar, the wheel axis does not extend away from the plane of the plate surface. It does not – and would not – intersect the plate or the plane defined by the plate at all, let alone at a right angle. A plane that would not be intersected by a line in any extension is parallel to the line. That, too, is basic geometry. Plate 308 is *parallel* to drive axis 311, not perpendicular to it.

The Board's error arises from its fundamental misreading of the usage of "perpendicular" elsewhere in the 343 patent, where it refers to another wheelchair patent, U.S. 6,129,165 (Schaffner):

> [F]or conventional configurations having a motor that is perpendicular to the drive wheel axis (and requiring a right angle gearbox, which is not shown in the figures), the motor swings about the gearbox output shaft to impart motion to the front caster arm, as for example shown in U.S. Pat. No. 6,129,165.

51

[JA036-37 referring to 343 patent at 9:20-25]. The Board refers to Figure 9 of

Schaffner



FIG. 9

to conclude that, since the 343 patent uses "perpendicular" here to refer to the

orientation of Schaffner's motor housing 80 to axis 24, "perpendicular" in claim 7

is broad enough to cover orientations "*other than* the orientation of mounting plate

56." [JA036-037, emphasis added]  On this basis, the Board somehow holds that

the Goertzen plate is perpendicular to its wheel axis. [JA051-052]

The Board's reasoning is confusing.  Its conclusions are wrong on several

levels.

First, the housing 80 on which the Board relies is not planar, but instead is

an elongated cylinder and is therefore irrelevant to the claim, which is limited to a

"substantially planar" element.  The Board's excerpt and other portions of the

Schaffner patent demonstrate just how misplaced the Board's reliance is.

The excerpt from the 343 patent refers to Schaffner's motor *shaft* within the

housing, as being perpendicular to its wheel axis – as evidenced by the reference to

52

the need for a "right-angle gearbox."  Schaffner itself describes its motor shaft as forming a "right angle" with the wheel axis.  [JA192, at 17:1-5, 17:30-39] Although the longitudinal extent of the motor shaft (or the Board's referenced housing) may be perpendicular to the wheel axis, that relationship is of two *lines* perpendicular to each other.  This neither describes nor is relevant to the different concept of perpendicularity of a line (axis) to a *plane*.   Yet, that is the only concept of perpendicularity in the claim.

Second, and more fundamentally, the Board's assertion that "perpendicular" in claim 7 covers orientations "*other than* the orientation of mounting plate 56" ignores two significant, related facts:  The claim language itself refers specifically, and only, to the orientation of the "planar" mounting plate; *and* the sole analog in the specification of the claim's planar mounting plate *is* plate 56.  There is a one-to-one correspondence of the claim language and the specification description. The specification, including the related figures thus controls the interpretation. The use of the term "perpendicular" in a different part of the specification, referring to the relationship of different elements from a different patent, cannot override or expand the plain language of the claim, which describes a specific relationship of two other elements that are clearly, and distinctly, identified in the specification as corresponding to the claim language.

The salient points:

- Plate 56 is the only "plate" in the specification of the 343 patent to which the drive motor and front arm are connected, as required by independent claim 1;

- Plate 56 is shown and described in only one way[16] – the plane defined by the plate is "perpendicular" to the wheel axis – consistent with the common understanding of a plane "perpendicular" to a line (axis):   From any perspective, the line points directly away from the plane surface and intersects the plane at a right angle (*i.e.,* 90 degrees);

- The same language is used in claim 7 as in the specification.

Pride's is the only correct interpretation here.  *Phillips v. AWH Corp*., 415,d 1303, 1316 (Fed. Cir. 2005)("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.") [17]

In contrast, the Board's decision gives no meaning to the claim requirements that the plate be planar, and that the plate – and thus the plane defined by it – be "oriented perpendicular to the drive wheel axis."  If the claim can read on a parallel plate such as Goertzen's 308, there is virtually no plate orientation that it could not

---

[16] JA2571-72, JA2599 at 8:27-32, JA 2602 at 13:19-23

[17] Even under the "broadest reasonable" standard, the Board may not divorce its reading from the specification or from general claim construction principles that this Court has established.  *Microsoft Corp. v. Proxyconn, Inc.,*  No. 2014-1542, -1543, slip op. at 6-7 (Fed. Cir. June 16, 2015) (reversing Board determination of obviousness based on "unreasonably broad construction" that incorrectly encompassed prior art).

cover.  That is reversible error.  *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LLP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010) ("Claims must be interpreted with an eye toward giving effect to all terms.")

Indeed, the Board essentially gave claim 7 no construction at all, except to state that it means "other than" what the express language of the claim itself says.  That cannot be right.

Permobil's Petition argued its own distorted construction:  "'Oriented perpendicular to the drive wheel axis' [means] *oriented such that the longest side of the plate is positioned at an approximately 90 degree angle to the drive wheel axis*."  Corrected Petition for IPR of the 343 patent, July 17, 2013, at 54 (emphasis added).  Permobil advanced this construction to capture the clearly parallel Goertzen plate.  Although the Board did not directly adopt this position, it seems to have influenced the Board's application of the claim language the Goertzen plate.

Permobil's definition and whatever the Board took from it are contrary to elementary geometry.  Sticking with the pencil/table analogy, under Permobil's definition of "perpendicular," the pencil would be "perpendicular" to the planar table even if it was lying flat across the table, so long as the pencil was oriented at 90° to one of the sides or edges.  That is not the common understanding of a line perpendicular to a plane or a planar element.

That view is wrong for a further, more fundamental, reason: A pencil lying flat on a table, whether or not perpendicular to a table edge, is actually *parallel* to the table surface. That is the same orientation that the Goertzen wheel axis has to the plane of the Goerzen plate. In basic geometry, parallel is the antithesis of perpendicular. An interpretation reading "perpendicular" on parallel is nonsense. *Becton, Dickinson,* 616 F.3d at 1254 ("Construction that renders asserted claims facially nonsensical cannot be correct."); See *Bd. of Regents v. BENQ Am. Corp.*, 533 F.3d 1362, 1370 (Fed.Cir. 2008) (refusing to adopt construction that "would effect nonsensical result").

### B.    Without Its Unsupportable Interpretation, the Board's Combination of References Does Not Create a Structure within the Claim

There is no reference of record in which a substantially planar mounting plate associated with a motor and suspension arm is oriented so that the planar surface is perpendicular – as correctly read – to the drive-wheel axis.  Thus, the combinations of prior art advanced by the Board do not result in a chair within claim 7 as properly interpreted.

The Board's attempt to cover the Goertzen structure is hindsight driven and result oriented. It should be rejected. Whatever the Board may have meant in its analogy, the fact is that Goertzen's plate/axis orientation is nothing like what is in the 343 patent and does not comport with the common understanding of a plane

perpendicular to a line (axis).  It does not meet the correctly interpreted claim.

Accordingly, no combination of any secondary reference with Goertzen, even if

properly motivated, would provide the invention of claim 7 because it would not

provide all the elements of the claim.[18]

Without *each* of the elements of claim 7 shown in properly combinable prior

art references, there is no obviousness.  In *K/S HIMPP v. Hear-Wear Tech. LLC,*

751 F.3d 1362, 1365-66 (Fed. Cir. 2014), an appeal from an inter partes

reexamination, the Court affirmed a Board decision of no obviousness where an

asserted combination did not result in a device within the claims.  The device of

the combination lacked one structural element of the claims.  The issue was

whether that element could be gleaned from "common sense" or "general

knowledge" in the art.  The Court held that the existence of a structural limitation

in the art is a core fact and that documentary evidence of the element was required.

Without it, there is no substantial evidence support:  "[G]eneral conclusions about

what is 'basic knowledge' or 'common sense' [cannot be accepted] as a

replacement for documentary evidence for core factual findings."  *Id*. at 1366.

---

[18] There is no assertion or finding in the record that Schaffner, Mulhern, or any
other record reference discloses a mounting plate that meets the limitations of
claim 7.

Here, too, there is no evidence, documentary or otherwise, that a mounting plate of the structure, structural associations, and orientation of correctly interpreted claim 7 was used in the wheelchair art.   As in *Hear-Wear*, the posited combination does not create a device within the properly interpreted claim. The Board's holding that claim 7 is unpatentable should be reversed.

## CONCLUSION

There was no proper motivation to combine the references asserted to render the claims of the Pride patents obvious, and the Board's conclusions in these IPRs failed to consider the combined significance of unintended adverse consequence of the asserted modification, additional effort to remedy it, and the fact that the resulting modification provides no additional functionality or capability to the primary reference. Claim 7 of the 343 patent is separately patentable. The Board erred with an overbroad claim construction; under the correct interpretation, no combination of the asserted art would provide a wheelchair within claim 7. The Board's conclusions of obviousness should be reversed as to all claims of the Pride patents, and in particular as to claim 7 of the 343 patent.

Dated: June 25, 2015

/s/ Gary H. Levin
Gary H. Levin
Harold H. Fullmer
Daniel J. Goettle
BAKER & HOSTETLER LLP
Cira Centre, 12th Floor
2929 Arch Street
Philadelphia, PA  19104
(215) 568-3100

**ADDENDUM**

Trials@uspto.gov                                          Paper 53
571-272-7822                              Entered: December 31, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

PERMOBIL, INC.,
Petitioner,

v.

PRIDE MOBILITY PRODUCTS CORPORATION,
Patent Owner.

————————

Case IPR2013-00407
Patent 8,408,598 B2

————————

Before BRIAN J. McNAMARA, JAMES B. ARPIN, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

CLEMENTS, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

# I.   INTRODUCTION

Permobil Inc. ("Petitioner") filed a Petition requesting *inter partes* review of claims 1–13 (the "challenged claims") of U.S. Patent No. 8,408,598 B2 (Ex. 1001, "the '598 patent").  Paper 8 ("Pet.").  Pride Mobility Products Corporation ("Patent Owner") filed a Preliminary Response.  Paper 12 ("Prelim. Resp.").  On January 2, 2014, we granted an *inter partes* review for all challenged claims on certain grounds of unpatentability alleged in the Petition.  Paper 13 ("Dec. to Inst.").

After institution of trial, Patent Owner filed a Patent Owner Response (Paper 23, "PO Resp.") to which Petitioner filed a Reply (Paper 26[1]).

Oral hearing was held on July 31, 2014.[2]

The Board has jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has shown, by a preponderance of the evidence, that claims 1–13 of the '598 patent are unpatentable.

## A.   Related Proceedings

Petitioner indicates that the '598 patent is asserted against Petitioner in *Pride Mobility Products Corp. v. Permobil, Inc.*, Case No. 2:13-cv-01999-LDD (E.D. Pa.).  Pet. 1.  The parent patent of the '598 patent, U.S. Patent No. 8,181,992 B2, is the subject of an *inter partes* reexamination captioned Control No. 95/002,355; a district court litigation captioned *Pride*

---

[1] We cite the public version of Petitioner's Reply because we do not rely on any of the confidential information in the version filed as "Parties and Board only" (Paper 27).

[2] A transcript of the oral hearing is included in the record as Paper 52 ("Tr.").

2

IPR2013-00407
Patent 8,408,598 B2

*Mobility Products Corp. v. Permobil, Inc.*, Case No. 2:12-cv-03931 (E.D.

Pa.) (*id.*); and an *ex parte* reexamination captioned Control No. 90/013,376

(Paper 51). Petitioner also has filed another petition for *inter partes* review,

IPR2013-00411, of claims 1–10 of a related patent, U.S. Patent No.

8,408,343 B2.

### B. The '598 Patent

The '598 patent relates to active anti-tip systems for powered

vehicles, such as powered wheelchairs. Ex. 1001, col. 1, ll. 22–23. More

particularly, the '598 patent relates to a linkage arrangement for providing

enhanced curb-climbing capability and/or pitch stability. *Id.* at col. 1, ll. 23–

25. Anti-tip systems enhance stability of a wheelchair about its pitch axis

and, in some of the more sophisticated anti-tip designs, improve the obstacle

or curb-climbing ability of the wheelchair. *Id.* at col. 1, ll. 38–41. Both

passive and active anti-tip systems were known in the art. *Id.* at col. 1, l. 47–

col. 2, l. 31. Active anti-tip systems offered significant enhancements over

passive anti-tip systems. *Id.* at col. 2, ll. 32–34. Nevertheless, the one-piece

construction of active anti-tip systems required that both the drive-train

assembly and the anti-tip wheel inscribe the same angle, which limited the

vertical displacement of the anti-tip wheel. *Id.* at col. 2, ll. 34–41. The

location of the pivot axis above the axis of the anti-tip wheel caused the anti-

tip wheel to move downwardly when impacting an obstacle horizontally in

line with the anti-tip wheel's rotational axis, instead of upwardly, as desired

for climbing curbs. *Id.* at col. 2, ll. 42–51.

IPR2013-00407
Patent 8,408,598 B2

To address these issues, a linkage arrangement for an active anti-tip system within powered wheelchair 2 is disclosed in the '598 patent. *Id.* at col. 2, ll. 55–56. Illustrative Figures 6 and 7 are reproduced below:



FIG. 6          FIG. 7

Figures 6 and 7 depict an embodiment of the linkage arrangement in a resting position (Figure 6) and reacting in response to motor torque or acceleration of the vehicle (Figure 7). *Id.* at Figs. 6, 7, col. 3, ll. 38–44. The Specification states that, in Figure 6, linkage arrangement 120 employs suspension arm 124 having pivot point $124_A$, which is positioned spatially at or below rotational axis $116_A$ of anti-tip caster wheel 116. *Id.* at col. 6, ll. 33–36. Anti-tip wheel 116 is a caster-type wheel and, as shown, is usually in contact with the ground. *Id.* at col. 6, ll. 40–42. Links 130 and 134 are connected operatively to drive-train assembly 7 and suspension arm 124. *Id.* at col. 6, ll. 36–37. First link 130 is connected pivotably to drive-train assembly 7 by a substantially vertical projection on drive-train mounting plate 58. *Id.* at col. 6, l. 66–col. 7, l. 1. Second link 134 is mounted pivotally to suspension arm 124, with bell-crank 60 operatively positioned therebetween. *Id.* at col. 6, ll. 37–40. Bell-crank 60 is mounted pivotally about pivot 78 on main structural frame 3. *Id.* at col. 6, ll. 49–51.

4

As depicted in Figure 7, bell-crank 60 redirects horizontal linear motion of drive-train assembly 7 to create a vertical motion of anti-tip caster wheel 116. *Id.* at col. 7, ll. 11–13. Bell-crank 60 increases the mechanical advantage for a given applied torque, thereby enabling a relatively close positioning of pivot connection 84 to pivot 124$_A$, while still resulting in significant motion by suspension arm 124. *Id.* at col. 7, ll. 13–17. As a result, anti-tip caster wheel 116 may traverse a larger vertical distance. *Id.* at col. 7, ll. 17–19. Furthermore, upon deceleration, drive-train assembly 7 lifts and creates a force, through linkage 120, that directs anti-tip wheel 116 into the ground and restricts the ability of suspension 88 to compress. *Id.* at col. 7, ll. 32–35. This arrangement limits the pitch of wheelchair 2. *Id.* at col. 7, ll. 35–36.

### C. *Illustrative Claim*

Of the challenged claims, claims 1 and 7 are independent. Claims 2–6 depend, directly or indirectly, from claim 1; and claims 8–13 depend, directly or indirectly, from claim 7. Claim 1 is illustrative and is reproduced below:

> 1.    A wheelchair comprising:
>
>    a frame;
>
>    a pair of drive wheels defining a drive wheel axis;
>
>    a drive assembly operatively coupled to at least one drive wheel of the pair of drive wheels, the drive assembly configured to rotate the at least one drive wheel about the drive wheel axis to thereby cause the wheelchair to move relative to a surface that defines a ground plane;
>
>    an arm pivotably mounted to the frame at an arm pivot axis; and

IPR2013-00407
Patent 8,408,598 B2

a caster wheel coupled to the arm, the caster wheel defining a rotational axis about which the caster wheel rotates,

wherein the vertical position of the arm pivot axis with respect to the ground plane when the caster wheel and the drive wheel are in contact with the surface is spaced from and positioned relatively below a straight line drawn between the drive wheel axis and the rotational axis of the caster wheel, and

wherein the arm is operatively coupled to the drive assembly such that the arm is configured to pivot about the arm pivot axis in response to torque created by rotation of the at least one drive wheel by the drive assembly so as to cause a responsive vertical movement of the caster wheel.

### D. Prior Art Supporting the Instituted Challenges

The following prior art references were asserted in the instituted grounds:

| | | | |
|---|---|---|---|
| Schaffner | US 6,129,165 | Oct. 10, 2000 | Ex. 1002 |
| Goertzen | WO 02/34190 A2 | May 2, 2002 | Ex. 1003 |
| Hosino | US 6,454,286 B1 | Sept. 24, 2002 | Ex. 1004 |

### E. The Instituted Challenges of Unpatentability

The following table summarizes the challenges to patentability on which we instituted *inter partes* review:

| Reference[s] | Basis | Claims challenged |
|---|---|---|
| Goertzen & Hosino | § 103 | 1, 4–8, and 11–13 |
| Goertzen, Hosino, & Schaffner | § 103 | 2, 3, 9, and 10 |

6

IPR2013-00407
Patent 8,408,598 B2

## II.   ANALYSIS

### A.  Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).  Also, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re Translogic Tech., Inc*., 504 F.3d 1249, 1257 (Fed. Cir. 2007).

Petitioner argues that "pivotably mounted to the frame" means "mounted to the frame such that the arm is capable of rotating about a pivot axis."  Pet. 6–7 (citing Ex. 1001, col. 7, ll. 47–48 ("A suspension arm 224 is pivotally mounted to the frame 3 at pivot 224$_A$.")).  Patent Owner contends that Petitioner's proposed construction "is vague because, when read in context of the rest of the claim language, it is unclear whether '*a* pivot axis' in the construction is the recited '*arm* pivot axis' or some different axis."  Prelim. Resp. 18.  We are not persuaded by Patent Owner's argument because each of claims 1 and 7 specifies that the arm is pivotably mounted to the frame "at an arm pivot axis."  However, we also are not persuaded by Petitioner's argument that the patentee intended to give "pivotably mounted to the frame" a meaning other than its plain and ordinary meaning.  Apart from the claims, the '598 patent does not use the term "pivotably mounted," and the portion of the '598 patent cited by Petitioner describes a suspension arm as "*pivotally* mounted," not "*pivotably* mounted."  Ex. 1001, col. 7, ll.

7

47–48.  Thus, we conclude that "pivotably mounted to the frame" does not require express construction.

## B.  The Level of Ordinary Skill in the Art

"The person of ordinary skill in the art is a hypothetical person who is presumed to know the relevant prior art."  *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).  This person is of ordinary creativity, not merely an automaton, and is capable of combining teachings of the prior art.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420–21 (2007).  The prior art itself can reflect the appropriate level of skill in the art.  *Okajima v. Bourdeau*, 261 F.3d. 1350, 1355 (Fed. Cir. 2001).  In addition, judges on the Board are "persons of scientific competence in the fields in which they work," and our findings are "informed by [our] scientific knowledge, as to the meaning of prior art references to persons of ordinary skill in the art."  *In re Berg*, 320 F.3d 1310, 1315 (Fed. Cir. 2003).

In the Petition, Petitioner does not set forth its contention on the level of the ordinary skill in the art.  Patent Owner proffers the testimony contained in the Declaration of Mr. Neil Curran ("Curran Declaration") on the determination of the level of skill in the art appropriate for the '598 patent.  PO Resp. 28–31 (citing Ex. 2012 (Curran Decl.) ¶¶ 43–47).  That testimony concludes that a person of ordinary skill in the art relevant to the '598 patent would have three years of experience designing, developing, and testing curb-climbing systems for power wheelchairs.  PO Resp. 28.

Petitioner disputes Mr. Curran's opinion regarding the training and experience that one of ordinary skill in the art relevant to the '598 patent would have had.  Pet. Reply 10–12.  Petitioner asserts that a person of

ordinary skill in the art would have had an undergraduate degree in mechanical engineering and (1) if (s)he had pursued post-graduate studies, at least one year of experience designing, developing, and testing wheelchairs; or (2) if she had not pursued post-graduate studies, at least three years of experience designing, developing, and testing power wheelchairs. *Id.* at 10–11.

We are not persuaded that the level of ordinary skill in the art required at least three years of experience specific to curb-climbing systems, as Patent Owner contends. The problems identified by Patent Owner and the skills required—e.g., "analysis of the various forces and moments," "understanding of moment arms," "understand[ing] the effects on moments and forces," (PO Resp. 29–30)—are within the ordinary skill of a person with an undergraduate degree in mechanical engineering. Moreover, we note that the named inventor of the '598 patent—James Mulhern—testified, in a related reexamination, that a person of ordinary skill in the art would have had only "a B.S. in mechanical engineering or equivalent, *or* at least 3 years of experience in the field of designing powered wheelchairs for personal mobility." Ex. 1028 ¶ 10 (emphasis added).

Based on our review of the technology claimed in the '598 patent and the description of the anti-tip systems for powered vehicles set forth in the specification, we determine that a person of ordinary skill in the art would have had either (1) an undergraduate degree in mechanical engineering or an equivalent degree; or (2) at least three years of experience designing powered wheelchairs for personal mobility.

IPR2013-00407
Patent 8,408,598 B2

*C. Claims 1, 4–8, and 11–13 – Obviousness over Goertzen & Hosino*

Petitioner argues that claims 1, 4–8, and 11–13 are unpatentable under 35 U.S.C. § 103(a) as obvious over Goertzen and Hosino.  Pet. 34–39, 43–60.  In support of this ground of unpatentability, Petitioner provides detailed explanations as to how each claim limitation is met by Goertzen and Hosino, and relies upon the Declaration of Dr. W. Mark Richter (Ex. 1008).  *Id.*

Patent Owner counters that (1) Petitioner cannot meet its burden because it failed to set forth the level of skill in the art; (2) Petitioner does not articulate any reason why a person of ordinary skill in the art would have combined Goertzen with Hosino; (3) choosing a pivot location below the axis-to-axis line would not have been a routine design choice; and (4) objective considerations demonstrate the nonobviousness of the claims of the '598 patent.  PO Resp. 7–57.  As support, Patent Owner proffers the Curran Declaration.  *Id.* (citing Ex. 2012).

Upon consideration of the parties' contentions and supporting evidence, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1, 4–8, and 11–13 are obvious over the combination of Goertzen and Hosino.

*Goertzen (Exhibit 1003)*

Goertzen describes a curb-climbing wheelchair having pivotal arm assemblies including pivot arms.  Ex. 1003, Abstract.  The pivotal arm assemblies include at least one front caster and have the ability to rotate or pivot.  *Id.*  The pivot arms rotate or pivot in response to moments generated by accelerating or decelerating the wheelchair, thereby raising or lowering the front casters through the rotational movement of the pivot arms.  *Id.*  By

10

IPR2013-00407
Patent 8,408,598 B2

raising or lowering the front casters, curb-like obstacles may be traversed in a low-impact manner. *Id.* Figure 3 of Goertzen is reproduced below:



Figure 3 depicts suspension and drive components of wheelchair 100. *Id.* at 7, ll. 3–26, Fig. 3. As depicted in Figure 3, wheelchair 100 comprises frame 142, a pair of drive wheels 102 and 104, drive motor 136 coupled to pivot arm 132 through gearbox assembly 309 and mounting plate 308, drive motor 138 coupled to pivot arm 134 through a gearbox assembly and mounting plate, and front casters 106 and 108. *Id.* at 6, ll. 3–15, 7, ll. 3–26, Fig. 3.

Figures 5A and 5B of Goertzen are reproduced below:



11

Figures 5A and 5B depict the curb-climbing capability of wheelchair 100. As depicted in Figure 5A, wheelchair 100 approaches curb 502 of approximately two to four inches in height. *Id.* at 10, ll. 5–6. As depicted in Figure 5B, drive motors 136 and 138 are torqued, such as by the occupant directing the wheelchair to accelerate, to cause pivot arms 132 and 134 to pivot about pin 330 and to raise front casters 106 and 108 off the ground. *Id.* at 10, ll. 11–20.

### *Hosino (Exhibit 1004)*

Hosino describes a traveling device, such as an electric-powered wheelchair, in which each wheel moves in conformity with uneven ground to allow comfortable driving thereon. Ex. 1004, col. 1, ll. 51–55. The traveling device comprises a truck member, acting as a platform and having a loop frame, a pair of front and rear casters, and a pair of left and right driving wheels. *Id.* at col. 1, ll. 57–62. The loop frame consists of a pair of side frame parts, each side frame part having a front section and a rear section divided by a bendable portion at which the side frame part is able to bend upwards and downwards. *Id.* at col. 1, ll. 63–67. Each bendable portion is located lower than a rotation axis of the driving wheel and as high as a rotation center of the front caster, such that the casters are able to ride over a projection in uneven ground. *Id.* at col. 2, ll. 36–44. Figure 1 of Hosino is reproduced below:

IPR2013-00407
Patent 8,408,598 B2



Figure 1 depicts a perspective view of the traveling device according to a first embodiment. *Id.* at Fig. 1. As depicted in Figure 1, loop frame 2 consists of front half-frame 2a and rear half-frame 2b. Front half-frame 2a has a pair of rear-end portions connected by a pivot to front-end portions of rear half-frame 2b to form bendable portion 5. *Id.* at col. 3, l. 64–col. 4, l. 5.

Figure 9 of Hosino is reproduced below:



Figure 9 depicts the action of the traveling device when front caster 3a rides over projection 18 in uneven ground. *Id.* at Fig. 9. This structure facilitates travel over uneven ground because bendable portion 5 is located in a relatively low position. *Id.* at col. 4, ll. 13–15. In a preferred embodiment,

13

IPR2013-00407
Patent 8,408,598 B2

bending portion 5 is positioned as high as the center of the front caster. *Id.* at col. 4, ll. 18–23.

Figure 11 is reproduced below:



Figure 11 is a partially elongated view for explaining an action of the front caster. *Id* at Fig. 11. As shown in Figure 11 of Hosino, when point $O_1$ of bendable portion 5 is as high as point $O_2$, front caster 3a moves upward and rearward, which enables smoother travel over uneven ground, e.g., projection 18. *Id.* at col. 7, ll. 6–9.

### *Analysis of Petitioner's Contentions*

Petitioner has demonstrated, by a preponderance of the evidence, that claims 1, 4–8, and 11–13 are obvious over the combination of Goertzen and Hosino.

Based on the record before us, we find that the following limitations of independent claims 1 and 7 are met by the following elements of Goertzen:

| *Independent Claim 1* | *Goertzen* |
| --- | --- |
| a frame | frame 142 |
| a pair of drive wheels | drive wheels 102 and 104 |

14

| a drive assembly | drive motor 136 or 138 |
| an arm | pivot arm 132 or 134 |
| a caster wheel | front caster 106 or 108 |

In addition, claim 1 recites:

> wherein the arm is operatively coupled to the drive assembly such that the arm is configured to pivot about the arm pivot axis in response to torque created by rotation of the at least one drive wheel by the drive assembly so as to cause a responsive vertical movement of the caster wheel.

Goertzen discloses that, "from preferably a standstill position, drive motors 136 and 138 are 'torqued' so as to cause pivot arms 132 and 134 to pivot about, for example, pin or bolt 330 and raise front casters 106 and 108 off the ground." Ex. 1003, 10, ll. 11–22, Fig. 5B.

Claim 7 similarly recites:

> wherein the arm is operatively coupled to the drive assembly such that (i) the arm is configured to pivot about the arm pivot axis in response to torque created by rotation of the at least one drive wheel by the drive, and (ii) the arm is configured to pivot about the arm pivot axis in response to braking.

As discussed above, Goertzen discloses that pivot arms 132 and 134 are configured to pivot about pin or bolt 330 in response to torque from drive motors 136 and 138. *Id.* at 10, ll. 11–22, Fig. 5B. Goertzen further discloses that pivot arm 132 is configured to pivot about the arm pivot axis in response to braking. *Id.* at 9, ll. 9–16, Fig. 4C.

Petitioner acknowledges that Goertzen does not disclose, as recited in claims 1 and 7, that:

> the vertical position of the arm pivot axis with respect to the ground plane when the caster wheel and the drive wheel are in contact with the surface is spaced from and positioned

15

IPR2013-00407
Patent 8,408,598 B2

relatively below a straight line drawn between the drive wheel axis and the rotational axis of the caster wheel.

Pet. 39. Petitioner's Declarant, Dr. Richter, concludes, however, that:

> It would have been obvious for one of ordinary skill in the art to position the pivot axis of the front arm in the Goertzen wheelchair below a line connecting the front wheel axis and the drive wheel axis, as is taught in Hosino, Mulhern '420, and Harakawa. A person of skill in the art would recognize that there are a limited number of design choices for the vertical position of the arm pivot axis – above the line, at the line, or below the line – and choosing one of these three options would be a routine design choice to a person of ordinary skill in the art. Doing so would be nothing more than a combination of known elements used for their known purpose and yielding predictable results.

Ex. 1008 ¶ 54. We find that there is sufficient evidence supporting the reasoning of the above-quoted analysis of Dr. Richter. *See* Ex. 1008 ¶¶ 52–54, 65.

### *Dr. Richter's Qualifications to Opine on the Reason to Combine*

Patent Owner contends that the reason to combine articulated by Dr. Richter is insufficient because (1) Dr. Richter is not a skilled artisan; (2) Dr. Richter misunderstands the law of obviousness; and (3) Dr. Richter's testimony should be disregarded because he did not articulate whether and how a person of ordinary skill in the art would compensate for the effect on stability of the proposed modification to Goertzen. PO Resp. 11–26.

We are not persuaded by Patent Owner's argument that Dr. Richter is not a person of ordinary skill in the art because, as discussed above, we do not agree that such a person would have to have had three years of experience specific to curb-climbing systems. Dr. Richter has a B.S., M.S.,

16

and Ph.D. in mechanical engineering, and has been involved in the development of wheelchairs, including power wheelchairs, since 1995. Ex. 1008 ¶¶ 2–9. Accordingly, we determine that Dr. Richter is, at least, a person of ordinary skill in the art, and, therefore, is qualified to testify from the perspective of one of ordinary skill in the relevant art at the time of the invention.

We also are not persuaded by Patent Owner's argument that Dr. Richter's testimony cannot be accepted because he "has never heard of 'hindsight,'" and misunderstands obviousness. PO Resp. 14–16. Dr. Richter's understanding of the law of obviousness is not determinative. We rely on Dr. Richter's testimony as to the facts of what a person of ordinary skill in the art would have known and understood at the time of the claimed invention, but not as to the ultimate legal conclusion of obviousness.

Finally, Patent Owner argues that Dr. Richter's testimony should not be considered because he did not, in his Declarations, address the effect on stability of lowering the pivot. PO Resp. 16–19. The deposition testimony, however, does not support the notion that Dr. Richter ignored stability. Dr. Richter testified that lowering the pivot in Goertzen is safe only "[i]f done properly." PO Resp. 19 (quoting Ex. 2004, 27:6–28:20); *see also* Ex. 1015, 28:21–30:12 (testifying that "[i]*f done properly*, [lowering the pivot] should have no – no adverse effect on [tipping over]" (emphasis added)). To the extent there was any doubt, Dr. Richter later testified that "there is no way in the world I would drop a pivot just because it has better obstacle climbing characteristics without taking into account its effect on stability." Ex. 2004, 158:15–19. Accordingly, we do not agree with Patent Owner that Dr.

Richter did not recognize initially the effect on stability of lowering the pivot of Goertzen.

Patent Owner also faults Dr. Richter for not analyzing declines or deceleration, or doing any of the engineering that, according to Dr. Richter, would be necessary to compensate for the reduced stability caused by a lower pivot. PO Resp. 19–24. The question before us, however, is not whether Dr. Richter did the engineering necessary to combine the prior art into a functional prototype, but whether doing so would have been within the ability of a person of ordinary skill in the art at the time of the claimed invention. In that regard, we credit Dr. Richter's testimony that a person of ordinary skill in the art would have known how to change various other parameters in order to achieve a stable version of the claimed invention. Ex. 2004, 185:23–186:14. Patent Owner asserts that the proposed modification is anything but routine (PO Resp. 24–26), but does not explain why such calculations would not have been within the ability of a person of ordinary skill in the art.

For the foregoing reasons, we are persuaded Petitioner has articulated sufficiently a reason with rational underpinnings for combining the teachings of Goertzen and Hosino to achieve the wheelchair recited in the challenged claims.

### *Whether a POSITA Could Compensate for Reduced Stability*

Patent Owner contends that a person of ordinary skill in the art would not have considered moving Goertzen's pivot below the axis-to-axis line to be a routine design choice because doing so would reduce stability. PO Resp. 27, 41. As support, Patent Owner analyzes a hypothetical version of

IPR2013-00407
Patent 8,408,598 B2

Goertzen in which the pivot has been lowered, and finds that the hypothetical chair is unstable because it is more prone to tip forward when descending a curb and when decelerating on a decline.  PO Resp. 41–50. Compensating for this decreased stability, according to Patent Owner, "would be extremely difficult, if not impossible."  PO Resp. 50 (citing Ex. 2012 (Curran Decl.) ¶ 121).

Petitioner counters that (1) Mr. Curran's analysis is based improperly upon the patent drawings; (2) a person of ordinary skill in the art would have known to make routine adjustments to compensate for the reduction in stability caused by lowering the pivot; and (3) Goertzen suggests several such adjustments.  Pet. Reply 2–9.

We are persuaded that a person of ordinary skill in the art at the time of the claimed invention would have known how to compensate for the reduction in stability caused by lowering the pivot.  As Petitioner points out, Goertzen teaches three design options for increasing stability.  Pet. Reply 7–9.  Patent Owner's expert, Mr. Curran, addresses only two of these three options.  Ex. 2012 ¶¶ 118–121.  Moreover, Petitioner's Declarant, Dr. Richter, testifies as to other ways in which a person of ordinary skill in the art would have known to compensate for the reduction in stability caused by lowering the pivot.  Ex. 1015, 182:6–190:20.  Mr. Curran does not explain adequately why those techniques would not have been known to a person of ordinary skill in the art.

For the foregoing reasons, we find that Petitioner has shown that a person of ordinary skill in the art would have known how to compensate for the reduction in stability caused by lowering the pivot of Goertzen.

19

IPR2013-00407
Patent 8,408,598 B2

*Physical combinability of Goertzen and Hosino*

Patent Owner argues that a person of ordinary skill in the art would not have looked to Hosino to modify the teachings of Goertzen because (1) the size of the caster wheels in Goertzen already would be higher than the obstacles at issue in Hosino; (2) Goertzen is directed to curb-climbing, whereas Hosino is directed to keeping its caster on the ground at all times for stability; and (3) Hosino does not include an arm that is pivotably mounted to the frame.  PO Resp. 51–53.

Petitioner counters that (1) physical combinability of prior art references is irrelevant; and (2) the claims of the '598 patent are silent as to obstacle size and caster wheel size.  Pet. Reply 4–5, 9.

We are not persuaded by Patent Owner's argument that a person of ordinary skill in the art would not look to Hosino to modify the teachings of Goertzen due to the physical differences and the different uses for the respective chairs.  The principle taught in Hosino—that low pivot point enables a front caster wheel to move "rear upward" and thereby more easily rise up and overcome the obstacle—applies equally to Goertzen, regardless of the differences in front caster wheel size, and nature of the obstacle being overcome.

For the foregoing reasons, we find that Petitioner has shown adequately that a person of ordinary skill in the art would have looked to Hosino to modify the teachings of Goertzen.

*Secondary Considerations of Nonobviousness*

Patent Owner asserts that Invacare's TDX SP and TDX SI, Sunrise Medical's Pulse, and Petitioner's M-Series wheelchairs are copies of the

20

product of the '598 patent (its Q6 Series wheelchair). PO Resp. 53–55. To support its allegations, Patent Owner submits a Declaration of Mr. Scott Meuser (Ex. 2015), its chairman and CEO, and relies upon an infringement analysis by Mr. Curran (Ex. 2012 ¶¶ 134–136). Petitioner contends that Patent Owner did not provide sufficient evidence of copying—particularly "evidence of actual efforts to replicate a specific product"—because Mr. Curran merely assumed copying by Petitioner. Pet. Reply 12–14. We agree. None of the evidence submitted by Patent Owner demonstrates that Invacare, Sunrise Medical, or Petitioner was aware of the '598 patent prior to developing its product, or that Invacare, Sunrise Medical, or Petitioner developed its product by copying the '598 patent.

Patent Owner also asserts commercial success because (1) Patent Owner's estimated share of the market increased following the introduction of the product of the '598 patent (its Q6 Series wheelchair); and (2) sales of the Q6 series outpaced sales of Patent Owner's previous (high-pivot) product. PO Resp. 56–57. Petitioner contends that Patent Owner provides insufficient evidence of a nexus between the claimed invention's low front-arm pivot and its purported commercial success. Pet. Reply 14–15. We agree that Patent Owner does not provide persuasive evidence that the company-wide increase in market share is attributable to the patented feature of the Q6 Series wheelchair. Patent Owner also does not provide persuasive evidence that the commercial success of the Q6 Series wheelchairs was attributable to the patented invention. The evidence shows only that the Q6 Series wheelchairs outsold the Jazzy series wheelchairs from 2005 onward. Ex. 2015 ¶¶ 38–39. The facts that the Q600 outsold the Jazzy 1121 from

IPR2013-00407
Patent 8,408,598 B2

2005 onward, and that the Q6000 outsold the Jazzy 1122, 1400, and 1402 combined from 2006 onward, do not establish sufficiently that customers were buying the Q600 and Q6000 because of their low-pivot.

*Conclusion*

For the foregoing reasons, we conclude that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1, 4–8, and 11–13 are unpatentable under 35 U.S.C. § 103(a) as obvious over Goertzen and Hosino.

*D. Claims 2, 3, 9, and 10 –*
*Obviousness over Goertzen, Hosino, and Schaffner*

Petitioner argues that claims 2, 3, 9, and 10 are unpatentable under 35 U.S.C. § 103(a) as obvious over Goertzen, Hosino, and Schaffner. Pet. 47–52. In support of this ground of unpatentability, Petitioner provides detailed explanations as to how each claim limitation is met by Goertzen, Hosino, and Schaffner and relies upon the Declaration of Dr. Richter. *Id.*

Patent Owner does not argue the patentability of claims 2, 3, 9, and 10 separately.

*Schaffner (Exhibit 1002)*

Schaffner describes a curb-climbing front wheel drive powered wheelchair with a frame, a seat connected to the frame, and a pair of drive wheels connected to the frame. Ex. 1002, Abstract. The powered wheelchair has anti-tip wheels forward of the drive wheels rigidly connected to the motors for pivotal movement. *Id.* Figure 27 of Schaffner is reproduced below:



*FIG. 27*

Figure 27 depicts a side view of a suspension apparatus for the powered wheelchair's drive wheels and forward anti-tip wheels. *Id.* at Fig. 27. As depicted in Figure 27, drive motor housing 80 is connected pivotally to frame 12 at pivotal connection 90. *Id.* at col. 26, ll. 47–52. Spindle 228 pivots about connection point 230. *Id.* at col. 25, ll. 63–67.

Movement of motor 76—especially pivotal movement of housing 80 relative to frame 12—indirectly controls the action of anti-tip wheels 42. *Id.* at col. 26, ll. 53–56. Pivoting beam 270 is connected pivotally to a forward, vertically-extending member 66 of frame 12 via pivotal connection 276. *Id.* at col. 26, ll. 56–58. Vertical link 268 is connected pivotally to a forward end of pivoting beam 270 at pivot connection 278. *Id.* at col. 26, ll. 59–61. The lower end of vertical link 268 is connected pivotally to spindle 238 via a pivotal connection that is not numbered in Figure 27. *Id.* at col. 26, ll. 61–63. At the opposite, rearward end of pivoting beam 270, intermediate link 274 is connected pivotally thereto via connection 280. *Id.* at col. 26, ll. 64–66. At the other end of intermediate link 274, pivotal connection 282 connects intermediate link 274 and motor link 272, which preferably is connected fixedly to housing 80 of motor 76 and transmission 78. *Id.* at col. 26, l. 66–col. 27, l. 3. The linkage, consisting of pivoting beam 270, vertical

23

IPR2013-00407
Patent 8,408,598 B2

link 268, and intermediate link 274, transfers motion between the rear end of housing 80 remote from pivot point 90 and forward anti-tip wheels 42, thereby accomplishing the action/reaction of these components to drive wheel acceleration/deceleration. *Id.* at col. 27, ll. 3–10.

*Petitioner's Contentions*

Upon consideration of the parties' contentions and supporting evidence, we are persuaded that Petitioner has demonstrated, by a preponderance of the evidence, that claims 2, 3, 9, and 10 are obvious over Goertzen, Hosino, and Schaffner.

Claims 2 and 9 depend from independent claims 1 and 7, respectively. As discussed above, we find that Petitioner has demonstrated, by a preponderance of the evidence, that Goertzen and Hosino teach the limitations of independent claims 1 and 7. Dependent claims 2 and 9 further recite "wherein the drive assembly is pivotally coupled to the frame at a drive assembly pivot axis that is substantially vertically aligned with the arm pivot axis." Petitioner acknowledges that pivot point 90 in Schaffner is not "substantially vertically aligned" with connection point 230, as recited in claims 2 and 9. Pet. 48–49. Petitioner argues, however, that "arranging the pivots in a substantially vertical alignment would [have been] an obvious design choice based on a finite number of possible locations for the two pivots with a reasonable expectation of success." Pet. 49–50.

Petitioner points to the analysis of the Examiner in an Action Closing Prosecution in *Inter Partes* Reexamination of Patent No. US 8,181,992 B2—the parent of the '598 patent—in concluding that:

> One of ordinary skill in the art would appreciate that the relative positions of the pivots 90 and 230 could be modified by

24

moving the pivots 230 rearward and/or the pivots 90 forward in order to adjust the suspension characteristics to suit particular design criteria. For example, moving the pivots 230 rearward and the pivots 90 forward would produce increased pivot radii for the anti-tip wheels 42 and the housings 80, thereby resulting in greater upward movement of the anti-tip wheels 42 during acceleration and greater downward movement of the anti-tip wheels 42 during deceleration. Greater upward movement of the anti-tip wheels 42 enables the wheels 42 to ride up and over taller obstacles. Greater downward movement of the anti-tip wheels 42 insures that the wheels 42 will contact the ground and perform their anti-tipping function even when the normal height of the wheels 42 is adjusted to a relatively high height. *Therefore, it would have been obvious to one of ordinary skill in the art to modify Schaffner et al. by positioning the pivots 90 and 230 in substantial vertical alignment in order to produce the desired upward and downward movement of the anti-tip wheels 42 for a particular application and/or end user.*

Ex. 1010, 13–14 (emphasis added). The same rationale applies with respect to the challenged claims of the '598 patent. We are persuaded that it would have been obvious to a person of ordinary skill in the art to modify Goertzen in view of Hosino and Schaffner for the reasons expressed by the Examiner. In consideration of the above evidence, we conclude that Petitioner has demonstrated, by a preponderance of the evidence, that these claims are unpatentable.

Claims 3 and 10 depend from claims 2 and 9, respectively. As discussed above, we are persuaded that Goertzen, Hosino, and Schaffner teach the limitations of dependent claims 2 and 9. Dependent claim 3 further recites "a suspension link connecting the drive assembly to the arm, the suspension link operatively transferring motion of the drive assembly to the arm to cause the arm to rotate about its pivotal mounting in response to

25

IPR2013-00407
Patent 8,408,598 B2

the torque created in rotation of the drive wheels." Dependent claim 10 further recites "a suspension link connecting the drive assembly to the arm, the suspension link operatively transferring to the arm, motion of the drive assembly about its pivotal mounting in response to the torque created in rotation of the drive wheels." We agree that the limitations of dependent claims 3 and 10 are taught by the linkage in Schaffner consisting of pivoting beam 270, vertical link 268, and intermediate link 274, which connect housing 80 to spindle 228, causing spindle 228 to rotate about connection point 230 in response to the torque created in the rotation of drive wheels 16. Pet. 50–52.

### *Conclusion*

For the foregoing reasons, we conclude that Petitioner has demonstrated, by a preponderance of the evidence, that claims 2, 3, 9, and 10 are unpatentable under 35 U.S.C. § 103(a) as obvious over Goertzen, Hosino, and Schaffner.

### *E. Petitioner's Motion to Exclude Evidence*

Petitioner filed a Motion to Exclude Evidence (Paper 38), to which Patent Owner responded (Paper 45). Petitioner filed a Reply in Support of its Motion to Exclude. Paper 49. Petitioner's Motion to Exclude Evidence seeks to exclude (1) paragraphs 3–6, 12, 13, 21–23, 25–30, and 32–40 of the Declaration of Scott Meuser (Ex. 2015); and (2) paragraphs 133–136 of the Declaration of Neal Curran (Ex. 2012). Paper 38, 1. As movant, Petitioner has the burden of proof to establish that it is entitled to the requested relief. *See* 37 C.F.R. § 42.20(c).

**JA026**

IPR2013-00407
Patent 8,408,598 B2

We decline to assess the merits of Petitioner's Motion to Exclude
Evidence.  As discussed above, even without excluding the identified
evidence, we have concluded that Petitioner has demonstrated, by a
preponderance of the evidence, that the challenged claims are unpatentable.
Accordingly, Petitioner's Motion to Exclude Evidence is *denied*.

### F.  Patent Owner's Motion to Exclude Evidence

Patent Owner also filed a Motion to Exclude Evidence (Paper 35), to
which Petitioner responded (Paper 46).  Patent Owner filed a Reply in
Support of its Motion to Exclude.  Paper 48.  Patent Owner's Motion to
Exclude Evidence seeks to exclude the testimony of Dr. Richter on the
grounds that he is not an expert under Federal Rule of Evidence 702.  Paper
35.  As movant, Petitioner has the burden of proof to establish that it is
entitled to the requested relief.  *See* 37 C.F.R. § 42.20(c).  For the reasons
stated below, Petitioner's Motion to Exclude is *denied*.

Patent Owner's motion is predicated on a definition of the level of
ordinary skill in the art that we declined to adopt, as discussed above.  Based
on the level of ordinary skill in the art that we determined above, Dr. Richter
is a person of at least ordinary skill.

Patent Owner also argues that Petitioner improperly needs the
evidence regarding the level of skill in the art relied upon in the Reply to
make out a prima facie case for the Petition.  Patent Owner, however, cites
no case law to support that proposition.  Petitioner asserts that the Board has
routinely found claims to be obvious without identifying a specific level of
ordinary skill in the art.  Paper 46, 8–9, n.5.  We are not persuaded that
Petitioner failed to make sufficient case of obviousness because the Petition

27

IPR2013-00407
Patent 8,408,598 B2

lacked an explicit contention in the Petition regarding the level of ordinary skill in the art. *See supra* Section II.B.

## III. CONCLUSION

Petitioner has shown, by a preponderance of the evidence, that claims 1–13 of the '598 patent are unpatentable based on the following grounds of unpatentability:

| Reference[s] | Basis | Claims challenged |
|---|---|---|
| Goertzen & Hosino | § 103 | 1, 4–8, and 11–13 |
| Goertzen, Hosino, & Schaffner | § 103 | 2, 3, 9, and 10 |

## IV. ORDER

In consideration of the foregoing, it is

ORDERED that claims 1–13 of the '598 patent are held unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is *denied*;

FURTHER ORDERED that Patent Owner's Motion to Exclude is *denied*; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

28

IPR2013-00407
Patent 8,408,598 B2


For PETITIONER:

David Cavanaugh
David.Cavanaugh@wilmerhale.com

Owen Allen
Owen.Allen@wilmerhale.com

For PATENT OWNER:

Gray Levin
glevin@bakerlaw.com

Jake Soumis
jsoumis@bakerlaw.com

Daniel Goettle
dgoettle@bakerlaw.com

29



US008408598B2

(12) **United States Patent**  
Mulhern et al.

(10) **Patent No.:** US 8,408,598 B2  
(45) **Date of Patent:** Apr. 2, 2013

(54) **ANTI-TIP SYSTEM FOR A POWER WHEELCHAIR**

(75) Inventors: **James P. Mulhern**, Nanticoke, PA (US); **Ronald Levi**, Courtdale, PA (US); **Christopher E. Grymko**, Plains, PA (US)

(73) Assignee: **Pride Mobility Products Corporation**, Exeter, PA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/464,099**

(22) Filed: **May 4, 2012**

(65) **Prior Publication Data**

US 2012/0217081 A1    Aug. 30, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 13/010,006, filed on Jan. 20, 2011, now Pat. No. 8,181,992, which is a continuation of application No. 12/780,318, filed on May 14, 2010, now Pat. No. 7,931,300, which is a continuation of application No. 12/170,876, filed on

(Continued)

(51) **Int. Cl.**  
*A61G 5/04*    (2006.01)

(52) **U.S. Cl.** .......................... **280/755**; 180/907; 180/908

(58) **Field of Classification Search** .................. 280/755, 280/250.1, 304.1, 47.16, DIG. 10; 180/907, 180/908  
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,104,112 | A | 9/1963 | Crail |
| 3,520,378 | A | 7/1970 | Slay |

| | | | |
|---|---|---|---|
| 3,827,718 | A | 8/1974 | Curry |
| 4,000,912 | A | 1/1977 | Donald et al. |
| 4,128,137 | A | 12/1978 | Booth |
| 4,245,847 | A | 1/1981 | Knott |
| 4,513,832 | A | 4/1985 | Engman |
| 4,840,394 | A | 6/1989 | Bickler |
| 5,435,404 | A | 7/1995 | Garin, III |
| 5,564,512 | A | 10/1996 | Scheulderman |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2254372 A1 | 5/2000 |
| EP | 1 522 295 A2 | 4/2005 |

(Continued)

OTHER PUBLICATIONS

Photographs-Sunrise Medical G-424 (Sold from Oct. 1999).

(Continued)

*Primary Examiner* — Drew Brown  
(74) *Attorney, Agent, or Firm* — Woodcock Washburn LLP

(57) **ABSTRACT**

An anti-tip system is provided for improving the stability of a powered vehicle, such as a powered wheelchair. The vehicle includes a drive-train assembly pivotally mounted to a main structural frame. A suspension system biases the drive-train assembly and its connected anti-tip wheel to a predetermined resting position. The drive-train assembly bi-directionally rotates about a pivot in response to torque applied to or acceleration forces on the vehicle. A linkage arrangement is provided and is characterized by a suspension arm pivotally mounting to the main structural frame about a pivot at one end thereof and an anti-tip wheel at the other end. The linkage may further include at least one link operable to transfer the bi-directional displacement of the drive-train assembly to the suspension arm. The link may include a bell crank member and/or may be resiliently compressible.

**13 Claims, 19 Drawing Sheets**



PERMOBIL 1001

US 8,408,598 B2

Page 2

### Related U.S. Application Data

Jul. 10, 2008, now Pat. No. 7,726,689, which is a continuation of application No. 11/180,207, filed on Jul. 13, 2005, now Pat. No. 7,413,038, which is a continuation-in-part of application No. 10/962,014, filed on Oct. 8, 2004, now Pat. No. 7,389,835.

(60) Provisional application No. 60/509,649, filed on Oct. 8, 2003, provisional application No. 60/509,495, filed on Oct. 8, 2003.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,772,237 | A | 6/1998 | Finch et al. |
| 5,848,658 | A | 12/1998 | Pulver |
| 5,855,387 | A | 1/1999 | Gill et al. |
| 5,964,473 | A | 10/1999 | Degonda et al. |
| 6,047,979 | A | 4/2000 | Kraft et al. |
| 6,070,898 | A | 6/2000 | Dickie et al. |
| 6,129,165 | A | 10/2000 | Schaffner et al. |
| 6,135,222 | A | 10/2000 | Furukawa |
| 6,196,343 | B1 | 3/2001 | Strautnieks |
| 6,220,382 | B1 | 4/2001 | Kramer et al. |
| 6,234,507 | B1 | 5/2001 | Dickie et al. |
| 6,341,657 | B1 | 1/2002 | Hopely et al. |
| 6,357,793 | B1 | 3/2002 | Dickie et al. |
| 6,460,641 | B1 | 10/2002 | Kral |
| 6,533,306 | B2 | 3/2003 | Watkins |
| 6,543,798 | B2 | 4/2003 | Schaffner et al. |
| 6,554,086 | B1 | 4/2003 | Goertzen et al. |
| 6,705,629 | B2 | 3/2004 | Post et al. |
| 6,752,230 | B1 | 6/2004 | Huang |
| 6,796,568 | B2 | 9/2004 | Martis et al. |
| 6,851,711 | B2 | 2/2005 | Goertzen et al. |
| 6,923,278 | B2 | 8/2005 | Mulhern et al. |
| 7,021,641 | B2 | 4/2006 | Wu |
| 7,038,195 | B2 | 5/2006 | Kida et al. |
| 7,040,429 | B2 | 5/2006 | Molnar |
| 7,104,346 | B2 | 9/2006 | Schaffner |
| 7,344,155 | B2 | 3/2008 | Mulhern et al. |
| 7,726,689 | B2 | 6/2010 | Mulhern et al. |
| 7,931,300 | B2 | 4/2011 | Mulhern et al. |
| 8,181,992 | B2 * | 5/2012 | Mulhern et al. ............. 280/755 |
| 2002/0093172 | A1 | 7/2002 | Watkins |
| 2003/0075365 | A1 | 4/2003 | Fought |
| 2004/0004342 | A1 | 1/2004 | Mulhern et al. |
| 2004/0035627 | A1 | 2/2004 | Richey et al. |
| 2004/0046358 | A1 | 3/2004 | White et al. |
| 2004/0060748 | A1 | 4/2004 | Molnar |
| 2004/0168839 | A1 | 9/2004 | Wu |
| 2004/0251649 | A1 | 12/2004 | Wu |
| 2004/0262859 | A1 | 12/2004 | Turturiello et al. |
| 2005/0000742 | A1 | 1/2005 | Mulhern et al. |
| 2005/0077714 | A1 | 4/2005 | Mulhern et al. |
| 2005/0077715 | A1 | 4/2005 | Mulhern et al. |
| 2005/0127631 | A1 | 6/2005 | Schaffner |
| 2005/0206149 | A1 | 9/2005 | Mulhern et al. |
| 2006/0022445 | A1 | 2/2006 | Mulhern et al. |
| 2006/0076747 | A1 | 4/2006 | Pauls et al. |
| 2006/0076748 | A1 | 4/2006 | Pauls et al. |
| 2006/0082117 | A1 | 4/2006 | Turturiello et al. |
| 2006/0086554 | A1 | 4/2006 | Jackson et al. |
| 2007/0181353 | A1 | 8/2007 | Puskar-Pasewicz et al. |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| FR | 2215054 | 3/1979 |
| FR | 2399822 | 3/1979 |
| GB | 2 051 702 | 5/1980 |
| GB | 2 192 595 | 7/1986 |
| JP | 2001104391 | 4/2001 |
| WO | WO 87/06205 | 10/1987 |
| WO | WO 90/06097 | 6/1990 |
| WO | WO 00/08910 | 9/2000 |
| WO | WO 00/54718 | 9/2000 |

#### OTHER PUBLICATIONS

Presentation-NSM Symposium (Jul. 2004).
EP Search Report EP 1 522 295 A3.
Control U.S. Appl. No. 95/002,255 dated Sep. 14, 2012 Request for Inter Parties Reexamination Under 35 USC 311-318 including Appendix B.1 through B.11.

* cited by examiner



*FIG. 1*



*FIG. 2*



*FIG. 3*



*FIG. 4*



FIG. 5



FIG. 6



*FIG. 7*

*FIG. 8*



*FIG. 9*



*FIG. 10*



*FIG. 11*



FIG. 12



FIG. 13



FIG. 14

U.S. Patent

Apr. 2, 2013    Sheet 10 of 19    US 8,408,598 B2



FIG. 15



# FIG. 16



FIG. 17



FIG. 18

U.S. Patent

Apr. 2, 2013

Sheet 14 of 19

US 8,408,598 B2



FIG. 19



FIG. 20

U.S. Patent

Apr. 2, 2013

Sheet 16 of 19

US 8,408,598 B2



*FIG. 21*

U.S. Patent

Apr. 2, 2013

Sheet 17 of 19

US 8,408,598 B2

JA146



FIG. 22

U.S. Patent          Apr. 2, 2013          Sheet 18 of 19          US 8,408,598 B2



FIG. 23A



FIG. 23D



FIG. 23C



FIG. 23B

US 8,408,598 B2

1

# ANTI-TIP SYSTEM FOR A POWER WHEELCHAIR

## RELATED APPLICATIONS

The present application is a continuation of copending U.S. application Ser. No. 13/010,006, filed Jan. 20, 2012, which is a continuation of U.S. Pat. No. 7,931,300, issued Apr. 26, 2011, which is a continuation of U.S. Pat. No. 7,726,689, issued Jun. 1, 2010, which is a continuation of U.S. Pat. No. 7,413,038, issued Aug. 19, 2008, which is a continuation-in-part of U.S. Pat. No. 7,389,835, issued Jul. 24, 2008, which claims the benefit of the filing date of U.S. Provisional Application No. 60/509,649, filed Oct. 8, 2003, and US. Provisional Application No, 60/509,495, filed Oct. 8, 2003; each of said patents and applications herein being incorporated by reference.

## TECHNICAL FIELD

The present invention relates to active anti-tip systems for powered vehicles, such as powered wheelchairs, and, more particularly, to a linkage arrangement for providing improved curb-climbing capability and/or pitch stability.

## BACKGROUND OF THE INVENTION

Self-propelled or powered wheelchairs have vastly improved the mobility/transportability of the disabled and/or handicapped. One particular system which has gained widespread popularity/acceptance is mid-wheel drive powered wheelchairs, and more particularly, such powered wheelchairs with anti-tip systems. Mid-wheel powered wheelchairs are designed to position the drive wheels, i.e., the rotational axes thereof, slightly forward of the occupant's center of gravity to provide enhanced mobility and maneuverability. Anti-tip systems enhance stability of the wheelchair about its pitch axis and, in some of the more sophisticated anti-tip designs, improve the obstacle or curb-climbing ability of the wheelchair. Such mid-wheel powered wheelchairs and/or powered wheelchairs having anti-tip systems are disclosed in Schaffner et al. U.S. Pat. Nos. 5,944,131 and 6,129,165, both assigned to Pride Mobility Products Corporation of Exeter, Pa.

The Schaffner '131 patent discloses a mid-wheel drive wheelchair having a passive anti-tip system. The passive anti-tip system functions principally to stabilize the wheelchair about its pitch axis, i.e., to prevent forward tipping of the wheelchair. The anti-tip wheel is pivotally mounted to a vertical frame support about a pivot point that lies above the rotational axis of the anti-tip wheel. As such, the system requires that the anti-tip wheel contact a curb or other obstacle at a point below its rotational axis to cause the wheel to flex upwardly and climb over the obstacle. A resilient suspension is provided to support the anti-tip wheel.

The Schaffner '165 patent discloses a mid-wheel drive powered wheelchair having an anti-tip system which is "active" in contrast to the passive system discussed previously and disclosed in the '131 patent. Such anti-tip systems are responsive to accelerations or decelerations of the wheelchair to actively vary the position of the anti-tip wheels, thereby improving the wheelchair's stability and its ability to climb curbs or overcome obstacles. More specifically, the active anti-tip system mechanically couples the suspension system of the anti-tip wheel to the drive-train assembly such

2

that the anti-tip wheels displace upwardly or downwardly as a function of the magnitude of torque applied to the drive-train assembly.

FIG. 1 is a schematic of an anti-tip system A disclosed in the Schaffner '165 patent. In this embodiment the drive-train and suspension systems, are mechanically coupled by a longitudinal suspension arm B, pivotally mounted to the main structural frame C about a pivot point D. At one end of the suspension arm B is mounted a drive-train assembly E, and at the other end is mounted an anti-tip wheel F. In operation, torque created by the drive-train assembly E and applied to the drive wheel G results in relative rotational displacement between the drive-train assembly E and the frame C about the pivot D. The relative motion therebetween, in turn, affects rotation of the suspension arm B about its pivot D in a clockwise or counterclockwise direction depending upon the direction of the applied torque. That is, upon an acceleration, or increased torque input (as may be required to overcome or climb an obstacle), counterclockwise rotation of the drive-train assembly E will occur, creating an upward vertical displacement of the respective anti-tip wheel F. Consequently, the anti-tip wheel F is "actively" lifted or raised to facilitate such operational modes, e.g., curb climbing. Alternatively, deceleration causes a clockwise rotation of the drive-train assembly E, thus creating a downward vertical displacement of the respective anti-tip wheel F. As such, the downward motion of the anti-tip wheel F assists to stabilize the wheelchair when traversing downwardly sloping terrain or a sudden declaration of the wheelchair. Here again, the anti-tip system "actively" responds to a change in applied torque to vary the position of the anti-tip wheel F.

The active anti-tip system disclosed in the Schaffner '165 offers significant advances by comparison to prior art passive systems. However, the one piece construction of the suspension arm B, with its single pivot connection D, necessarily requires that both the drive-train assembly E and the anti-tip wheel F inscribe the same angle (the angles are identical). As such, the arc length or vertical displacement of the anti-tip wheel F may be limited by the angle inscribed by the drive-train assembly E, i.e., as a consequence of the fixed proportion.

Moreover, an examination of the relationship between the location of the pivot or pivot axis D and the rotational axis of the anti-tip wheel F reveals that when the anti-tip wheel F impacts an obstacle at or near a point, which is horizontally in-line with the wheel's rotational axis, the anti-tip wheel F may move downwardly. That is, as a result of the position of the pivot D being relatively above the axis of the anti-tip wheel F, a force couple may tend to rotate the suspension arm B downwardly, contrary to a desired upward motion for climbing curbs and/or other obstacles.

## SUMMARY OF THE INVENTION

A linkage arrangement is provided for an active anti-tip system within a powered wheelchair. A drive-train assembly is pivotally mounted to a main structural frame of the wheelchair and a suspension system for biasing the drive-train assembly and the anti-tip wheel to a predetermined resting position. The drive-train assembly bi-directionally rotates about the pivot in response to torque applied by or to the assembly. The linkage arrangement includes a suspension arm pivotally mounted to the main structural frame about a pivot at one end thereof and an anti-tip wheel mounted about a rotational axis at the other end. The linkage further includes at least one link operable to transfer the displacement of the drive-train assembly to the suspension arm. Preferably, the

US 8,408,598 B2

3

4

rotational axis of the anti-tip wheel is preferably spatially located at a vertical position that is substantially equal to or above the vertical position of the pivot.

In another aspect of the invention, the linkage arrangement is provided with at least one suspension spring to create a biasing force that sets the normal rest position for the linkage and a restoring force for returning the linkage back to its normal position. The spring may be disposed forwardly of the pivot of the drive-train assembly and engages the frame at one end and may also be aligned vertically above the link and supports the suspension arm and the drive assembly.

In another aspect of the invention, the linkage may include a bell crank pivotably secured to the frame. The bell crank linkage serves to transfer the motion for the drive-train assembly to the anti-tip wheels and may amplify the motion by adjustment of the size of the legs of the crank.

## BRIEF DESCRIPTION OF THE DRAWINGS

For the purpose of illustrating the invention, there is shown in the drawings various forms that are presently preferred; it being understood, however, that this invention is not limited to the precise arrangements and constructions particularly shown.

FIG. **1** is a schematic view of an example of a prior art active anti-tip system for use in powered vehicles.

FIG. **2** is a partial side view of a linkage arrangement within a powered vehicle having one of its drive-wheels removed to more clearly show the present invention.

FIG. **3** is an enlarged partial side view of the linkage arrangement of the embodiment of FIG. **2**.

FIG. **4** is a partial side view of the linkage of FIGS. **2** and **3** reacting in response to motor torque or acceleration of the vehicle.

FIG. **5** is a partial side view of the linkage of FIGS. **2** and **3** reacting in response to braking or deceleration of the vehicle.

FIG. **6** is a partial side view of an alternate embodiment of a linkage arrangement within a powered vehicle having one of its drive wheels removed to more clearly show the present invention.

FIG. **7** is a partial side view of the linkage arrangement of FIG. **6** reacting in response to motor torque or acceleration of the vehicle.

FIG. **8** is a partial side view of the linkage arrangement of FIGS. **6** and **7** reacting in response to braking or deceleration of the vehicle.

FIG. **9** is a partial side view of a further embodiment of a linkage arrangement within a powered vehicle having one of its drive-wheels removed to more clearly show the present invention.

FIG. **10** is a partial side view of the linkage arrangement of FIG. **9** reacting in response to motor torque or acceleration of the vehicle.

FIG. **11** is a partial side view of the linkage arrangement of FIGS. **9** and **10** reacting in response to braking or deceleration of the vehicle.

FIG. **12** is a perspective view of a further embodiment of a linkage arrangement within a powered vehicle having one of its drive wheels removed to more clearly show the present invention.

FIG. **13** is an enlarged view of the linkage arrangement of the embodiment in FIG. **11**.

FIG. **14** is a partial side view of the linkage arrangement of FIGS. **12** and **13** reacting in response to motor torque or acceleration of the vehicle.

FIG. **15** is a partial side view of a further embodiment of a linkage arrangement within a powered vehicle having one of its drive wheels removed to more clearly show the present invention.

FIG. **16** is a partial front elevation of the linkage arrangement of FIG. **15** with portions of the vehicle frame being removed to more clearly show the features of the present invention.

FIG. **17** is a partial perspective view of a still further linkage arrangement within a powered vehicle having the near drive wheel removed and having the opposite side drive train assembly omitted to more clearly show the structure of the present invention within the wheelchair assembly.

FIG. **18** is a perspective view of the linkage arrangement of the embodiment shown in FIG. **17**.

FIG. **19** is a partial side view of the linkage arrangement of FIGS. **17** and **18** reacting in response to motor torque or acceleration of the vehicle.

FIG. **20** is a partial side view of the linkage arrangement of FIGS. **17-19** reacting in response to breaking or deceleration of the vehicle.

FIG. **21** is a partial side elevation of the wheelchair embodiment particularly shown in FIGS. **12-14**, having the near drive wheel removed to illustrate the relationship between the various links and pivots.

FIG. **22** is a partial side elevation of the suspension arm structure and the anti-tip caster assembly of the embodiment shown in FIG. **21**.

FIGS. **23**A-D show various views of a collapsible link connecting the drive train assembly and the suspension arm within the structures of the present invention.

## DETAILED DESCRIPTION OF THE DRAWINGS

Referring now to the drawings wherein like reference numerals identify like elements, components, subassemblies etc., FIG. **2** depicts a power wheelchair **2** including an active anti-tip system linkage **20** according to the present invention. The linkage **20** may be employed in any vehicle, such as a powered wheelchair, which potentially benefits from stabilization about a pitch axis $P_A$, or enables/controls large angular excursions in relation to a ground plane $G_P$. In the embodiment shown in this FIG. **2**, the wheelchair **2** comprises an anti-tip system identified generally by the numeral **10**, a main structural frame **3**, a seat **4** for supporting a wheelchair occupant (not shown), a footrest assembly **5** for supporting the feet and legs (also not shown) of the occupant, and a pair a drive wheels **6** (shown schematically) each being independently controlled and driven by a drive-train assembly **7**. Each drive-train assembly **7** is pivotably mounted to the main structural frame **3** about a pivot **8** to affect relative rotation therebetween in response to positive or negative acceleration or torque. Further, a suspension assembly **9** is provided for biasing the drive-train assembly **7** and anti-tip system **10** generally to a predetermined operating position.

The linkage **20** of the present invention is defined as the elements between the drive-train assembly **7** and the pivot or suspension arm supporting the anti-tip wheel **16**. Referring also to FIG. **3**, the anti-tip wheel **16** is mounted for rotation about axis **16**$_A$ which lies substantially at or above the vertical position of the pivot or pivot axis **24**$_A$ for the suspension arm **24** on the main structural frame **3**. A link **34** is operably connected to the drive-train assembly **7** at one end and to the suspension arm **24** at the other end. The link **34** acts to transfer bi-directional displacement of the drive-train assembly **7** to the suspension arm **24**. In the context used herein, the phrase "substantially at or above" means that the pivot **24**$_A$ is located

US 8,408,598 B2

5

at a vertical position (relative to a ground plane $G_P$) that is substantially equal to or less than the vertical position of the rotational axis $16_A$ of the anti-tip wheel 16 (relative to the ground plane $G_P$). Furthermore, these spatial relationships are defined in terms of the "resting" position of the system 10, when the loads acting on the suspension arm 24 or anti-tip wheel 16 are in equilibrium.

In addition, the pivot $24_A$ is distally spaced from the rotational axis $16_A$ of the anti-tip wheel 16. As illustrated, the pivot $24_A$ is disposed inboard of the forward portions of the main structural frame 3 and is proximal to the position of the drive wheel axis (also called the pitch axis) $P_A$.

In the present embodiment, a bracket 30 is rigidly mounted to the drive-train assembly 7 and projects forwardly thereof. As illustrated, the bracket 30 is substantially parallel to the suspension arm 24. The link 34 is pivotally mounted to the suspension arm 24 at one end thereof at a pivot 38, which is positioned between the pivot $24_A$ and the rotational axis $16_A$ of the anti-tip wheel 16. The link 34 is substantially orthogonal to the longitudinal axis of the suspension arm 24, and pivotally mounts to the bracket 30 at pivot 42. The bracket 30 and suspension arm 24 include a plurality of longitudinally spaced-apart apertures 46 for facilitating longitudinal or angular adjustments of the link 34 relative to the bracket 30 and/or the suspension arm 24.

In FIG. 3 the drive-train assembly 7 and linkage arrangement are biased to a predetermined operating or "resting" position by the suspension assembly 9. As illustrated, the suspension assembly 9 comprises a pair of spring strut assemblies 52a, 52b, each being disposed on opposite sides of the drive-train pivot 8. Furthermore, each spring strut assembly 52a, 52b is interposed between an upper horizontal frame support $3H_S$ of the main structural frame 3 and the drive-train assembly 7. The first strut 52a is pivotally mounted to an L-bracket 56 at a point longitudinally forward of the pivot mount 8. The second strut 52b is pivotally mounted to an upper mounting plate 58 for the drive-train assembly 7 at a point longitudinally aft of the pivot 8. When resting, the spring bias forces acting on the drive-train assembly 7 are in equilibrium.

Referring to FIG. 4, in an operational mode requiring increased torque output, such as may be required when accelerating or climbing a curb and/or obstacle, the drive-train assembly 7 rotates in a clockwise direction about pivot 8, indicated by arrow $R_7$. It will be appreciated that the rotational directions described are in relation to a left side view from the perspective of a wheelchair occupant. Rotation of the drive-train assembly 7 will cause the bracket 30 to rotate in the same clockwise direction, see arrow $R_{30}$, and the link 34 to move in a counterclockwise direction, see arrow $R_{34}$, about pivot 42. Clockwise rotation of the bracket 30 affects a substantially upward vertical motion of the link 34. The link 34 rotates the suspension arm 24 in a clockwise direction about pivot $24_A$, denoted by arrow $R_{24}$, and lifts or raises the anti-tip wheel 16.

In addition to the spatial relationship of the pivot $24_A$ and the anti-tip wheel 16, the length of the suspension arm 24 also contributes to the enhanced curb-climbing ability. To best appreciate the impact of suspension arm length, consider that a short suspension arm (having a characteristic short radius), tend to traverse a substantially arcuate path in contrast to a linear path of a relatively longer suspension arm. An arcuate path produces components of displacement in both a vertical and forward direction. While the forward component is small relative to the vertical component, it will be appreciated that this component can jam or bind an anti-tip wheel as it lifts vertically. This will more likely occur when the axis of the

6

anti-tip wheel is positioned relatively below the pivot of the suspension arm. Conversely, as a suspension arm is lengthened, the anti-tip wheel traverses a more vertical or substantially linear path. As such, the forward component is substantially eliminated along with the propensity for an anti-tip wheel to jam or bind. To effect the same advantageous geometry, the pivot $24_A$ of the suspension arm 24 is disposed proximal to the longitudinal center of the main structural frame 3.

Referring to FIG. 5, in an operational mode reversing the applied torque, such as will occur during braking or deceleration, the bracket 30, link 34 and suspension arm 24 rotate in directions opposite to those described above with regard to FIG. 4 to urge the anti-tip wheel 16 into contact with the ground plane $G_P$. A downward force is produced to counteract the forward pitch or tipping motion of the wheelchair 2 upon deceleration.

The mounting location 38 of the link 34, as illustrated, is at a point on the suspension arm 24 that is closer to the anti-tip wheel 16 than to the pivot $24_A$. This mounting location functions to augment the structural rigidity of the suspension arm 24 to more effectively stabilize the wheelchair 2. That is, by effecting a stiff structure, structural rigidity of the linkage 20, rapidly arrests and stabilizes the wheelchair about the pitch axis $P_A$. Moving the link 34 closer to the pivot $24_A$ will, conversely, serve to accentuate the effect of the motion of the drive-train assembly 7; that is, the same linear movement of the pivot 38, when positioned closer to suspension arm pivot $24_A$ will result in a greater movement of the anti-tip wheels 16, at the end of the arm.

FIGS. 6-8 depict and an alternate embodiment 20 of the linkage arrangement adapted for use in powered wheelchairs 2. The linkage arrangement 120 employs a suspension arm 124 having a pivot point $124_A$, which is spatially positioned at or below the rotational axis $116_A$ of the anti-tip caster wheel 116. Two links 130, 134 are operatively connected to the drive-train assembly 7 and the suspension arm 124. The first link 130 is fixed to the drive-train assembly 7 while the second link 134 is pivotally mounted to the suspension arm 124, with bell-crank 60 operatively positioned therebetween. The anti-tip wheel 116 as illustrated in this figure is a caster type wheel and, as shown, is normally in contact with the ground $G_P$. A bi-directional spring strut 88 biases the anti-tip system to a resting position. The strut 88 is pivotally mounted to the suspension arm 124, rather than to the drive-train assembly 7 as in FIGS. 2-5.

As seen in FIG. 6, the linkage arrangement 120 includes a bell-crank link 60 for re-directing and/or amplifying input motions originating from the drive-train assembly 7. The bell-crank 60 is pivotally mounted about a pivot 78 on the main structural frame 3. The bell-crank 60 includes first and second crank arms 60-1, 60-2 that, as illustrated, define a right angle therebetween. However, the relative angular orientation of the arms 60-1, 60-2 may vary depending on the positioning of connecting links and the location of the pivot 78. The first and second crank arms 60-1, 60-2 also differ in length. The first crank arm 60-1 is longer than the second arm 60-2. As illustrated, there is a 2:1 length ratio (i.e., first to second length). Also, the first crank arm 60-1 is oriented substantially vertically with respect to the longitudinal axis of the suspension arm 24 and pivotally mounted to the third link 64. The second crank arm 60-2 is substantially horizontal with respect to the longitudinal axis of the suspension arm 24 and is pivotally mounted to the second link 34. Again, these parameters and positions may vary as desired.

The drive-train assembly 7 is pivotally connected to the first link 130 by a substantially vertical projection on the

**JA151**

US 8,408,598 B2

7

8

drive-train mounting plate **58**. The first link **130** includes an elliptically-shaped aperture or thru-slot **64** to allow the pivot connection to float. Thus, small vertical displacements/perturbations of the anti-tip wheel **116**, which may occur, e.g., when riding over uneven/rough terrain, do not significantly back-drive the drive-train assembly **7**.

FIGS. **7** and **8** are analogous to FIGS. **4** and **5**, respectively, wherein the linkage kinematics are illustrated. One difference between the linkage arrangement **120** of FIGS. **7** and **8** relates to the amplification of displacement gained from the bell-crank **60**. The bell crank **60** serves to redirect horizontal linear motion of the drive-train **7** to create a vertical motion of the anti-tip wheel **116**. Further, the bell-crank **60** increases the mechanical advantage for a given applied torque. This enables a relatively close positioning of the pivot connection **84** to the pivot **124**$_A$, while still resulting in a significant motion by the suspension arm **124**. As shown in FIG. **7**, the anti-tip caster wheel **116** is able to traverse a large vertical distance. That is, the vertical displacement of the anti-tip caster wheel **116** is magnified by the bell crank **60** and the proximal spacing of the pivot connection **84** to the axis **124**$_A$.

It will be appreciated that, in view of the spatial positioning of the pivot connection **84** and length ratio of the bell-crank arms **60-1**, **60-2**, various levels of displacement and/or moment loads may be achieved or applied by the linkage arrangement **120** within a relatively confined design envelope.

Furthermore, additional leverage is provided to the anti-tip caster wheel **116** so as to stabilize the wheelchair about its pitch axis P$_A$. The castor **116** rides normally on the ground G$_p$. Upon deceleration, the drive-train assembly **7** lifts and creates a force, through the linkage **120**, that forces the anti-tip wheel **116** into the ground G$_p$ and restricts the ability of the suspension **88** to compress. This arrangement limits pitch of the wheelchair. Further, in the normal rest position, a force on the foot plate **5** (such as by a person standing) will not cause significant rotation of the wheelchair about the pitch axis P$_A$.

In FIG. **9**, the wheelchair **2** includes a further embodiment of an anti-tip system linkage **220**, which is supported on a main structural frame **3**. A drive-train assembly **7** is pivotally mounted to the frame **3** about a pivot **8** to effect relative rotation therebetween in response to positive or negative acceleration or torque. A suspension assembly **209** is provided for biasing the drive-train assembly **7** and the anti-tip system to a predetermined operating position.

A suspension arm **224** is pivotally mounted to the frame **3** at pivot **224**$_A$. At the opposite end of the suspension arm **224** is mounted on anti-tip wheel **16**, which is rotatable about a rotational axis **16**$_A$. Again, it is preferred that the position of the rotational axis **16**$_A$ lie substantially at or above the vertical position of the pivot **224**$_A$. As illustrated, the pivot **224**$_A$ is disposed inboard of the front of the frame **3** and is positioned proximal to the drive wheel axis, or pitch axis P$_A$, and substantially vertically below the drive-train assembly pivot **8**.

A mounting extension **230** projects from the mounting plate **258** for the drive-train assembly **7**. A link **234** is pivotally mounted **238** to the suspension arm **224** between the pivot **224**$_A$ and the rotational axis **16**$_A$ of the anti-tip wheel **16**. Furthermore, the link **234** is substantially orthogonal to the longitudinal axis of the suspension arm **224**, and mounts to the extension **230** at a pivot **242**. As illustrated, the anti-tip wheel has a fixed axis, rather than being a caster, as is shown in FIGS. **6-8**. However, caster type anti-tip wheels may be used on this embodiment, as well as any of embodiments shown. The anti-tip wheel may be positioned as close to the ground as desired. Casters will normally ride on the ground.

As illustrated, the suspension assembly **209** comprises a pair of suspension springs **252**$_a$, **252**$_b$, disposed on opposite sides of the drive-train pivot **8**. Each of the suspension springs **252**$_a$, **252**$_b$ is interposed between an upper horizontal frame support 3H$_S$ of the main structural frame **3** and the drive-train assembly **7**. The forward spring **252**$_a$ is mounted adjacent to or directly above the pivot **242** for link **234**. The aft suspension spring **252**$_b$ (considered to be optional) is mounted to an upper mounting plate **258** for the drive-train assembly **7** at a point longitudinally aft of the mounting pivot **8**. When resting, the spring bias of the assembly **209** acting on the drive-train assembly **7** is in equilibrium.

Referring to FIGS. **10** and **11**, in an operational mode the applied torque, such as will occur during acceleration or curb/obstacle climbing (FIG. **10**) or during braking or deceleration (FIG. **11**), the link **234** serves to move the suspension arm **224**, which rotates to urge the anti-tip wheel **16** upward or into contact with the ground plane G$_p$. For the purposes of conciseness, the kinematics of the linkage arrangement will not be again described in detail.

The substantial co-axial alignment of the pivots **238** and **242** of the linkage **234** and the forward suspension spring **252**$_a$ creates a direct load path for augmenting pitch stabilization. That is, by tying the forward suspension spring **252**$_a$ directly to the link **234**, loads tending to force the anti-tip wheel **16** upwardly will be reacted to immediately by the suspension assembly **209**. A similar direct reaction is created with the counter clockwise rotation of the motor due to deceleration or braking (FIG. **11**). Further, the linkage assembly can be positioned inside the confines of the frame **3**.

While the linkage arrangements above have been described in terms of various embodiments that exemplify the anticipated use and application of the invention, other embodiments are contemplated and also fall within the scope and spirit of the invention. For example, while the linkage arrangements have been illustrated and described in terms of a forward anti-tip system, the linkage arrangements are equally applicable to a rearward or aft stabilization of a powered wheelchair.

Furthermore, it is contemplated that the anti-tip wheel may be either out of ground contact or in contact with the ground, whether employing a long suspension arm (such as that shown in FIGS. **2-5**), a relatively shorter suspension arm (FIGS. **6-8**), or when including a bell crank (FIGS. **6-8**). Also, the anti-tip wheel may be in or out of ground contact when disposed in combination with any of the linkage arrangements.

The linkage arrangements as illustrated may include apertures for enabling adjustment. Other adjustment devices are also contemplated. For example, a longitudinal slot may be employed in the bracket or link and a sliding pivot mount may be engaged within the slot.

In FIGS. **12-13**, there is illustrated a further vehicle structure which incorporates the features of the linkage arrangement and anti-tip systems of the present invention. The wheelchair vehicle in these figures is generally referred to by the numeral **302** and includes a main structural frame **3**, which supports a seat (not shown) that is mounted on seat post sockets **4**$_A$. A footrest **5** is positioned on a forward portion of the frame **3** and a drive-train assembly **7** is mounted on the frame **3** at pivot **8**. In the perspective view of FIG. **12**, one drive wheel has been removed for purposes of illustrating the linkage **320**. The far side drive wheel **6** has been illustrated in this FIG. **12**. Attached to the rear of the frame **3** is the rear suspension **14** that, in this embodiment, includes a rocker arm

US 8,408,598 B2

9 10

11 pivotally mounted to the frame at pivot 13 and including caster wheels 12 at each projected end of the rocker arm 11.

In FIG. 13, the linkage arrangement 320 is specifically illustrated with the remaining portions of the vehicle being removed. The linkage 320 includes a first link 334 attached at its upper end at pivot 342 to a bracket 356$_A$ extending from drive-train mounting plate 358. The opposite end of the first link 334 is connected at a lower pivot 338 to the suspension arm 324. The suspension arm 324 is secured to the frame (FIG. 12) at suspension pivot 324$_A$. At the projected end of the suspension arm 324 is provided a caster assembly 116, serving as the anti-tip wheel for the suspension. The anti-tip wheel 116 includes an anti-tip wheel axel 116$_A$ and also includes a flexible mount 318 that permits limited movement of the anti-tip wheel back towards the linkage 320 when it engages an obstacle. A stop 359 is also provided on the mounting plate 358 to limit upward movement of the drive-train assembly about pivot 8.

In addition to the linkage 320, a suspension assembly 309 is provided. The suspension is pivotally mounted to a bracket 356 on the mounting plate 358. The upper end of the suspension 309$_A$ engages the upper portion of the frame 3. From this arrangement, it can be seen that rotation of the mounting plate 358 about the pivot 8 will cause a corresponding movement of the suspension arm 324 by means of the link 334. Movement of the link 334, which is transferred to the suspension arm 324, causes a pivoting motion of the suspension arm 324 about its pivot 324$_A$. The pivoting motion of the suspension arm 324 causes a corresponding motion to the anti-tip wheel 116.

In FIG. 14, there is shown the operational mode of the vehicle 302 where an increased torque output is provided, such as may be required when accelerating or climbing a curb and/or obstacle. The drive-train assembly 7 rotates in a counter-clockwise direction (as seen in this FIG. 14) about pivot 8 as indicated by arrow R$_7$. Rotation of the drive-train assembly 7 will cause the mounting plate 358 to also rotate, lifting the link 334 upwardly. Due to the connection between the link 334 and the suspension arm 324, the suspension arm also pivots in a counter clockwise direction about the suspension arm pivot 324$_A$. The counter clockwise rotation (again as seen in FIG. 14) of the suspension arm 324 causes the anti-tip wheel 116 to lift off of the ground plane G$_P$. In addition to movement of the linkage in response to the motion of the drive-train assembly 7, the suspension 309 compresses due to the upward movement of the bracket 356 and the fixed positioning of the frame 3. Compression of the spring creates a restoration force for the linkage, returning the suspension arm 324 and anti-tip wheel 116 to its normal position upon removal of the torque of the drive-train 7. As will be understood by reference to the figures above, a deceleration or braking torque will cause a corresponding opposite reaction by the assembly about the pivot 8 thereby forcing the anti-tip wheel into the ground plane G.

There is shown in FIGS. 15 and 16 a further embodiment of the linkage arrangement as contemplated by the present invention. In this variation, the link connecting the drive-train and the suspension arm has been adapted to accommodate various modifications in the frame and other structures. In FIG. 15, the vehicle 402 includes a frame 3 supporting a drive-train assembly 7 about a pivot 8, with the drive-train assembly 7 driving a drive wheel 6. One drive wheel 6 is illustrated in FIG. 15, with the relatively closer drive wheel removed for clarity. Further, the battery structures, which are typically centrally mounted within the frame 3, have also been removed for clarity. The frame 3 also supports a seat (not shown). Mounting sockets 4$_A$ are provided for purposes of

mounting a seat, although other mounting arrangements may be provided as desired. A rear suspension 14 is also illustrated.

Front anti-tip wheels 116 project forwardly of the frame 3 and are mounted on a suspension arm 424 by means of resilient mount 418. The suspension arm 424 is pivotally mounted to the frame 3 at pivot 424$_A$. A link 434 is pivotally connected to the suspension arm 424 at pivot 438. The upper end of the link 434 is pivotally connected 442 to a bracket 456, which is formed as part of the drive-train mounting plate 458. The mounting plate 458 is pivotally connected to the frame at pivot 8 and supports the drive-train assembly 7. A suspension 409 extends between the bracket 456 and the upper portion of the frame 3 of the vehicle 402.

As can be seen in FIG. 15, the link 434 includes a forwardly projecting curvature. Thus, the pivot 442 between one end of the link 434 and the bracket 456 is relatively rearward of the pivot 438 that connects the link 434 to the suspension arm 424. As seen in FIG. 16, the link 434 has an inward step towards the central portion of the vehicle 402. Thus, the pivot 442 between the link 434 and the bracket 456 is closer to the drive wheel 6 than is the connection between the link 434 and the suspension arm 424. Further, the suspension arm 424 includes an outwardly projecting portion such that the caster 116 and its mount 418 extend relatively outward from the frame 3, as compared to its pivot 424$_A$. In this FIG. 16, the lower portion of the frame 3 is partially broken away so as to expose the suspension 409 as it extends between the bracket 456 and the upper frame portion 3H$_S$. A further feature of these linkage connections may include the positioning of the pivot 438 for linkage 434 within the suspension arm 424. Thus, a slot or groove may be formed in the suspension arm and the end of the link 434 inserted therein. These structures serve to position the linkage and structures at a desired position within the confines of the frame and other structures of the vehicle 402. Further modifications and alterations may be provided so as to permit the linkage to fit within the vehicle structures.

In FIGS. 17-20, there is shown a further variation of a vehicle having an anti-tip suspension as contemplated by the present invention. The wheelchair 502 includes a structural frame 3 that supports a seat (not shown). Seat mounting sockets 4$_A$ are provided on the frame 3, and seat mounting bars 4$_B$ are provided for attachment of the seat thereto. The drive-train assembly 7 is pivotally mounted to the frame 3 at pivot 8. An opposing drive-train assembly 7 (including the anti-tip wheel) has been omitted from the illustration for purposes of clarity. A drive wheel 6 is shown on the far side of the vehicle frame with the near side drive wheel having been removed for illustration purposes. The axis of rotation of the drive wheel 6 constitutes the pitch axis P$_A$ for the vehicle 502. A rear suspension 14 is provided with a rocker arm 11 and caster wheels 12. A further suspension assembly 513 is provided for fixing the rocker arm 11 to the frame 3. The suspension assembly 513 includes dual dampening mechanisms 515 having a spring and a central piston. The dampening mechanisms 515 are attached at one end to the frame 3 and at the opposite end to a bar 514. The bar 514 is pivotally mounted to the frame at pivots 520 by means of arms 519.

FIG. 18 shows an enlarged view of the linkage arrangement of the present embodiment. The drive-train assembly 7 is attached to the mounting plate 558 having a bracket 556 that connects to the drive-train pivot 8. The bracket 556 further connects to the link 534 at pivot 542. Suspension 509 is also connected to the bracket 556 at one end. The link 534 extends downwardly to a pivot 538 on the suspension arm 524. Suspension 509 also attaches to the suspension arm 524 at pivot

US 8,408,598 B2

11

560. A series of mounting holes are provided on the suspension arm 524 for the attachment of the suspension 509 at a variety of positions. Mounting holes are also provided for attachment of the link 534 to the pivot arm 524, permitting re-positioning of the pivot 538. At the one end of the suspension arm 524 is pivot 524$_A$, which attaches to the frame (not shown in FIG. 18). The opposite end of the suspension arm 524 supports the anti-tip wheel 116. In this embodiment, the anti-tip wheel 116 shown is a caster type wheel having a caster support 518 including a resilient mounting to permit limited deflection of the caster upon engagement of an obstacle.

As seen in FIG. 19, a torque generated by the drive-train 7 for purposes of climbing a curve or obstacle causes a rotation of the drive-train 7 about pivot 8 as illustrated by arrow R$_7$. From the side view illustrated in FIG. 19, it can be seen that the drive-train assembly 7 moves counter-clockwise about the pivot 8, causing the link 534 to move upwardly along with the bracket (556). The link 534 thus lifts the suspension arm 524, causing a counter-clockwise rotation about its pivot 524$_A$. The pivoting rotation of the suspension arm 524 causes the anti-tip wheel 116 to lift off the ground plane G$_p$ and, as illustrated in FIG. 19, to step up over the obstacle.

During the action illustrated in FIG. 19, the counter-clockwise rotation of the drive-train 7 will cause a slight compression of the suspension 509 due to the differences in the location of attachment of the suspension arm 524 and the position of the link 534. When the torque subsides, the suspension will normally cause the drive-train 7 to move back into its normal rest position, and lower the anti-tip wheel 116. The force of the suspension on the obstacle surface O$_p$ will help lift the frame 3 and the drive wheel 6 over the obstacle.

It is further contemplated that the suspension members 515 will also compress upon any counter-clockwise rotation of the frame 3 about the pitch axis P$_A$. The motion of the frame 3 back on the suspension 515 will also cause a pivoting motion of the arms 519.

There is illustrated in FIG. 20 a further reaction of the vehicle in response to deceleration and/or the response of the linkage arrangement to variations in the ground plane. In this figure, the anti-tip wheel 116 has moved over a curb and is in contact with a plane that is relatively below the ground plane G$_p$ on which the drive wheel sits and the rear casters 12 rest. The suspension 509 extends to permit the anti-tip wheel 116 to engage the lower surface. Further, the linkage 534 adapts to this motion. Assuming a deceleration force or breaking torque, the drive-train assembly 7 rotates clockwise (in this FIG. 20) about the pivot 8 as illustrated by arrow R$_7$. The connection between the bracket 556 and the link 534 causes the suspension arm 524 to move downwardly to help engage the lower plane. If the caster 116 was on level ground with the drive wheel 6 and rear caster 12, the drive-train 7 will force the front casters 116 into the ground, providing a force that resists the pitch of the vehicle about the pitch axis P$_A$. A similar force would be provided by the suspension 509 in the normal rest position should the occupant stand on the foot-plate (not shown). Thus, pitch of the vehicle would not occur if a force were applied to the footplate on one side of the pitch axis P$_a$. The spring force and the linkage arrangement between the drive-train 7 and the anti-tip wheel 116 adds further support.

There is illustrated in FIGS. 21 and 22 a side view of various portions of the vehicle 302 as previously described with respect to FIGS. 12-14. As is readily apparent from the prior figures, the suspension arm 324 is mounted at pivot 324$_A$ on the vehicle frame 3 at a position relatively below the pivotal mounting 8 of the drive train assembly 7 and also

12

below the pitch axis P$_A$, which forms the axis of rotation for the drive wheel 6. The first link 334 connects the bracket 358 to the suspension arm 324. The pivotal connection 342 between the drive train 7 and the first link 334 is adjacent the pivotal mounting 8 of the drive train 7 to the frame 3. Similarly, the pivotal connection 338 of the first link 334 with the suspension arm 324 is adjacent the suspension arm pivot 324$_A$ on the frame 3. In addition, the connection between the anti-tip wheel 116 and the suspension arm 324 is formed at the flexible mount 318. The flexible mount 318 is positioned relatively above, with reference to the ground plane G$_P$, the suspension pivot 324$_A$. This relationship is more particularly illustrated in FIG. 22.

In FIG. 22 there is illustrated the suspension arm 324 portion of the vehicle 302. The suspension pivot 324$_A$ is fixed to the vehicle frame (3, FIG. 21) at a height designated as H1. The anti-tip axle 116$_A$ is positioned at a height H$_2$, with the pivot 360 for the flexible mount 318 positioned at a different height H$_3$. In FIG. 22, the anti-tip wheel 116 is shown having engaged an obstacle O$_B$ causing the flexible mount 318 to move rearwardly towards the suspension pivot 324$_A$ and a deflection of the anti-tip wheel about the mounting pivot 360. This deflection is illustrated as an angle θ with respect to the normal vertical position of the caster axis 362 about which the anti-tip wheel pivots. This slight angular deflection θ causes a lifting of the anti-tip wheel 116 off of the ground plane G$_P$ and an increase in height ΔH of the wheel axle 116$_A$. (Thus, the height H$_2$ is normally the diameter of the anti-tip wheel 116. When an angular deflection θ occurs upon engagement of an obstacle O$_B$, prior to the pivoting of the suspension arm 324 about the suspension arm pivot 324$_A$, the axle 116$_A$ is at a slightly greater height than the diameter of the wheel, which in this embodiment rides on the ground.) The flexible mount 318 generally comprises a fixed member 364, which is formed at the projected end of the suspension arm 324. The mounting pivot 360 comprises the coupling between the rotational member 366 and the fixed member 364. The rotational member 366 is fixed to the caster barrel 368, which forms the caster swivel axis 362. A fork 370 is attached to a spindle 372 formed within the caster barrel 368. The fork supports the caster wheel 116, while permitting rotation of the wheel about the axle 116$_A$. (Other forms of caster type wheels and anti-tip wheels may also be used.) A spring 374 (or other resilient means) is formed between a flange 376 and the underside of the fixed member 364. The resilient force of the spring 374 normally moves the flange 376 counterclockwise (as seen in FIG. 22) about the mounting pivot 360 and positions the spindle 372 and its corresponding caster swivel axis 362 in a substantially vertical position. A stop is formed between the caster barrel 368 and the fixed member 364 to fix the normal position of the flexible mount and, thus, stop rotation of the member 366 about the pivot 360. Upon engagement of an obstacle O$_B$ by the wheel 116, a force is generated toward the suspension pivot 324$_A$, causing rotation of the member 366 about the pivot 360 against the spring 374, causing compression of the spring and permitting the wheel to more easily ride over the obstacle O$_B$. Upon the force created by the obstacle O$_B$ on the wheel 116 reaching an equilibrium with the force of the spring 374, the suspension arm 324 will pivot counterclockwise (as seen in FIG. 22) about the suspension pivot 324$_A$.

The moment arm created by the anti-tip wheel 116 about the flexible mount pivot 360 is greater than the moment created about the suspension pivot 324$_A$. The initial movement is for the anti-tip wheel 116 to move rearwardly upon engagement of an obstacle O$_B$, prior to the lifting of the suspension arm 324. This relationship is a function of the height H$_3$ of the

**JA154**

US 8,408,598 B2

13                                                         14

mounting pivot **360** being greater than the height H₁ of the suspension pivot **324**$_A$ and the restoration force of the spring **374**. The relationship between these elements permit the suspension to flex resiliently in response to various sized obstacles without substantially affecting the position of the wheelchair occupant.

The form of the flexible mount **318** as illustrated is contemplated to meet the needs of the present invention. However, other embodiments of a flexible mount for an anti-tip wheel assembly are contemplated. Examples of caster type assemblies include, but are not limited to, commonly assigned U.S. Pat. Nos. 6,543,798 and 6,796,658, which are herein incorporated by reference. Alternatively, a Rosta™ type bearing may be utilized to mount and support the anti-tip wheel on the suspension arm.

In FIGS. **23**A-D there is illustrated a variation of the anti-tip suspension illustrated in FIGS. **12-14**, **21** and **22**. As illustrated in FIG. **23**A, a suspension arm **324** is mounted to the vehicle frame (not shown in this Figure) at suspension pivot **324**$_A$. The suspension arm projects outwardly from the pivot and terminates in a flexible mount **318**, comprising the fixed member **364**, the rotational member **366** and the spring **374**. The rotational member **366** supports the anti-tip wheel **116**. The drive train mounting plate **358** is pivotally supported on the frame at pivot **8** and includes a bracket **356** for supporting the suspension spring **309** (shown broken away) which at its upper end **309**$_A$ is supported by the frame. In the present embodiment, the rigid link **334** in the prior figures has been replaced by a resilient link **380**, which permits a limited contraction in length of the link upon the application of certain forces on the suspension arm **324** created by the drive train (not shown in this figure).

One construction of the flexible link **380** is more particularly illustrated in FIGS. **23**A-D. In FIG. **23**B the link **380** includes an upper mounting loop **382** and a lower mounting loop **384**. The upper loop **382** is contemplated to be fixed to the bracket **356**$_A$ at pivot **342**. The lower loop **384** forms the attachment of the link **380** to the suspension arm **324** at the lower pivot **338**. Attachment to the brackets and suspension arm may be formed by any type fastener. Extending between the loops **382**, **384** is a first member **386**, which is telescopingly received within a second member **388**. A resilient member **390**, such as an elastomeric material, is provided within the internal space of the second member, between the lower end of the first member **386** and the bottom wall of the second member **388**. A pin **392** is formed on the first member and projects outwardly through a slot **394** formed in the second member **388**. The resilient member **390** exerts a force on the first member **386** such that the pin **392** is positioned at the upper end of the slot **394** in the normal rest position. The projection of the pin **392** through the wall of the slot **394** is more particularly illustrated in FIG. **23**C.

As illustrated in FIG. **23**D, upon a force F being exerted on the link **380**, the loops **382** and **384** move closer together such that the length of the link **380** is reduced by an amount ΔX. The reduction in length of the link **380** is permitted by the compression of the resilient member **390**. Thus, the force F must be sufficient to overcome the restoration force of the resilient member **390**.

In normal operation, the force F may be created by a number of actions within the suspension structure of the vehicle. First, the anti-tip wheel **116** may engage an obstacle (such as obstacle O$_B$ in FIG. **22**) sufficient to cause pivoting of the suspension arm **324** about the suspension pivot **324**$_A$. Depending on the operative position of the drive train and the position of the drive wheels, the link **380** will be reduced in length prior to a significant force being applied to the drive

train mounting plate through bracket **356**$_A$. Alternatively, the torque created by the drive train mounting plate about the pivot axis P$_A$ (see FIGS. **12**, **14** and **21**) may also cause a reaction within the suspension through the link **380**. In the condition illustrated in FIG. **14**, whereby a rotational torque causing the drive train assembly to pivot counterclockwise, the engagement of the pin **392** with the slot **394** prevents the link **380** from increasing in length and thus the rotation of the drive train causes the link to lift the suspension arm **324** and anti-tip wheel **116**. In a situation where the torque operates in the opposite direction, due to deceleration of the vehicle or travel on a downward slope, the drive train creates a force in the clockwise direction as illustrated in FIG. **23**A. The link **380** attempts to move downwardly along with the pivoting of the drive train mounting bracket about the pivot **8**. Since the anti-tip wheel **116** is positioned on the ground, the suspension arm will not move further downwardly. Thus, the first member **386** compresses the resilient member **390**, while the second member **388** remains relatively fixed with respect to the ground plane.

It should be understood that the flexible link **380** as illustrated in FIGS. **23**A-D may be applied to any of the embodiments illustrated in the application. The linked connection between the drive train and the suspension arm that supports the anti-tip wheel is common in each of the embodiments.

Further, it should be understood that the relationship in height of the flexible mount with respect to the height of the pivot for the suspension arm is also common through the various embodiments illustrated in, at least, FIGS. **12-20**. Variations in the flexible link structure will become apparent to those who have skill in the art upon reviewing the parameters discussed herein. The resilient and/or resistive force within the link may be created by a number of devices, such as a spring, an elastomeric material, a hydraulic fluid or any combination thereof.

A variety of other modifications to the structures particularly illustrated and described will be apparent to those skilled in the art after review of the disclosure provided herein. Thus, the present invention may be embodied in other specific forms without departing from the spirit or essential attributes thereof and, accordingly, reference should be made to the appended claims, rather than to the foregoing specification, as indicating the scope of the invention.

What is claimed is:

1. A wheelchair comprising:

a frame;

a pair of drive wheels defining a drive wheel axis;

a drive assembly operatively coupled to at least one drive wheel of the pair of drive wheels, the drive assembly configured to rotate the at least one drive wheel about the drive wheel axis to thereby cause the wheelchair to move relative to a surface that defines a ground plane;

an arm pivotally mounted to the frame at an arm pivot axis; and

a caster wheel coupled to the arm, the caster wheel defining a rotational axis about which the caster wheel rotates,

wherein the vertical position of the arm pivot axis with respect to the ground plane when the caster wheel and the drive wheel are in contact with the surface is spaced from and positioned relatively below a straight line drawn between the drive wheel axis and the rotational axis of the caster wheel, and

wherein the arm is operatively coupled to the drive assembly such that the arm is configured to pivot about the arm pivot axis in response to torque created by rotation of the

**JA155**

US 8,408,598 B2

15

at least one drive wheel by the drive assembly so as to cause a responsive vertical movement of the caster wheel.

**2.** The wheelchair of claim **1**, wherein the drive assembly is pivotally coupled to the frame at a drive assembly pivot axis that is substantially vertically aligned with the arm pivot axis.

**3.** The wheelchair of claim **2**, further comprising a suspension link connecting the drive assembly to the arm, the suspension link operatively transferring motion of the drive assembly to the arm to cause the arm to rotate about its pivotal mounting in response to the torque created in rotation of the drive wheels.

**4.** The wheelchair of claim **1**, wherein the caster wheel is a front caster wheel.

**5.** The wheelchair of claim **1**, wherein the arm is configured to pivot about the arm pivot axis in response to braking so as to cause the caster wheel to apply a force to the surface.

**6.** The wheelchair of claim **1**, wherein the suspension arm is configured to pivot about the suspension arm pivot axis to enable the caster wheel to move downwardly and engage a surface that is lower than the ground plane in response to braking

**7.** A wheelchair comprising:

a frame;

a pair of drive wheels defining a drive wheel axis;

a drive assembly operatively coupled to at least one drive wheel of the pair of drive wheels, the drive assembly configured to provide power to the at least one drive wheel to rotate the drive wheel about the drive wheel axis to thereby cause the wheelchair to move relative to a surface that defines a ground plane;

an arm pivotally mounted to the frame at an arm pivot axis; and

a caster wheel coupled to the arm, the caster wheel defining a rotational axis about which the caster wheel rotates,

16

wherein the vertical position of the arm pivot axis with respect to the ground plane when the caster wheel and drive wheel are in contact with the surface is spaced from and positioned relatively below a straight line drawn between the drive wheel axis and the rotational axis of the caster wheel, and

wherein the arm is operatively coupled to the drive assembly such that (i) the arm is configured to pivot about the arm pivot axis in response to torque created by rotation of the at least one drive wheel by the drive, and (ii) the arm is configured to pivot about the arm pivot axis in response to braking

**8.** The wheelchair of claim **7**, wherein the caster wheel is a front caster wheel and the arm is configured to pivot about the arm pivot axis in response to torque created by forward rotation of the at least one drive wheel by the drive assembly so as to cause a responsive vertically upward movement of the caster wheel.

**9.** The wheelchair of claim **7**, wherein the drive assembly is pivotally coupled to the frame at a drive assembly pivot axis that is substantially vertically aligned with the arm pivot axis.

**10.** The wheelchair of claim **9**, further comprising a suspension link connecting the drive assembly to the arm, the suspension link operatively transferring to the arm, motion of the drive assembly about its pivotal mounting in response to the torque created in rotation of the drive wheels.

**11.** The wheelchair of claim **7**, wherein the caster wheel is a front caster wheel.

**12.** The wheelchair of claim **7**, wherein the arm is configured to pivot about the arm pivot axis in response to braking torque so as to cause the caster wheel to apply a force to the surface.

**13.** The wheelchair of claim **7**, wherein the arm is configured to pivot about the arm pivot axis so as to enable the caster wheel to move downwardly and engage a surface that is lower than the ground plane in response to braking.

* * * * *

Trials@uspto.gov                                                    Paper 51
571-272-7822                                    Entered: December 31, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

PERMOBIL, INC.,
Petitioner,

v.

PRIDE MOBILITY PRODUCTS CORPORATION,
Patent Owner.

_____

Case IPR2013-00411
Patent 8,408,343 B2

_____

Before BRIAN J. McNAMARA, JAMES B. ARPIN, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

CLEMENTS, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2013-00411
Patent 8,408,343 B2

# I.    INTRODUCTION

Permobil Inc. ("Petitioner") filed a Petition requesting *inter partes* review of claims 1–10 (the "challenged claims") of U.S. Patent No. 8,408,343 B2 (Ex. 1001, "the '343 patent").  Paper 5 ("Pet.").  Pride Mobility Products Corporation ("Patent Owner") filed a Preliminary Response.  Paper 11 ("Prelim. Resp.").  On January 2, 2014, we granted an *inter partes* review for all challenged claims on certain grounds of unpatentability alleged in the Petition.  Paper 12 ("Dec. to Inst.").

After institution of trial, Patent Owner filed a Patent Owner Response (Paper 22, "PO Resp.") to which Petitioner filed a Reply (Paper 26, "Pet. Reply").

Oral hearing was held on July 31, 2014.[1]

The Board has jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has shown, by a preponderance of the evidence, that claims 1–10 of the '343 patent are unpatentable.

## A.  Related Proceedings

Petitioner indicates that the '343 patent is asserted against Petitioner in *Pride Mobility Products Corp. v. Permobil, Inc.*, Case No. 2:13-cv-01999-LDD (E.D. Pa.).  Pet. 1; Paper 49.  Petitioner also has filed another petition for *inter partes* review, IPR2013-00407, of claims 1–13 of a related patent, U.S. Patent No. 8,408,598 B2.

---

[1] A transcript of the oral hearing is included in the record as Paper 50 ("Tr.").

IPR2013-00411
Patent 8,408,343 B2

### B. The '343 Patent

The '343 patent relates to powered wheelchair configurations that are capable of assisting in curb-climbing. Ex. 1001, col. 1, ll. 19–21. Wheelchairs with casters disposed on forward-extending arms coupled to the frame at a pivot were known in the prior art. *Id*. at col. 1, ll. 43–45. Wheelchairs also are known in the prior art as having pivoting front caster arms that raise or are biased upwardly in response to wheelchair acceleration or motor torque to enhance the capability of the wheelchair to climb curbs. *Id*. at col. 1, ll. 45–50. Still, there was a general need for wheelchair configurations that are simple and inexpensive, yet effective in climbing obstacles, such as curbs. *Id*. at col. 2, ll. 10–12. To address this need, the '343 patent discloses a wheelchair having a combination of stability and curb-climbing capabilities. *Id*. at col. 2, ll. 16–18.

Figures 3A and 4B are reproduced below:



FIG. 3A                    FIG. 4B

Figures 3A and 4B depict a perspective view of an embodiment of the wheelchair with portions of the chair assembly and cover removed (Figure 3A) and a side view of the wheelchair with the drive wheel and a portion of the mounting plate removed (Figure 4B). The Specification states that, in

3

Figure 3A, frame assembly 12 comprises frame structure 24, which includes central support 25a, rear support 25b, T-shaped support 25c, a pair of pivot supports 25d, and footrest support 25e. *Id*. at col. 5, ll. 50–55. Wheelchair 10 includes a pair of drive assemblies 16 and pivot assemblies 18. *Id*. at col. 7, ll. 51–53.

Drive assembly 16 includes a pair of drives 50, each of which includes motor 52, gearbox 54, and mounting plate 56. *Id*. at col. 7, ll. 60–62. Each one of the drive assemblies is connected to one of a pair of drive wheels 58. *Id*. at col. 7, ll. 62–63. Drive assembly 16 is coupled pivotally to frame assembly 12 by pivot 29 between frame structure 24 and mounting plate 56. *Id*. at col. 7, ll. 63–65. Each drive 50 is affixed rigidly to mounting plate 56. *Id*. at col. 8, l. 27.

Pivot assembly 18 includes a front arm, such as caster arm 60, swivel bearing 62, caster support 64, and caster wheel 66. *Id*. at col. 8, ll. 58–60. Caster arm 60 is coupled rigidly to drive 50 via mounting plate 56. *Id*. at col. 8, ll. 60–61.

### C.  Illustrative Claim

Of the challenged claims, claim 1 is independent. Claims 2–10 depend, directly or indirectly, from claim 1. Claim 1 is illustrative and is reproduced below:

> 1.    A wheelchair comprising:
>
> a frame;
>
> a drive wheel defining a drive wheel axis a mounting plate pivotally coupled to the frame at a pivot axis, the pivot axis being positioned forward of the drive wheel axis; a mounting plate pivotally coupled to the frame at a pivot axis,

IPR2013-00411
Patent 8,408,343 B2

the pivot axis being positioned forward of the drive wheel axis;

a drive operatively coupled to the drive wheel and affixed to the mounting plate;

a forward-extending front arm rigidly extending from the mounting plate such that the mounting plate, drive, and front arm are together configured to pivot about the pivot axis;

a front wheel rotatably coupled to the front arm, the front wheel defining a front wheel axis, wherein a vertical position of the pivot axis with respect to the ground plane is spaced from and positioned relatively below a line drawn between the drive wheel axis and the front wheel axis when the drive wheels and front wheels are on level ground, whereby motor torque biases the front wheel.

## D. Prior Art Supporting the Instituted Challenges

The following prior art references were asserted in the instituted grounds:

| Goertzen | WO 02/34190 A2 | May 2, 2002 | Ex. 1003 |
| Hosino | US 6,454,286 B1 | Sept. 24, 2002 | Ex. 1005 |
| Mulhern '420 | US 2003/0205420 | Nov. 6, 2003 (filed May 6, 2002) | Ex. 1006 |

## E. The Instituted Challenges of Unpatentability

The following table summarizes the challenges to patentability on which we instituted *inter partes* review:

| Reference[s] | Basis | Claims challenged |
|---|---|---|
| Goertzen & Hosino | § 103 | 1–10 |
| Goertzen & Mulhern '420 | § 103 | 1 and 4–10 |

IPR2013-00411
Patent 8,408,343 B2

# II.   ANALYSIS

## A.  Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).  Also, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

### 1.  *"a forward-extending front arm rigidly extending from the mounting plate"(claim 1)*

In the Decision to Institute, we concluded that no express construction of "a forward-extending front arm rigidly extending from the mounting plate" was necessary.  Dec. to Inst. 7–8.  Neither party contests that conclusion, and nothing since our Decision to Institute indicates it should be changed.  We maintain our conclusion that no express construction of "a forward-extending front arm rigidly extending from the mounting plate" is necessary.

### 2.  *"a front wheel rotatably coupled to the front arm"(claim 1)*

In the Decision to Institute, we concluded that no express construction of "a front wheel rotatably coupled to the front arm" was necessary.  Dec. to Inst. 8.  Neither party contests that conclusion, and nothing since our Decision to Institute indicates it should be changed.  We maintain our conclusion that no express construction of "a front wheel rotatably coupled to the front arm" is necessary.

6

IPR2013-00411
Patent 8,408,343 B2

   3.  *"oriented perpendicular to the drive wheel axis"(claim 7)*

   In the Decision to Institute, we construed "oriented perpendicular to the drive wheel axis" to encompass not only the orientation of mounting plate 56 relative to drive wheel axis A-$_{DW}$, but also the orientation of motor 80 relative to drive wheel axis 24, as depicted in Figure 9 of U.S. Patent No. 6,129,165 B1 ("the '165 patent"), which is referenced in the Specification of the '343 patent.  Dec. to Inst. 8–10.

   Patent Owner argues that this phrase encompasses only the orientation of mounting plate 56 relative to the drive wheel axis, as depicted in Figures 3A, 3B, 4A, 4B, 7A, and 7B of the '343 patent.  PO Resp. 53–54.

   We are not persuaded by Patent Owner's argument.  Figure 3B is reproduced below:



FIG.3B

Figures 3B depicts mounting plate 56 relative to drive wheel axis A-$_{DW}$.

However, the '343 patent also discloses that:

> for conventional configurations having a motor that is *perpendicular to the drive wheel axis* (and requiring a right angle gearbox, which is not shown in the figures), the motor swings about the gearbox output shaft to impart motion to the front caster arm, *as for example shown in U.S. Pat. No. 6,129,165.*

7

IPR2013-00411
Patent 8,408,343 B2

Ex. 1001, col. 9, ll. 20–25 (emphasis added).  Figure 9 of the '165 patent is
reproduced below:



FIG. 9

Figure 9 depicts a side view of a power wheelchair according to the '165
patent.  The '343 Patent describes motor 80 of Figure 9 as "perpendicular to
the drive wheel axis" 24.  As can be seen by a comparison of the figures,
motor 80 of Figure 9 of the '165 patent is oriented differently from mounting
plate 56 of Figure 3B of the '343 patent.  Thus, the '343 patent uses
"perpendicular to the drive wheel axis" to refer to orientations other than the
orientation of mounting plate 56 in Figure 3B.

Patent Owner contends that the '343 patent's description of the motor
in the '165 patent as "perpendicular" is not relevant because it relates to the
motor of a different patent, not the motor mount of the '343 patent.  PO
Resp. 55.  We disagree.  As an instance of the word "perpendicular" in the
'343 patent, it reflects directly on the meaning ascribed to that term by the
drafters of the '343 patent.

Patent Owner also contends that the orientation of motor 80 of the
'165 patent is not relevant because the motor is not "substantially planar," as
claim 7 requires of the recited "mounting plate."  PO Resp. 56.  Whether
motor 80 is "substantially planar," however, is irrelevant to whether the '343

8

IPR2013-00411
Patent 8,408,343 B2

patent uses the phrase "perpendicular to the drive wheel axis," as recited in claim 7, to encompass the orientation of motor 80 in the '165 patent. It clearly does.

Finally, Patent Owner addresses the construction proposed by Petitioner. PO Resp. 57–58. Because we did not adopt Petitioner's proposed construction, we need not reach these arguments.

Accordingly, we maintain our construction of "oriented perpendicular to the drive wheel axis" as broad enough to encompass not only the orientation of mounting plate 56 relative to drive wheel axis A-$_{DW}$, but also the orientation of motor 80 relative to drive wheel axis 24, as depicted in Figure 9 of the '165 patent.

## B. The Level of Ordinary Skill in the Art

"The person of ordinary skill in the art is a hypothetical person who is presumed to know the relevant prior art." *In re GPAC Inc.,* 57 F.3d 1573, 1579 (Fed. Cir. 1995). This person is of ordinary creativity, not merely an automaton, and is capable of combining teachings of the prior art. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420–21 (2007). The prior art itself can reflect the appropriate level of skill in the art. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). In addition, judges on the Board are "persons of scientific competence in the fields in which they work," and our findings are "informed by [our] scientific knowledge, as to the meaning of prior art references to persons of ordinary skill in the art." *In re Berg*, 320 F.3d 1310, 1315 (Fed. Cir. 2003).

In the Petition, Petitioner does not set forth its contention on the level of the ordinary skill in the art. Patent Owner proffers the testimony

9

IPR2013-00411
Patent 8,408,343 B2

contained in the Declaration of Mr. Neal Curran ("Curran Declaration") on the determination of the level of skill in the art appropriate for the '343 patent. PO Resp. 27–29 (citing Ex. 2003 (Curran Decl.) ¶¶ 37–41). That testimony concludes that a person of ordinary skill in the art relevant to the '343 patent would have three years, or more, experience designing, developing, and testing obstacle-traversing (and curb-climbing) systems and suspensions for power wheelchairs. PO Resp. 27.

Petitioner disputes Mr. Curran's opinion regarding the training and experience that one of ordinary skill in the art relevant to the '343 patent would have had. Pet. Reply 11–13. Petitioner asserts that a person of ordinary skill in the art would have had an undergraduate degree in mechanical engineering and (1) if (s)he had pursued post-graduate studies, at least one year of experience designing, developing, and testing wheelchairs; or (2) if she had not pursued post-graduate studies, at least three years of experience designing, developing, and testing power wheelchairs. *Id.* at 11 (citing Ex. 1017 ¶ 13 (Second Declaration of Dr. W. Mark Richter)).

We are not persuaded that the level of ordinary skill in the art required at least three years of experience specific to obstacle-traversing and curb-climbing systems and suspensions, as Patent Owner contends. The problems identified by Patent Owner and the skills required—e.g., "analysis of the various forces and moments," "understanding of moment arms," "understand[ing] the effects on moments and forces," (PO Resp. 28–29)— are within the ordinary skill of a person with an undergraduate degree in mechanical engineering. Moreover, we note that the named inventor of the '343 patent—James Mulhern—testified, in a related reexamination, that a

10

person of ordinary skill in the art would have had only "a B.S. in mechanical engineering or equivalent, *or* at least 3 years of experience in the field of designing powered wheelchairs for personal mobility." Ex. 1026 ¶ 10 (emphasis added).

Based on our review of the technology claimed in the '343 patent and the description of the powered wheelchair set forth in the specification, we determine that a person of ordinary skill in the art would have had either (1) an undergraduate degree in mechanical engineering or an equivalent degree; or (2) at least three years of experience designing powered wheelchairs for personal mobility.

### C. Claims 1–10 – Obviousness over Goertzen & Hosino

Petitioner argues that claims 1–10 are unpatentable under 35 U.S.C. § 103(a) as obvious over Goertzen and Hosino. Pet. 34–39, 45–60. In support of this ground of unpatentability, Petitioner provides detailed explanations as to how each claim limitation is met by Goertzen and Hosino, and relies upon the Declaration of Dr. W. Mark Richter (Ex. 1008). *Id.*

Patent Owner counters that (1) Petitioner cannot meet its burden because it failed to set forth the level of skill in the art; (2) Petitioner does not articulate any reason why a person of ordinary skill in the art would have combined Goertzen with Hosino; (3) choosing a pivot location below the axis-to-axis line would not have been a routine design choice; and (4) objective considerations demonstrate the nonobviousness of the claims of the '343 patent. PO Resp. 7–52. As support, Patent Owner proffers the Curran Declaration. *Id.* (citing Ex. 2003).

IPR2013-00411
Patent 8,408,343 B2

Upon consideration of the parties' contentions and supporting evidence, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–10 are obvious over the combination of Goertzen and Hosino.

### *Goertzen (Exhibit 1003)*

Goertzen describes a curb-climbing wheelchair having pivotal arm assemblies including pivot arms. Ex. 1003, Abstract. The pivotal arm assemblies include at least one front caster and have the ability to rotate or pivot. *Id.* The pivot arms rotate or pivot in response to moments generated by accelerating or decelerating the wheelchair, thereby raising or lowering the front casters through the rotational movement of the pivot arms. *Id.* By raising or lowering the front casters, curb-like obstacles may be traversed in a low-impact manner. *Id.* Figure 3 of Goertzen is reproduced below:



Figure 3 depicts suspension and drive components of wheelchair 100. *Id.* at 7, ll. 3–26, Fig. 3,. As depicted in Figure 3, wheelchair 100 comprises frame

IPR2013-00411
Patent 8,408,343 B2

142, a pair of drive wheels 102 and 104, drive motor 136 coupled to pivot arm 132 through gearbox assembly 309 and mounting plate 308, drive motor 138 coupled to pivot arm 134 through a gearbox assembly and mounting plate, and front casters 106 and 108. *Id.* at 6, ll. 3–15, 7, ll. 3–26, Fig. 3.

Figures 5A and 5B of Goertzen are reproduced below:



Figures 5A and 5B depict the curb-climbing capability of wheelchair 100. As depicted in Figure 5A, wheelchair 100 approaches curb 502 of approximately two to four inches in height. *Id.* at 10, ll. 5–6. As depicted in Figure 5B, drive motors 136 and 138 are torqued, such as by the passenger directing the wheelchair to accelerate, to cause pivot arms 132 and 134 to pivot about pin 330 and to raise front casters 106 and 108 off the ground. *Id.* at 10, ll. 11–20.

*Hosino (Exhibit 1005)*

Hosino describes a traveling device, such as an electric-powered wheelchair, in which each wheel moves in conformity with uneven ground to allow comfortable driving thereon. Ex. 1005, col. 1, ll. 51–55. The traveling device comprises a truck member, acting as a platform and having a loop frame, a pair of front and rear casters, and a pair of left and right

13

IPR2013-00411
Patent 8,408,343 B2

driving wheels. *Id.* at col. 1, ll. 57–62. The loop frame consists of a pair of side frame parts, each side frame part having a front section and a rear section divided by a bendable portion at which the side frame part is able to bend upwards and downwards. *Id.* at col. 1, ll. 63–67. Each bendable portion is located lower than a rotation axis of the driving wheel and as high as a rotation center of the front caster, such that the casters are able to ride over a projection in uneven ground. *Id.* at col. 2, ll. 36–44. Figure 1 of Hosino is reproduced below:



Figure 1 depicts a perspective view of the traveling device according to a first embodiment. *Id.* at Fig. 1. As depicted in Figure 1, loop frame 2 consists of front half-frame 2a and rear half-frame 2b. Front half-frame 2a has a pair of rear-end portions connected by a pivot to front-end portions of rear half-frame 2b to form bendable portion 5. *Id.* at col. 3, l. 64–col. 4, l. 5.

14

Figure 9 of Hosino is reproduced below:



Figure 9 depicts the action of the traveling device when front caster 3a rides over projection 18 in uneven ground. *Id.* at Fig. 9. This structure facilitates travel over uneven ground because bendable portion 5 is located in a relatively low position. *Id.* at col. 4, ll. 13–15. In a preferred embodiment, bending portion 5 is positioned as high as the center of the front caster. *Id.* at col. 4, ll. 18–23.

Figure 11 is reproduced below:



Figure 11 is a partially elongated view for explaining an action of the front caster. *Id* at Fig. 11. As shown in Figure 11 of Hosino, when point $O_1$ of bendable portion 5 is as high as point $O_2$, front caster 3a moves upward and

15

rearward, which enables smoother travel over uneven ground, e.g., projection 18. *Id.* at col. 7, ll. 6–9.

*Analysis of Petitioner's Contentions*

Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–10 are obvious over the combination of Goertzen and Hosino.

Based on the record before us, we find that the following limitations of independent claim 1 are met by the following elements of Goertzen:

| Independent Claim 1 | Goertzen |
| --- | --- |
| a frame | frame 142 |
| a drive wheel | drive wheel 102 or 104 |
| a mounting plate | mounting plate 308 |
| a drive | drive motor 136 or 138 |
| a forward-extending front arm | pivot arm 132 or 134 |
| a front wheel | front caster 106 or 108 |

In addition, claim 1 recites "whereby motor torque biases the front wheels." Goertzen discloses that, "from preferably a standstill position, drive motors 136 and 138 are 'torqued' so as to cause pivot arms 132 and 134 to pivot about, for example, pin or bolt 330 and raise front casters 106 and 108 off the ground." Ex. 1003, 10, ll. 11–22, Fig. 5B;.

Petitioner acknowledges that Goertzen does not disclose that "a vertical position of the pivot axis with respect to the ground plane is spaced from and positioned relatively below a line drawn between the drive wheel axis and the front wheel axis when the drive wheels and front wheels are on level ground," as recited in independent claim 1. Pet. 38. Petitioner's Declarant, Dr. Richter, concludes, however, that:

> It would have been obvious for one of ordinary skill in the art to position the pivot axis in the Goertzen wheelchair below a line connecting the front wheel axis and the drive wheel axis. A

16

person of skill in the art would recognize that there are a limited
number of design choices for the vertical position of the pivot
axis – above the line, at the line, or below the line – and
choosing one of these three options would be a routine design
choice to a person of ordinary skill in the art. *Doing so would
be nothing more than a combination of known elements used
for their known purpose and yielding predictable results.*
Therefore, claim 1 is unpatentable over Goertzen in view of any
one of the Low Pivot References.

Ex. 1008 ¶ 56 (emphasis added). We find that there is sufficient evidence

supporting the reasoning of the above-quoted analysis of Dr. Richter. *See*

Ex. 1008 ¶¶ 49-56.

Petitioner has shown that each of these limitations is taught or

suggested by the combination of Goertzen and Hosino. We further

determine that Petitioner has demonstrated that each of the additional

limitations recited in claims 2–10 is taught or suggested by the combination

of Goertzen and Hosino, as set forth in the Petition (Pet. 47–60).

### *Dr. Richter's Qualifications to Opine on the Reason to Combine*

Patent Owner contends that the reason to combine articulated by Dr.

Richter is insufficient because (1) Dr. Richter is not a skilled artisan; (2) Dr.

Richter misunderstands the law of obviousness; and (3) Dr. Richter's

testimony should be disregarded because he did not articulate whether and

how a person of ordinary skill in the art would compensate for the effect on

stability of the proposed modification to Goertzen. PO Resp. 12–25.

We are not persuaded by Patent Owner's argument that Dr. Richter is

not a person of ordinary skill in the art because, as discussed above, we do

not agree that such a person would have to have had three years of

experience specific to curb-climbing systems. PO Resp. 12–14. Dr. Richter

IPR2013-00411
Patent 8,408,343 B2

has a B.S., M.S., and Ph.D. in mechanical engineering, and has been involved in the development of wheelchairs, including power wheelchairs, since 1995. Ex. 1008 ¶¶ 2–9. Accordingly, we find that Dr. Richter is, at least, a person of ordinary skill in the art, and, therefore, is qualified to testify from the perspective of one of ordinary skill in the relevant art at the time of the invention.

We also are not persuaded by Patent Owner's argument that Dr. Richter's testimony cannot be accepted because he "has never heard of 'hindsight,'" and misunderstands obviousness. PO Resp. 14–16. Dr. Richter's understanding of the law of obviousness is not determinative. We rely on Dr. Richter's testimony as to the facts of what a person of ordinary skill in the art would have known and understood at the time of the claimed invention, but not as to the ultimate legal conclusion of obviousness.

Finally, Patent Owner argues that Dr. Richter's testimony should not be considered because he did not, in his Declarations, address the effect on stability of lowering the pivot. PO Resp. 16–19. The deposition testimony, however, does not support the notion that Dr. Richter ignored stability. Dr. Richter testified that lowering the pivot in Goertzen is safe only "[i]f done properly . . . ." PO Resp. 19 (quoting Ex. 2004, 27:6–28:20); *see also* Ex. 1012, 28:21–29:12 (testifying that "[*i*]*f done properly*, [lowering the pivot] should have no – no adverse effect on [tipping over]" (emphasis added)). To the extent there was any doubt, Dr. Richter later testified that "there is no way in the world I would drop a pivot just because it has better obstacle climbing characteristics without taking into account its effect on stability." Ex. 2004, 158:15–19. Accordingly, we do not agree with Patent Owner that

Dr. Richter did not recognize initially the effect on stability of lowering the pivot of Goertzen.

Patent Owner also faults Dr. Richter for not analyzing declines or deceleration, or doing any of the engineering that, according to him, would be necessary to compensate for the reduced stability caused by a lower pivot. PO Resp. 19–23.  The question before us, however, is not whether Dr. Richter did the engineering necessary to combine the prior art into a functional prototype, but whether doing so would have been within the ability of a person of ordinary skill in the art at the time of the claimed invention.  In that regard, we credit Dr. Richter's testimony that a person of ordinary skill in the art would have known how to change various other parameters in order to achieve a stable version of the claimed invention.  Ex. 2004, 185:23–186:14.  Patent Owner asserts that the proposed modification is anything but routine (PO Resp. 23–25), but does not explain why such calculations would not have been within the ability of a person of ordinary skill in the art.

For the foregoing reasons, we find that Petitioner has articulated sufficiently a reason with rational underpinnings for for combining the teachings of Goertzen and Hosino to achieve the wheelchair recited in the challenged claims.

### *Whether a POSITA Could Compensate for Reduced Stability*

Patent Owner contends that a person of ordinary skill in the art would not have considered moving Goertzen's pivot below the axis-to-axis line to be a routine design choice because doing so would reduce stability.  PO Resp. 26–27, 37–38.  As support, Patent Owner analyzes a hypothetical

19

version of Goertzen in which the pivot has been lowered, and finds that the hypothetical chair is unstable because it is more prone to tip forward when descending a curb and when decelerating on a decline. PO Resp. 38–45. Compensating for this decreased stability, according to Patent Owner, would be "extremely difficult, if not impossible." PO Resp. 46 (citing Ex. 2003 (Curran Decl.) ¶¶ 103–110).

Petitioner counters that (1) Mr. Curran's analysis is based improperly upon the patent drawings; (2) a person of ordinary skill in the art would have known to make routine adjustments to compensate for the reduction in stability caused by lowering the pivot; and (3) Goertzen suggests several such adjustments. Pet. Reply 2–9.

We are persuaded that a person of ordinary skill in the art at the time of the claimed invention would have known how to compensate for the reduction in stability caused by lowering the pivot. As Petitioner points out, Goertzen teaches three design options for increasing stability. Pet. Reply 7–9. Patent Owner's expert, Mr. Curran, addresses only two of the three options. Ex. 2003 ¶¶ 106–109. Moreover, Petitioner's Declarant, Dr. Richter, testifies as to other ways in which a person of ordinary skill in the art would have known to compensate for the reduction in stability caused by lowering the pivot. Ex. 1012, 182:6–190:20. Mr. Curran does not explain adequately why those techniques would not have been known to a person of ordinary skill in the art.

For the foregoing reasons, we find that Petitioner has shown that a person of ordinary skill in the art would have known how to compensate for the reduction in stability caused by lowering the pivot of Goertzen.

IPR2013-00411
Patent 8,408,343 B2

_Physical combinability of Goertzen and Hosino_

Patent Owner argues that a person of ordinary skill in the art would not have looked to Hosino to modify Goertzen because (1) the size of the caster wheels in Goertzen already would be higher than the obstacles at issue in Hosino; (2) Goertzen is directed to curb-climbing, whereas Hosino is directed to keeping its caster on the ground at all times for stability; and (3) Hosino does not include an arm that is pivotably mounted to the frame.  PO Resp. 46–49.

Petitioner counters that (1) physical combinability of prior art references is irrelevant; and (2) the claims of the '343 patent are silent as to obstacle size and caster wheel size.  Pet. Reply 4–5, 9.

We are not persuaded by Patent Owner's argument that a person of ordinary skill in the art would not look to Hosino to modify Goertzen due to the physical differences and the different uses for the respective chairs.  The principle taught in Hosino—that low pivot point enables a front caster wheel to move "rear upward" and thereby more easily rise up and overcome the obstacle—applies equally to Goertzen, regardless of the differences in front caster wheel size, and nature of the obstacle being overcome.

For the foregoing reasons, we find that Petitioner has shown adequately that a person of ordinary skill in the art would have looked to Hosino to modify Goertzen.

_Secondary Considerations of Nonobviousness_

Patent Owner asserts that Invacare's TDX SI and Petitioner's M-Series wheelchairs are a copy of the product of the '343 patent (its Jazzy Select 6 wheelchair).  PO Resp. 49–52.  To support its allegations, Patent

IPR2013-00411
Patent 8,408,343 B2

Owner submits a Declaration of Mr. Scott Meuser (Ex. 2006), its chairman and CEO, and relies upon an infringement analysis by Mr. Curran (Ex. 2003 ¶¶ 123, 124). None of the evidence submitted by Patent Owner, however, demonstrates that Invacare or Petitioner was aware of the '343 patent prior to developing its product, or that Invacare or Petitioner developed its product by copying the '343 patent.

### *Claim 7*

Claim 7 recites "wherein the mounting plate is substantially planar and is oriented perpendicular to the drive wheel axis." Petitioner asserts that in Goertzen, as depicted in Figure 3, "mounting plate 308 is substantially planar and is oriented perpendicular to the drive wheel axis 311." Pet. 54 (citing Ex. 1003, 7, ll. 6–12, Fig. 3). Patent Owner contends, however, that Goertzen's mounting plate 308 is parallel—*not* perpendicular—to drive wheel axis 311. PO Resp. 58. Patent Owner's argument is based upon a claim construction that, for the reasons discussed above, we decline to adopt. Figure 3 of Goertzen is reproduced below:

22

IPR2013-00411
Patent 8,408,343 B2



Figure 3 depicts mounting plate 308 in the same orientation with respect to the drive wheel axis as motor 80 of the '165 patent, which the '343 patent describes as "perpendicular to the drive wheel axis." *See* Ex. 1001, col. 9, ll. 20–25. Thus, we are persuaded that mounting plate 308 is "oriented perpendicular to the drive wheel axis," as recited in claim 7.

*Conclusion*

For the foregoing reasons, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–10 are unpatentable under 35 U.S.C. § 103(a) as obvious over Goertzen and Hosino.

IPR2013-00411
Patent 8,408,343 B2

*D. Claims 1 and 4–10 – Obviousness over Goertzen and Mulhern '420*

Petitioner contends that claims 1 and 4–10 are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of Goertzen and Mulhern '420. Pet. 34–39, 45–60. In support of this asserted ground of unpatentability, Petitioner provides detailed explanations as to how each claim limitation is met by Goertzen and Mulhern '420, and again relies upon the Declaration of Dr. Richter. Pet. 34–39 (citing Ex. 1008 ¶¶ 49–56).

Patent Owner does not argue the patentability of claims 1 and 4–10 separately.

Upon consideration of the parties' contentions and supporting evidence, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1 and 4–10 are obvious over Goertzen and Mulhern '420.

## *Mulhern '420 (Exhibit 1005)*

Mulhern '420 describes front anti-tip wheels for powered wheelchairs. Ex. 1006 ¶ 1. Specifically, Mulhern '420 describes a wheelchair having one or more anti-tip wheels and a supporting structure for maintaining the anti-tip wheels in a position very near the ground, when desired, thereby eliminating the uncomfortable sensation of a partial tip for the user. *Id.* ¶ 4. Figures 1 and 2A of Mulhern '420 are reproduced below:

24

IPR2013-00411
Patent 8,408,343 B2



FIG. 1                                                FIG. 2A

Figures 1 and 2A depict a right-side view of a wheelchair according to a first embodiment (Figure 1), and a side-view of an anti-tip wheel assembly with anti-tip wheels in a neutral position (Figure 2). As depicted in Figure 1, wheelchair 10 has forwardly-extending arm 24 that is pivotally connected to frame 60 by bolt 32. *Id.* ¶ 22. Wheel 22 is coupled rotatably to forwardly-extending arm 24 by pin 30. *Id.* Drive wheels 62 are connected rotatably to frame 60. *Id.* ¶ 20. Pivot point 32 is located below a line drawn between the axis of front wheel 22 and the axis of drive wheels 62.

*Petitioner's Contentions*

Petitioner has demonstrated, by a preponderance of the evidence, that claims 1 and 4–10 are obvious over Goertzen and Mulhern '420.

Petitioner acknowledges that wheels 22 of Mulhern '420 are not always "in contact with the surface," as recited in claim 1. Pet. 30–31. Dr. Richter states that:

> Mulhern '420 further explains that front wheel 22 can be lowered to the ground: "Anti-tip wheels assembly 20 further comprises a mechanism for lowering arm 24 and wheel 22. … In this embodiment, the lowering mechanism is capable of holding wheel 22 in a near ground position …. As used herein, near ground position is understood to include a ground engaging position wherein the wheel 22 is in contact with the ground." *See id.* ¶ [0024] (Ex. 1006). A person of skill in the

25

IPR2013-00411
Patent 8,408,343 B2

> art would understand that when the front wheel depicted in
> Figure 1 is lowered to the ground, the front arm pivot point
> would remain below a line drawn between the front wheel axis
> and the drive wheel axis.

Ex. 1008 ¶ 42.  We are persuaded by the reasoning in the above-quoted

analysis of Dr. Richter.

### *Physical combinability of Goertzen and Mulhern '420*

Patent Owner argues that a person of ordinary skill in the art would

not have looked to Mulhern '420 to modify Goertzen because Goertzen

requires its arm to pivot upwards whereas Mulhern '420 prevents its arm

from pivoting upward when it is held in the near ground position by cam 56.

PO Resp.  49.

Petitioner counters that (1) physical combinability of prior art

references is irrelevant; and (2) the claims of the '343 patent are silent as to

obstacle size and caster wheel size.  Pet. Reply 4–5, 9.

We are not persuaded by Patent Owner's argument that a person of

ordinary skill in the art would not look to Mulhern '420 to modify Goertzen

due to the operation of cam 56 in Mulhern '420.  A person of ordinary skill

in the art would recognize that Mulhern '420 does *not* prevent its arm from

pivoting upward when it is *not* held in the near ground position by cam 56.

We find that Petitioner has adequately shown that a person of ordinary

skill in the art would have looked to Mulhern '420 to modify Goertzen.

### *Conclusion*

For the foregoing reasons, we determine that Petitioner has

demonstrated, by a preponderance of the evidence, that claims 1 and 4–10

IPR2013-00411
Patent 8,408,343 B2

are unpatentable under 35 U.S.C. § 103(a) as obvious over the combination of  Goertzen and Mulhern '420.

### E.  Petitioner's Motion to Exclude Evidence

Petitioner filed a Motion to Exclude Evidence (Paper 35), to which Patent Owner responded (Paper 43).  Petitioner filed a Reply in Support of its Motion to Exclude.  Paper 47.  Petitioner's Motion to Exclude Evidence seeks to exclude (1) paragraphs 3–6, 12, 13, 21–23, 25–30, and 32–40 of the Declaration of Scott Meuser (Ex. 2006); and (2) paragraphs 122–124 of the Declaration of Neal Curran (Ex. 2003).  Paper 35, 1.  As movant, Petitioner has the burden of proof to establish that it is entitled to the requested relief. *See* 37 C.F.R. § 42.20(c).

We decline to assess the merits of Petitioner's Motion to Exclude Evidence.  As discussed above, even without excluding the identified evidence, we have concluded that Petitioner has demonstrated, by a preponderance, of the evidence that the challenged claims are unpatentable. Accordingly, Petitioner's Motion to Exclude Evidence is *denied*.

### F.  Patent Owner's Motion to Exclude Evidence

Patent Owner also filed a Motion to Exclude Evidence (Paper 36), to which Petitioner responded (Paper 45).  Patent Owner filed a Reply in Support of its Motion to Exclude.  Paper 46.  Patent Owner's Motion to Exclude Evidence seeks to exclude the testimony of Dr. Richter on the grounds that he is not an expert under Federal Rule of Evidence 702.  Paper 36.  As movant, Petitioner has the burden of proof to establish that it is

27

IPR2013-00411
Patent 8,408,343 B2

entitled to the requested relief.  *See* 37 C.F.R. § 42.20(c).  For the reasons stated below, Petitioner's Motion to Exclude is *denied*.

Patent Owner's motion is predicated on a definition of the level of ordinary skill in the art that we declined to adopt, as discussed above.  Based on the level of ordinary skill in the art that we determined above, Dr. Richter is a person of greater than ordinary skill.

Patent Owner also argues that Petitioner improperly needs the evidence regarding the level of skill in the art relied upon in the Reply to make out a prima facie case for the Petition.  Patent Owner, however, cites no case law to support that proposition.  Petitioner asserts that the Board has routinely found claims to be obvious without identifying a specific level of ordinary skill in the art.  Paper 45, 8–9, n.6.  We are not persuaded that Petitioner failed to make a sufficientcase of obviousness because the Petition lacked an explicit contention in the Petition regarding the level of ordinary skill in the art.

## III.  CONCLUSION

Petitioner has shown, by a preponderance of the evidence, that claims 1–10 of the '343 patent are unpatentable based on the following grounds of unpatentability:

| Reference[s] | Basis | Claims challenged |
|---|---|---|
| Goertzen & Hosino | § 103 | 1–10 |
| Goertzen & Mulhern '420 | § 103 | 1 and 4–10 |

IPR2013-00411
Patent 8,408,343 B2

## IV.  ORDER

In consideration of the foregoing, it is

ORDERED that claims 1–10 of the '343 patent are held unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is *denied*;

FURTHER ORDERED that Patent Owner's Motion to Exclude is *denied*; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2013-00411
Patent 8,408,343 B2


For PETITIONER:

David Cavanaugh
David.Cavanaugh@wilmerhale.com

Owen Allen
Owen.Allen@wilmerhale.com


For PATENT OWNER:

Gray Levin
glevin@bakerlaw.com

Jake Soumis
jsoumis@bakerlaw.com

Daniel Goettle
dgoettle@bakerlaw.com

US008408343B2

(12) **United States Patent**
Puskar-Pasewicz et al.

(10) Patent No.: **US 8,408,343 B2**
(45) Date of Patent: **Apr. 2, 2013**

(54) **POWERED WHEELCHAIR CONFIGURATIONS AND RELATED METHODS OF USE**

(71) Applicants: **John Puskar-Pasewicz**, Shavertown, PA (US); **Kip D. Alder**, West Pittston, PA (US)

(72) Inventors: **John Puskar-Pasewicz**, Shavertown, PA (US); **Kip D. Alder**, West Pittston, PA (US)

(73) Assignee: **Pride Mobility Products Corporation**, Exeter, PA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/656,833**

(22) Filed: **Oct. 22, 2012**

(65) **Prior Publication Data**

US 2013/0043083 A1    Feb. 21, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 12/822,464, filed on Jun. 24, 2010, now Pat. No. 8,292,010, which is a continuation of application No. 11/486,638, filed on Jul. 14, 2006, now Pat. No. 7,766,106.

(60) Provisional application No. 60/699,201, filed on Jul. 14, 2005, provisional application No. 60/727,537, filed on Oct. 17, 2005.

(51) **Int. Cl.**
**B60K 1/00**    (2006.01)

(52) **U.S. Cl.** ..... **180/68.1**; 180/907; 180/6.5; 180/24.02; 180/308

(58) **Field of Classification Search** ................... 180/8.1, 180/8.2, 8.3, 8.4, 8.5, 8.6, 8.7, 65.1, 6.48, 180/6.5, 24.02, 24.06, 24.07, 308, 907, 908, 180/21, 22;  80/5.2, 5.22, 5.28
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,104,112 | A | 9/1963 | Crait |
| 3,213,957 | A | 10/1965 | Wrigley |
| 3,520,378 | A | 7/1970 | Slay |
| 3,794,132 | A | 2/1974 | Moon |
| 3,807,520 | A | 4/1974 | Chisholm |
| 3,827,718 | A | 8/1974 | Curry |
| 3,938,608 | A | 2/1976 | Folco-Zambelli |
| 3,952,822 | A | 4/1976 | Udden |
| 4,000,912 | A | 1/1977 | Donald et al. |
| 4,128,137 | A | 12/1978 | Booth |
| 4,245,847 | A | 1/1981 | Knott |
| 4,513,832 | A | 4/1985 | Engman |
| 4,566,551 | A | 1/1986 | Feliz |
| 4,840,394 | A | 6/1989 | Bickler |
| 5,094,310 | A | 3/1992 | Richey et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| CA | 2254372 A1 | 5/2000 |
|---|---|---|
| EP | 1 142 548 A2 | 10/2001 |

(Continued)

OTHER PUBLICATIONS

EP Search Report Dated Feb. 28, 2005—EP 1522295 A3.

(Continued)

*Primary Examiner* — Hau Phan
*Assistant Examiner* — Bryan Evans
(74) *Attorney, Agent, or Firm* — Woodcock Washburn LLP

(57) **ABSTRACT**

A wheelchair includes a frame, a chair. a pair of drive wheels, a pair of rear wheels, and a pair of front wheels. Each front wheel is part of a front arm assembly that is rigidly coupled to a drive via a mounting plate. The mounting plate is connected to the wheelchair frame by a pivot. The drives are transversely mounted. The batteries are disposed rearward of the drives. The wheelchair seat can be moved forward to provide access to the batteries without fully removing the wheelchair from the frame.

**10 Claims, 27 Drawing Sheets**



PERMOBIL 1001

**JA2567**

## US 8,408,343 B2
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,156,226 | A | 10/1992 | Boyer |
| 5,275,248 | A | 1/1994 | Finch et al. |
| 5,435,404 | A | 7/1995 | Garin, III |
| 5,540,297 | A | 7/1996 | Meier |
| 5,564,512 | A | 10/1996 | Scheulderman |
| 5,778,996 | A | 7/1998 | Prior et al. |
| D397,645 | S | 9/1998 | Pulver |
| 5,848,658 | A | 12/1998 | Pulver |
| 5,855,387 | A | 1/1999 | Gill et al. |
| 5,944,131 | A | 8/1999 | Schaffner et al. |
| 5,964,473 | A | 10/1999 | Degonda et al. |
| 6,047,979 | A | 4/2000 | Kraft et al. |
| 6,070,898 | A | 6/2000 | Dickie |
| 6,129,165 | A | 10/2000 | Schaffner |
| 6,135,222 | A | 10/2000 | Furukawa |
| 6,176,335 | B1 | 1/2001 | Schaffner |
| 6,196,343 | B1 | 3/2001 | Strautnieks |
| 6,199,647 | B1 | 3/2001 | Schaffner |
| 6,202,773 | B1 | 3/2001 | Richey, II et al. |
| 6,220,382 | B1 | 4/2001 | Kramer, Jr. et al. |
| 6,234,507 | B1 | 5/2001 | Dickie |
| 6,341,657 | B1 | 1/2002 | Hopely, Jr. et al. |
| 6,357,793 | B1 | 3/2002 | Dickie et al. |
| 6,375,209 | B1 * | 4/2002 | Schlangen ................ 280/250.1 |
| 6,460,641 | B1 | 10/2002 | Kral |
| 6,494,474 | B1 | 12/2002 | Kramer, Jr. |
| 6,533,306 | B2 | 3/2003 | Watkins |
| 6,543,798 | B2 | 4/2003 | Schaffner et al. |
| 6,554,086 | B1 | 4/2003 | Goertzen et al. |
| 6,640,916 | B2 | 11/2003 | Schaffner |
| 6,705,629 | B2 | 3/2004 | Post et al. |
| 6,752,230 | B1 | 6/2004 | Huang |
| 6,769,503 | B2 | 8/2004 | Cheng |
| 6,796,568 | B2 | 9/2004 | Martis et al. |
| 6,851,711 | B2 | 2/2005 | Goertzen et al. |
| 6,923,278 | B2 | 8/2005 | Mulhern |
| 7,021,641 | B2 | 4/2006 | Wu |
| 7,040,429 | B2 | 5/2006 | Molnar |
| 7,066,290 | B2 | 6/2006 | Fought |
| 7,083,195 | B2 | 8/2006 | Goertzen et al. |
| 7,104,346 | B2 | 9/2006 | Schaffner |
| 7,344,155 | B2 | 3/2008 | Mulhern et al. |
| 7,380,824 | B2 | 6/2008 | Chen et al. |
| 7,389,835 | B2 | 6/2008 | Mulhern |
| 7,413,038 | B2 | 8/2008 | Mulhern et al. |
| 7,506,709 | B2 | 3/2009 | Kiwak et al. |
| 7,766,106 | B2 | 8/2010 | Puskar-Pasewicz et al. |
| 8,292,010 | B2 | 10/2012 | Puskar-Pasewicz et al. |
| 2001/0011613 | A1 | 8/2001 | Schaffner |
| 2002/0093172 | A1 | 7/2002 | Watkins |
| 2003/0075365 | A1 * | 4/2003 | Fought ............................ 180/6.5 |
| 2003/0089537 | A1 | 5/2003 | Sinclair |
| 2004/0004342 | A1 | 1/2004 | Mulhern et al. |
| 2004/0035627 | A1 | 2/2004 | Richey et al. |
| 2004/0046358 | A1 | 3/2004 | White et al. |
| 2004/0060748 | A1 | 4/2004 | Molnar |
| 2004/0168839 | A1 | 9/2004 | Wu |
| 2004/0251063 | A1 | 12/2004 | Patterson |
| 2004/0251649 | A1 | 12/2004 | Wu |
| 2004/0262859 | A1 | 12/2004 | Turturiello et al. |
| 2005/0000742 | A1 | 1/2005 | Mulhern et al. |
| 2005/0077714 | A1 | 4/2005 | Mulhern et al. |
| 2005/0077715 | A1 | 4/2005 | Mulhern |
| 2005/0127631 | A1 | 6/2005 | Schaffner |
| 2005/0206149 | A1 | 9/2005 | Mulhern et al. |
| 2006/0022445 | A1 | 2/2006 | Mulhern |
| 2006/0076747 | A1 | 4/2006 | Pauls et al. |
| 2006/0076748 | A1 | 4/2006 | Pauls et al. |
| 2006/0082117 | A1 | 4/2006 | Turturiello et al. |
| 2006/0086554 | A1 | 4/2006 | Jackson et al. |
| 2007/0181353 | A1 | 8/2007 | Puskar-Pasewicz et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1 493 418 A1 | 1/2005 |
| EP | 1 522 294 A2 | 4/2005 |
| EP | 1522295 A2 | 4/2005 |
| FR | 2215054 | 3/1974 |
| FR | 2399822 | 3/1979 |
| GB | 2051702 | 5/1980 |
| GB | 2192595 | 7/1986 |
| JP | 2001-104391 | 4/2001 |
| JP | 2001104391 A * | 4/2001 |
| WO | WO 87/06205 | 4/1987 |
| WO | WO 90/06097 | 6/1990 |
| WO | WO 00/08910 | 2/2000 |
| WO | WO 00/53142 A1 | 9/2000 |
| WO | WO 00/54718 | 9/2000 |
| WO | WO 02/34190 A2 | 5/2002 |

### OTHER PUBLICATIONS

Non-Final Rejection Dated Dec. 12, 2008 for U.S. Appl. No. 12/170,876, filed Jul. 10, 2008. First Named Inventor James P. Mulhern.

Response to Non-Final Rejection Dated Mar. 12, 2009 for U.S. Appl. No. 12/170,876, filed Jul. 10, 2008. First Named Inventor James P. Mulhern.

Non-Final Rejection Dated Jun. 6, 2009 for U.S. Appl. No. 12/170,876, filed Jul. 10, 2008. First Named Inventor James P. Mulhern.

Response to Non-Final Rejection Dated Sep. 14, 2009 for U.S. Appl. No. 12/170,876, filed Jul. 10, 2008. First Named Inventor James P. Mulhern.

Notice of Allowance Dated Jan. 27, 2010 for U.S. Appl. No. 12/170,876, filed Jul. 10, 2008. First Named Inventor James P. Mulhern.

English Abstract of French Patent FR2399822 Granted on Mar. 9, 1979.

Non-Final Rejection Dated Jul. 6, 2009 for U.S. Appl. No. 11/857,323, filed Sep. 18, 2007. First Named Inventor Christopher Grymko.

Response to Non-Final Rejection Dated Oct. 6, 2009 for U.S. Appl. No. 11/857,323, filed Sep. 18, 2007. First Named Inventor Christopher Grymko.

Notice of Allowance Dated Feb. 1, 2010 for U.S. Appl. No. 11/857,323, filed Sep. 18, 2007. First Named Inventor Christopher Grymko.

Non-Final Rejection Dated Aug. 8, 2008 for U.S. Appl. No. 11/550,147, filed Oct. 17, 2006. First Named Inventor John Puskar-Pasewicz.

Response to Non-Final Rejection Dated for Nov. 17, 2008 for U.S. Appl. No. 11/550,147, filed Oct. 17, 2006. First Named Inventor John Puskar-Pasewicz.

Final Rejection Dated Feb. 2, 2009 for U.S. Appl. No. 11/550,147, filed Oct. 17, 2006. First Named Inventor John Puskar-Pasewicz.

Amendment to Final Rejection Dated Apr. 1, 2009 for U.S. Appl. No. 11/550,147, filed Oct. 17, 2006. First Named Inventor John Puskar-Pasewicz.

Non-Final Rejection Dated Aug. 10, 2009 for U.S. Appl. No. 11/550,147, filed Oct. 17, 2006. First Named Inventor John Puskar-Pasewicz.

Response to Non-Final Rejection Dated Jan. 11, 2010 for U.S. Appl. No. 11/550,147, filed Oct. 17, 2006. First Names Inventor John Puskar-Pasewicz.

Control No. 95/002,255 dated Sep. 14, 2012, Request for Inter Parties Reexamination Under 35 USC 311-318 including Appendix B.1 through B.11.

Control No. 95/002,255 dated Sep. 14, 2012, Petition for Review of the Denial issued Dec. 26, 2012.

Conrol No. 95/002,255 dated Sep. 14, 2012, Reexamination Non final Office Action dated Nov. 27, 2012.

* cited by examiner



# FIG. 1



**FIG. 2**



## FIG. 3A



FIG.3B



# FIG. 4A



# FIG. 4B



FIG. 5



FIG. 6A



## FIG. 6B



FIG.6C



# FIG. 7A



# FIG. 7B



## FIG. 8A



# FIG. 8B

**JA2582**



## FIG. 9



10'

FIG. 10

**JA2584**



## FIG. 11

JA2585



FIG. 12



FIG. 13



FIG. 18



**FIG. 15**



**FIG. 14**



## FIG. 16



FIG. 17



# FIG. 19



FIG. 20

U.S. Patent    Apr. 2, 2013    Sheet 24 of 27    US 8,408,343 B2



FIG. 21

U.S. Patent

Apr. 2, 2013

Sheet 25 of 27

US 8,408,343 B2



FIG. 22



FIG. 23

U.S. Patent

Apr. 2, 2013

Sheet 27 of 27

US 8,408,343 B2

US 8,408,343 B2

1

**POWERED WHEELCHAIR CONFIGURATIONS AND RELATED METHODS OF USE**

CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 12/822,464, filed Jun. 24, 2010, which is a continuation of U.S. application Ser. No. 11/486,638 filed Jul. 14, 2006, now U.S. Pat. No. 7,766,106, which claims priority to U.S. provisional application No. 60/699,201 filed Jul. 14, 2005 and U.S. provisional application No. 60/727,537 filed Oct. 17, 2005, the contents of each are incorporated by reference herein in their entireties.

TECHNICAL FIELD

The present invention relates to powered wheelchairs, and more specifically to wheelchair configurations that are capable of assisting in curb-climbing.

BACKGROUND

Powered wheelchairs often have six wheels including a pair of center wheels, a pair of rear wheels, and a pair of front wheels. Typically, one pair of wheels is driven by, and directly connected to, a drive. The front wheels may be suspended above the ground plane on which the wheelchair rests or in contact with the ground. Typically, wheels that are spaced apart from the ground surface, or configured to only lightly contact the ground surface, are fixed except for the capability of turning about their axes of rotation; such wheels are referred to herein as "fixed wheels." Wheels that are configured to ride on the ground surface during normal operation typically have the capability to swivel about a vertical axis; such wheels are referred to herein as "casters."

Wheelchairs that employ fixed wheels often employ springs to suspend the fixed wheels above the ground at the end of forward extending arms. The fixed wheels are the first part of the wheelchair that contact a curb, and the fixed wheels are often configured to ride over a curb.

Wheelchairs that employ casters often are disposed on forward-extending arms that are coupled to the frame at a pivot. Some wheelchairs, such as those employing an Active-Track™ suspension, available on some powered wheelchairs from Pride Mobility Products Corporation, have pivotable front caster arms that raise or are upwardly biased in response to wheelchair acceleration or motor torque to enhance the capability of the wheelchair to climb curbs. Pivotable front caster arms typically employ biasing springs to provide a downward force that is balanced against the drive's capability to raise the casters for ascending a curb and that urges the casters downward to contact the lower ground surface while descending a curb.

Wheelchairs typically have a frame onto which loads from the passenger and the wheelchair's batteries are applied. To properly distribute the load between the center wheels and the rear casters (and where applicable the front casters) and to enhance stability of the wheelchair, loads from the batteries and passenger typically are applied between the axis of rotation of the center wheels and the rear casters, especially where the center wheels are drive wheels. Often, the batteries are located such that the center of gravity of the batteries is near, but rearward of, the center drive wheels or in general near the center of the wheelchair. To accommodate the battery location, the drive for each drive wheel typically includes a lon-

2

gitudinally oriented (that is, oriented parallel to the axis of straight-ahead movement of the wheelchair) motor and a right-angle gearbox. An exception to such drive and battery configuration is shown in U.S. Pat. No. 5,964,473 ("De-gonda"), which discloses a transversely oriented motor that splits the battery compartment.

Because the conventional location of the battery compartment is at least partly underneath the passenger chair, the chair must be removed to access the batteries.

Furthermore, there is a general need for wheelchair configurations that are simple and inexpensive, yet are effective in climbing obstacles such as curbs.

SUMMARY

Wheelchair configurations and corresponding methods of use are provided that have a combination of stability and curb-climbing capabilities. According to a first aspect, a wheelchair includes a frame; a pair of drive wheels and at least one rear wheel; a pair of drives operatively coupled to the drive wheels such that each one of the drives includes a motor and a gearbox; a pair of forward-extending, front arms rigidly coupled to the drives such that each one of the drives-and-front arm structures is pivotally coupled to the frame only at a single pivot axis; and a pair of front wheels rotatably coupled to the front arm. A centerline of the pivot axis has a vertical height that is approximately the same or less than the vertical height of an axis of rotation of the front wheel. Accordingly, the motor torque is capable of biasing the front wheels when encountering or ascending a curb, when accelerating, and when decelerating.

Preferably, the wheelchair drive includes a drive mount, which preferably is an upright mounting plate, to which the gearbox is rigidly coupled. The drive mount is coupled to the frame at the pivot axis. The motors preferably are transversely mounted and their batteries are located to the rear of the motors. An articulating beam is generally located generally behind the batteries. The pivot axis preferably is spaced apart from the front wheel axis by a horizontal dimension that is between about 40% and about 65% of the horizontal dimension between the drive wheel axis and the front castor axis, more preferably between about 45% and about 60%, more preferably, approximately 54% of the horizontal dimension between the drive wheel axis and the front castor axis.

A method of using this wheelchair configuration includes positioning the wheelchair such that the front wheels are in contact with or in close proximity to an obstacle that has a height measured from a support surface that is approximately equal to or less than the height of the front wheel axis of rotation; and urging the wheelchair forward to enable the front wheels to ascend the obstacle.

According to another aspect, a wheelchair includes a frame; a pair of opposing drives, each including a substantially-transversely mounted motor and gearbox; a pair of drive wheels each coupled to a corresponding one of the drives; and a chair assembly supported on the frame and being moveably coupled thereto such that the chair is forwardly moveable to enhance access to a power supply portion of the wheelchair without fully removing the chair from the frame. Preferably, the power supply portion constitutes batteries that are located rearward of the chair support and rearward of the motors. Preferably, the seat is hinged or slideable.

According to another aspect, a wheelchair includes a frame; a pair of opposing drive wheels; a pair of pivoting assemblies associated with the drive wheels and including a drive assembly and a front arm assembly. Each drive assembly (i) includes a motor and gearbox that are transversely

US 8,408,343 B2

3

mounted relative to the frame, (ii) is operatively coupled to one of the drive wheels, and (iii) is pivotally connected to the frame. Each front arm assembly includes a front wheel rotatably coupled to the front arm, and the front arm assembly is rigidly coupled to the drive assembly. Accordingly, the drive assembly and front arm assembly pivot in unison about the pivotal connection upon encountering an obstacle. Preferably, a pivot axis of the pivotal connection between the drive assembly and the frame has a vertical height that is approximately the same or less than the vertical height of an axis of rotation of the front wheel. The motor and single reduction gearbox assembly has a longitudinal axis that is transverse relative to the frame, and the drive assembly includes a mount to which the gearbox is affixed such that the mount includes a surface to which the front arm is rigidly affixed. The battery compartment may be located rearward of the drive and an articulating transverse beam, located rearward of the battery, may include a pair of rear idler wheels.

According to another aspect, a wheelchair includes a frame; a seat coupled to the frame; a pair of opposing drive wheels and at least one rear wheel. Each side of the wheelchair includes: a drive including a motor and a gearbox that are transversely mounted, such the drive is operatively coupled to a drive wheel; and a forward-extending, front arm rigidly coupled to the drive such that each one of the drive and front arm structures is pivotally coupled to the frame only at a single pivot axis. The wheelchair also includes a front wheel located at a forward end of the front arm; a pivoting transverse beam located rearward of the drive wheels and having a pair of rear idler wheels coupled to opposing ends thereof; and at least one battery assembly that is accessible from rearward of the drive wheels.

Preferably, the gearbox is a single reduction gearbox and the front wheel is rotatably coupled the front arm, and a centerline of the pivot axis has a height that is approximately the same or less than the vertical height of an axis of rotation of the front wheel. The pivot on which the transverse beam pivots is substantially horizontal and located rearward of the battery assembly such that the battery assembly is accessible via the back-center of the wheelchair.

According to another aspect, a wheelchair includes a frame; a seat coupled to the frame; a pair of opposing drive wheels and at least one rear wheel. Each side of the wheelchair includes a motor and a gearbox that are transversely mounted, wherein the drive is operatively coupled to a drive wheel; a forward-extending, front arm operatively coupled to the drive whereby motor torque may bias the front arm, wherein the front arm coupled to the frame at a pivot axis; and a front wheel rotatably coupled to the front arm such that a centerline of the pivot axis (i) has a height that is approximately the same or less than the vertical height of an axis of rotation of the front wheel, and (ii) is horizontally spaced apart from the axis of rotation of the front wheel by no more than about 65% of the horizontal distance between the axis of rotation of the front wheel and the drive wheel axis.

The centerline of the pivot axis is horizontally spaced apart from the axis of rotation of the front wheel more preferably by no more than about 50% of the horizontal distance between the axis of rotation of the front wheel and the drive wheel axis, more preferably no more than about 40%, and even more preferably no more than about 33% of the horizontal distance between the axis of rotation of the front wheel and the drive wheel axis. Preferably, the wheelchair includes a pivoting transverse beam that is located rearward of the drive wheels, and rearward of the batteries, and that has a pair of rear idler wheels coupled to opposing ends thereof.

4

According to another aspect, a wheelchair includes a frame; a seat coupled to the frame; a pair of opposing drive wheels; and at least one rear wheel. Each side of the wheelchair includes: a drive including a motor and a gearbox that are transversely mounted such that the drive is operatively coupled to a drive wheel; a forward-extending, front arm operatively coupled to the drive whereby motor torque may bias the front arm and such that the front arm is coupled to the frame at a pivot axis; and a front wheel rotatably coupled the front arm. The pivot axis (i) has a height that is approximately inline with or below a line extending between a drive wheel centerline and a centerline of rotation of the front wheel and (ii) is horizontally spaced apart from the axis of rotation of the front wheel by no more than about 65% of the horizontal distance between the axis of rotation of the front wheel and the drive wheel axis.

The centerline of the pivot axis is horizontally spaced apart from the axis of rotation of the front wheel more preferably by no more than about 50% of the horizontal distance between the axis of rotation of the front wheel and the drive wheel axis, more preferably no more than about 40%, and even more preferably no more than about 33% of the horizontal distance between the axis of rotation of the front wheel and the drive wheel axis. Preferably, the pivot axis height is approximately the same as or less than the vertical height of an axis of rotation of the front wheel, batteries for powering the motors are disposed rearward of the motors, and an articulating, transverse beam to which rear wheels are operatively attached is located the batteries.

Where applicable above, the front wheel may be a caster that is in contact with the ground while the wheelchair is at rest on a level ground plane or an anti-tip wheel that is suspended from the ground plane. In either case, springs may bias the wheels.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a side view of an embodiment of a wheelchair illustrating aspects of the present invention;

FIG. 2 is a perspective view of the wheelchair shown in FIG. 1;

FIG. 3A is a perspective view of the wheelchair shown in FIG. 1 with portions of the chair assembly and cover removed;

FIG. 3B is a perspective view of the wheelchair as shown in FIG. 3A with the drive wheels and a portion of the mounting plate removed;

FIG. 4A is a side view of the wheelchair shown in FIG. 1 with portions of the chair assembly and cover removed;

FIG. 4B is side view of the wheelchair as shown in FIG. 4A with the drive wheel and a portion of the mounting plate removed;

FIG. 5 is a top view of the wheelchair shown in FIG. 1 with portions of the chair assembly and cover removed;

FIG. 6A is a side view of the wheelchair shown in FIG. 1 on a level ground surface with the cover, drive wheel, and a portion of the mounting plate removed;

FIG. 6B is a side view of the wheelchair shown in FIG. 6A illustrating the wheelchair ascending a curb;

FIG. 6C is a side view of the wheelchair shown in FIG. 6A illustrating the wheelchair descending a curb;

FIG. 7A is a perspective view of another embodiment of a wheelchair with a portion of the chair assembly and cover removed;

FIG. 7B is a perspective view of the wheelchair of FIG. 7A with the drive wheels and a portion of the mounting plate removed;

US 8,408,343 B2

5

FIG. **8A** is a side view of the wheelchair shown in FIG. **7A**;

FIG. **8B** is a side view of the wheelchair shown in FIG. **7A** with the drive wheel and a portion of the mounting plate removed;

FIG. **9** is a top view of the wheelchair shown in FIG. **7A**;

FIG. **10** is a side view of the wheelchair shown in FIG. **7A** illustrating the wheelchair ascending a curb;

FIG. **11** is a perspective view of a portion of the chair assembly showing the chair in its forward-most position;

FIG. **12** is a perspective view of a moveable portion of the chair assembly corresponding to the chair being in an intermediate position;

FIG. **13** is a perspective view of the moveable portion of the chair assembly corresponding to the chair being in its forward-most position;

FIG. **14** is a perspective view of another embodiment of a moveable portion of the chair assembly shown in a lower or operational position;

FIG. **15** is a perspective view of the embodiment in FIG. **14** showing the chair in a forward-most position;

FIG. **16** is a side view of another embodiment of a moveable portion of the chair assembly shown in its lower or operational position;

FIG. **17** is a perspective view of the underside of the embodiment shown in FIG. **16**, but shown in its open configuration that corresponds to the chairs' forward-most position;

FIG. **18** is a perspective view of another embodiment of a moveable portion of the chair assembly.

FIG. **19** is a view of the preferred drive;

FIG. **20** is a graph of output efficiency versus current draw for a preferred drive and a conventional drive;

FIG. **21** is graph of output horsepower versus current draw for a preferred drive and a conventional drive;

FIG. **22** is a graph of output speed versus torque for a preferred drive and a conventional drive; and

FIG. **23** is a graph of output torque versus current draw for a preferred drive and a conventional drive.

## DETAILED DESCRIPTION OF ILLUSTRATIVE EMBODIMENTS

Two main embodiments of a wheelchair are disclosed herein to illustrate aspects of the present invention. A first embodiment wheelchair **10** is shown in FIGS. **1** through FIG. **5**. A second embodiment wheelchair **10'** is shown in FIGS. **7A**, **7B**, **8A**, and **8B**. First embodiment wheelchair **10** includes a frame assembly **12**, a chair assembly **14**, a drive assembly **16**, a front pivot assembly **18**, and a rear wheel assembly **20**.

Frame assembly **12** in the embodiment shown is a box-like structure that is formed of welded and/or bolted square and round tubing and formed plates. The frame structure, which is generally referred to herein by reference numeral **24**, includes a central support **25a**, a rear support **25b**, a T-shaped support **25c**, a pair of pivot supports **25d**, and a footrest support **25e**. Frame **24** is generally rigid, even though the present invention encompasses frames having joints for enhancing the suspension or any other reason.

Central support **25a**, which is best shown in FIGS. **3A**, **3B**, and **4B**, is disposed along a horizontal centerline of the wheelchair **10**. Central support is shown in FIGS. **4A** and **4B**, and partially shown schematically in dashed lines in FIG. **5**. Rear support **25b**, which is shown in FIGS. **4A** and **4B**, and schematically in dashed lines in FIGS. **3A** and **5**, extends upwardly from a rear portion of central support **25a** and includes a mounting plate **25f**. T-shaped support **25c** is disposed above and forward of central support **25a** and includes

6

a longitudinal portion **25g** and a pair of transverse supports **25h**. Pivot supports **25d** extend generally downwardly from transverse supports **25h**. Footrest support **25e** is disposed at a forward end of longitudinal portion **25b** of T-shaped support **25c**. A footrest **80** is coupled to footrest support **25e**.

A housing **26** for holding batteries **82** or other power source is bolted or welded to frame **24**. A chair support, such as support post **27**, extends upwardly from frame **24**. Support post **27** may be integrally formed as a portion of frame **24** or may be a separate structure. Support post **27**, as best shown in FIG. **6A**, includes a substantially upright portion **28a**, a backwardly curved portion **28b**, and an upright square tube **28c**.

Chair assembly **14** includes a seat **30** for holding the wheelchair passenger, a seat post **31** for insertion into tube **28c** of support post **27**, and a hinge assembly **32** for enabling the seat **30** to pivot forward. Hinge assembly **32** enables seat **30** to pivot relative to seat post **31**. As best shown in FIG. **11** through FIG. **13**, hinge assembly **32** includes a pair of plates or brackets **34a** and **34b**, and a hinge or pivot **36**.

To retain the seat in its forward-most position, which is shown in FIG. **11** and FIG. **13**, a retainer assembly **38** includes a retainer plate **40** having a slot **42**, a stud **44**, and a detent recess **46**. Retainer plate **40** preferably is attached to upper bracket **34a** by a pivot **39**. Stud **44** preferably is affixed to lower bracket **34b** and disposed to slide within slot **42**. Detent recess **46** is formed in retainer plate **40** as an extension of slot **42**. Stud **44** can slide into the recess **46** to temporarily and releasably lock seat **30** in its forward-most position. This locking mechanism can be released by moving the retainer plate **40** by hand such that stud **44** is disposed into the long slotted portion of slot **42**, which enables stud **44** to slide in slot **42** to enable seat **30** to return to its ready position for use by a passenger The ready position is shown schematically in dashed lines in FIG. **1**. A pair of pins **48** are provided for manually locking brackets **34a** and **34b** together to prevent seat **30** from pivoting forward and keep seat **30** in its ready position.

Referring to FIGS. **14** and **15** to illustrate another assembly to enable a seat **30** (not shown in FIGS. **14** and **15** for convenience of illustration) to move forward, a hinge assembly **32'** is coupled to a seat post **31'**. Hinge assembly **32'** includes an upper mounting plate or bracket **34a'** and a lower mounting plate or bracket **34b'**. Plates **34a'** and **34b'** are connected at front portions thereof by a hinge or pivot **36'**. A pair of gas or spring-loaded cylinders **38'**, which are biased toward the extended position, are connected between the two plates to urge upper bracket **34b'** toward its forward-most position, as shown in FIG. **15**. Preferably, cylinders **38'** provide enough force to retain seat **30** in its forward position such that a person can by hand lower seat **30** against the force of cylinders **38'**. Also, cylinders **38'** are oriented and chosen such that force tending move chair **30** from its lowermost position does not create a personnel risk. In general, cylinders **38'** preferably assist in the raising of chair **30**.

A latch mechanism **40'** holds lower bracket **34b'** in its rearward-most or lower-most position, in which upper bracket **34a'** rests on lower bracket **34b'**, and is coupled to an ear or flange **41a'** on upper plate **34a'**. The lower-most position is shown in FIG. **14**. Latch mechanism **40'** includes a retractable pin **48a'**, which preferably may be spring loaded or, alternatively, retractable by threading onto threads fixed onto one of the brackets. As best shown in FIG. **15**, pin **48a'** is housed in a body **49'**, which is affixed to an ear or flange **41a'** that extends from upper bracket **34a'**. Body **49'** preferably is threaded onto a nut that is affixed to flange **41a'**.

Lower bracket **34b'** includes connections for cylinders **38'**, a connection for seat post **31'**, and a downwardly projecting

US 8,408,343 B2

7

ear or flange 41b'. Flange 41b' preferably has a curved portion that forms a smooth transition between a substantially vertical portion of flange 41b' and the major surface of bracket 34b'. Thus, when upper bracket 34a' is lowered onto lower bracket 34b', pin 48a' contacts the curved portion of flange 41a' and gradually retracts. Pin 48a' aligns with a hole 48b' formed in flange 41a' when upper bracket 34a' is fully engaged with lower bracket 34b'. Pin 48a' then extends into hole 48b' to retain upper bracket 34b' onto lower bracket 34a'.

FIGS. 16 and 17 show an alternative embodiment of the assembly that enables seat 30 (not shown in FIGS. 17 and 17 for clarity) to move foreword. The brackets 34a" and 34b" of the embodiment of FIGS. 16 and 17 are similar to those shown in FIGS. 14 and 15 except latch mechanism 40' (and its cooperating structure) is omitted in favor of a locking handle 40" (and its cooperating structure) that is employed to retain upper bracket 34a" and lower bracket 34b" together. In this regard, upper bracket 34a" includes a pair of tabs 41a" that form a pair 42a". In its lower position, slot 42a" receives an alignment bar 42b" that is part of lower bracket 34b". Brackets 34a" and 34b" are coupled together by a hinge or pivot 36".

Locking handle 40" includes a handle portion 48" and a pair of cam portions 49" that are connected to tabs 41a" via a hinge 47". In the lower position, shown in FIG. 16, can portions 49" engage alignment bar 42b" to retain brackets 34a" and 34b" together. Upward rotation of handle mechanism 40" disengages cam portions 49" from alignment bar 42b" and enables upper bracket 34a" to move upward relative to lower bracket 34b". Preferably, air cylinders, as shown in FIGS. 14 and 15 (not shown in FIGS. 16 and 17), are connected between brackets 34a" and 34b" to urge seat 30 toward its forward-most position (or more preferably to aid in the manual raising of seat 30 toward its forward-most position), and to retain it in the forward-most position, until manually returned to its lower position.

Referring to FIG. 18 to illustrate another embodiment of an assembly to enable a seat 30 to move forward, a slide assembly 32"' is mounted onto a lower chair assembly bracket 34b"'. A corresponding upper chair assembly bracket 34a"', which is shown schematically in dashed lines, is pivotally coupled to a chair 30 (not shown in FIG. 18). A pair of slides enables upper bracket 34a"' to slide on lower bracket 34b"', which is affixed to a support 31. Support post 27"' is generally identical to post 27 described above.

Each one of the pair of slides includes a slide member 33a that is fixed to the upper bracket 34a"' and a cooperating slide member 33b that is fixed to the lower bracket 34b"'. Slide members 33a and 33b may have any configuration that will enable seat 30 to slide relative to lower bracket 34b"', including conventional slides.

According to a first embodiment wheelchair 10 as illustrated beginning at FIG. 3A, a wheelchair 10 includes a pair of drive assemblies 16 and pivot assemblies 18. Preferably, the left combination of drive assembly 16 and pivot assembly 18 is the mirror image of the right combination of drive assembly 16 and pivot assembly 18. For convenience, only one of each assembly drive 16 and pivot assembly 18 is described in detail herein, as it is clear that the description applies equally to each one of the left and right assemblies 16 and 18.

Drive assembly 16 includes a pair of drives 50, each of which includes a motor 52, a gearbox 54, and a mounting plate 56. Each one of the drive assemblies is connected to one of a pair of drive wheels 58. Drive assembly 16 is pivotally coupled to frame assembly 12 by the pivot 29 between frame structure 24 and mounting plate 56. Motor 52 preferably is oriented with its centerline (that is, the central axis of its output shaft) parallel to the output shaft of gearbox 54, which

8

is coupled to a drive wheel 58 as shown in the figures. A longitudinal centerline of the output shaft of gearbox 54, which preferably is a single reduction gearbox, is collinear with the drive wheel rotational axis, which is designated C-DW. Motor 52 may be oriented such that its centerline is collinear with or—as shown in the figures—is parallel to, but offset from, drive wheel rotational axis C-DW and the output shaft of gearbox 54.

Drives 50 preferably are mounted transverse to the direction of translation of the wheelchair. As illustrated by arrow F shown for example in FIG. 6A, the direction of translation is parallel to a ground plane surface 200 on which the wheelchair moves forward and perpendicular to the rotational axis C-DW of the drive wheels. The transverse axis is parallel to the axis of rotation of the drive wheels and parallel to the level ground. As used herein, the orientation of rotational or pivotal axes are based on the wheelchair at rest on level ground surface 200 with all wheels oriented to roll straight forward (direction F). Also, the present invention encompasses motors 52 having a centerline (that is, the central axis of its output shaft) that is not parallel to the drive wheel rotational axis C-DW. The present invention (that is, as recited in a claim) is not limited to any relationship or orientation of any part of the drive relative to the frame unless such relationship or orientation is explicitly stated in the claim.

Drive 50 is rigidly affixed to mounting plate 56. Mounting plate 56 preferably is planar and oriented perpendicular to rotational axis C-DW of drive wheels 58. As best shown in FIGS. 3A, 3B, 4A, and 4B, mounting plate 56 includes a mounting portion 57a to which drive 50 is coupled and a projection 57b that extends forward and downward. Preferably, gearbox 54 is bolted onto mounting portion 57a. Projection 57b houses a portion of a pivot 29 for pivotally connecting mounting plate 56 to pivot support 25d of frame 24.

The configuration of drive 50 aids in locating and configuring battery compartment 26, but is not required generally to obtain other benefits of the inventive aspects of wheelchair 10. And the term "battery compartment" encompasses not only enclosures for housing the batteries but also volumes (even if unenclosed) in which the batteries for powering the motors resides. The configuration of drives 50 also provides improvement in efficiency compared with conventional right angle drives. Preferably drive 50, which is shown in FIG. 19, includes a 24 volt DC motor rated for 3.0 amps and a single reduction gearbox having a reduction ratio of 17.75:1. The no-load speed rating is 166 rpm. FIGS. 20 through 23 illustrate some benefits of preferred drive 50 compared with a conventional worm-gear, right angle drive having a 4500 rpm motor rated for 2.1 amps (at no load) and a 32:1 gear ratio. FIG. 20 is a graph of output efficiency versus current draw; FIG. 21 is graph of output horsepower versus current draw; FIG. 22 is a graph of output speed versus torque; and FIG. 23 is a graph of output torque versus current draw. Because of the higher efficiency of the preferred drive 50, a smaller motor may be used, and therefore a smaller controller and batteries may be used in some circumstances.

Pivot assembly 18 includes a front arm, such as caster arm 60, a swivel bearing 62, a caster support 64, and a caster wheel 66. Caster arm 60 is rigidly coupled to drive 50 via motor mounting plate 56. Preferably, a rearward end of caster arm 60 is affixed to an upper portion of mounting plate 56. Bearing 62 preferably has a barrel that is oriented vertically to enable caster wheel 66 to swivel or turn about a vertical axis to enhance the capability of wheelchair 10 to turn. Caster support 64 includes a fork on which an axle or bearing of caster wheel 66 is fixed.

US 8,408,343 B2

9

10

Rear wheel assembly 20 includes an articulating beam 70 that is coupled to frame 24 at mounting plate 25f, a pair of swivel bearings 72, a pair of rear caster supports 74, and a pair of rear casters 76. Beam 70 is coupled to mounting plate 25f by any means that enables beam 70 to articulate to adapt to changes in the ground, such as a pivot having a horizontal pivot axis. Preferably, this pivot is located rearward of the battery compartment 26. The articulating structure and function of rear caster beams is shown in U.S. Pat. No. 6,129,165, which is incorporated herein by reference in its entirety. Bearings 72 are disposed on distal ends of beam 70, and each preferably includes a barrel that is vertically oriented to enable the corresponding caster 76 to swivel or turn to enhance the capability of wheelchair 10 to turn. Caster support 74 includes a fork on which an axle or bearing of caster wheel 76 is fixed.

Transverse mounting of drives 50 enhances the ability to accomplish and configure the combination of generally rearward battery location and an articulating, transverse beam 70. For example, for conventional configurations having a motor that is perpendicular to the drive wheel axis (and requiring a right angle gearbox, which is not shown in the figures), the motor swings about the gearbox output shaft to transition motion to the front caster arm, as for example shown in U.S. Pat. No. 6,129,165. Providing clearance for the swinging motion for such longitudinally mounted motors sacrifices space that may be used for locating the batteries. And because the articulating transverse beam also requires space for swinging (when, for example, only one rear caster is on a curb), configuring the combination of rear battery location and rear articulating, transverse beam would be difficult if conventional, longitudinally mounted motors with right angle gearboxes would be employed.

Support post 27, and preferably the connection between support post 27 and frame 24, is disposed rearward of drive motors 52, preferably generally rearward of drive assembly 16, and preferably rearward of the drive wheel axis of rotation C-DW. The connection between support post 27 and frame 24 may be the location at which the load from chair assembly 14 and the passenger is transmitted to frame 24. Battery housing 26, and thus batteries 82 or other power source, preferably is disposed substantially, and preferably entirely, rearward of drive wheel axis C-DW, and preferably substantially, and more preferably entirely, rearward of the support post 27 connection to frame 24. Also, the invention encompasses the center of gravity of batteries 82 or other power source being located rearward of the support 27 connection and/or rearward of drive wheel axis C-DW.

The generally rearward position of battery housing 26 and/or the capability of seat 30 to move forward (by the mechanisms 32 or 32' or any other mechanism) enables access to the batteries without fully removing seat 30. In this regard, the wheelchair cover, which typically covers the batteries and mechanical components, may be removable or configured with a hatch (not shown in the figures) to enable direct access to the batteries. Whether the seat is moveable or is fixed, the configuration of wheelchair 10 enables batteries to be accessed from the behind the drive wheels, and preferably from the rear center (that is, the 6 o'clock position when viewed from above). When the seat is slideable forward or fixed (the latter configuration is not shown in the Figures), a technician may access the batteries while the wheelchair driver remains in the seat. This function enables only one technician to make a sales call to a wheelchair owners home, rather than requiring additional people to help the driver from the seat. As the present invention generally encompasses structures in which the batteries are not accessible from

behind the drive wheels, no aspect of the present invention is limited to enabling access to batteries 82 as described herein, unless such limitation is expressly recited in the claim.

The loads borne by frame 24 are transmitted to the ground via drive wheels 58, front casters 66, and rear casters 76. As will be clear to people familiar with wheelchair design, the location of pivot 29 will affect the weight distribution of wheelchair 10. In this regard, the position of pivot 29 forward of drive wheel axis C-DW causes front casters 66 to bear a vertical load while wheelchair 10 is at rest, as mounting plate 56 is supported by drive wheel 58 via its axle. Configuring the wheelchair such that front casters 66 bears a vertical load during steady-speed operation on level ground and/or while at rest on level ground may, in some circumstances, enhance the stability and stable feel of a wheelchair, although load-bearing casters are not required.

In the preferred embodiment illustrated in the figures, the position of pivot 29 may be chosen to achieve the desired weight distribution and the desired downward load borne by front casters 66. The weight distribution and magnitude of load borne by the casters may be chosen according to such parameters as desired stability of the particular wheelchair during operation on level ground and while ascending and descending a step, motor torque and horsepower, other wheelchair dimensions (such as the horizontal distance from drive wheel axis C-DW to the rear casters), overall wheelchair weight, and like parameters.

For the wheelchair 10 shown in FIGS. 1-4, pivot axis 29 preferably is spaced apart from the front wheel axis by a horizontal dimension that is between 40% and 65%, more preferably between 45% and 60%, and even more preferably about 54% of the horizontal dimension between drive wheel axis C-DW and the front caster axis. Pivot axis 29 may be spaced apart from front wheel axis C-RC by less than or about 30% of the distance between the drive wheel axis and the front caster axis. Front casters 66 bear approximately 30% of the wheelchair load. A "horizontal" dimension or distance, when referring to pivot position, is measured parallel to a level ground plane in a direction of straight-ahead travel of the wheelchair (that is, perpendicular to the drive wheel axis) while the wheelchair is at rest. A "vertical" distance or dimension, or height, when referring to pivot position, is perpendicular to a level ground plane while the wheelchair is at rest.

Conventional wheelchairs having front casters often employ springs to bias the casters. The configuration of pivot assembly 18 enables the front suspension of wheelchair 10 to function without a spring bias on caster 66 because of the downward force applied to casters 66 described above. Forgoing biasing springs in the anti-tip wheels eliminates the step of adjusting spring bias for the weight of the wheelchair occupant. The present invention, however, is not limited to wheelchairs lacking springs, regardless of the type of front wheels employed.

Referring to FIG. 6A to illustrate a preferred horizontal relationship of some components, drive wheel axis C-DW has a height H1, a centerline of pivot 29 defines a pivot axis C-P that has a height H2, and a centerline of front caster 66 defines a front caster axis C-FC that has a height H3. Preferably, front caster axis height H3 is approximately the same as or more than pivot axis height H2. The inventors believe that it is advantageous for pivot axis height H2 to be approximately below a line drawn between the drive wheel axis and axis of rotation of front caster 66.

Referring again to FIG. 6A to illustrate operation of wheelchair 10 while ascending from a level ground surface 200 up a curb, such as a step 201 having a face 202, a corner 203, and an upper surface 204. Wheelchair 10 may be driven forward

11

12

until front caster 66 contacts face 202 or, as shown in FIG. 6A, corner 203. Applying torque to drive wheels 58 urges front caster 66 against corner 203. For a step height H4 that is less than front caster axis height H3, front caster 66 overcomes step 201 because of a force couple created by horizontal components of the driving force of wheelchair 10 and a reaction force from step 201. Also, in embodiments in which the front caster height H3 is greater than pivot height H2, a vertical, upward component of the reaction force or impulse applied at the wall tends to raise caster 66 (even if the height of curb face 202 is greater than the caster radius). This upward force also enables or enhances wheelchair 10 to overcome a step having a height that is approximately the same as caster axis height H3.

FIG. 6B illustrates the partially ascended position in which front caster 66 is disposed on step upper surface 204 while drive wheel 58 and rear caster 76 are disposed on ground surface 200. Front arm 60 and mounting plate 56 have been pivoted clockwise (as oriented in FIG. 6B) from the at-rest position in which all six wheels are in contact with ground surface 200. In the position shown in FIG. 6B, frame 24 of wheelchair 10 tips slightly upward from its at rest position, as mounting plate 56 pivots—clockwise as oriented in FIG. 6B—about drive wheel axis C-DW. In this regard, front arm 60 pivots as caster 66 moves from ground surface 200 to step upper surface 202, and the corresponding pivoting of mounting plate 56 about drive wheel axis C-DW results in a corresponding pivoting of pivot 29 about drive wheel axis C-DW. Upward movement of pivot 29 results in a upward movement of the forward portion of frame 24. For the embodiment shown in FIG. 6B, frame 24 tips by an angle A1 of approximately 2.5 degrees upon front caster 66 initially touching lower surface 212.

FIG. 6C illustrates wheelchair 10 in the process of descending a step 210, which includes a face 211 and a lower surface 212. Front caster 66 is shown on the lower surface 212 of the step and drive wheels 58 and rear wheels 76 are on the ground surface 200. As caster 66 is driven over the lip of step 210, front caster 66 is urged from the upper surface 100 to the lower surface 212 by the downward force from frame 24 transmitted to plate 56 via pivot 29.

In the position shown in FIG. 6C, frame 24 of wheelchair 10 tips slightly forward from its at rest position, as mounting plate 56 pivots—counterclockwise as oriented in FIG. 6C—about drive wheel axis C-DW. In this regard, front arm 60 pivots as caster 66 moves from step upper surface 200 to step lower surface 212, and the corresponding pivoting of mounting plate 56 about drive wheel axis C-DW results in a corresponding pivoting of pivot 29 about drive wheel axis C-DW. Downward movement of pivot 29 results in a downward movement of the forward portion of frame 24. For the embodiment shown in FIG. 6C, frame 24 tips by an angle A2 of approximately 3 degrees upon front caster 66 initially touching lower surface 212.

The present invention encompasses a wheelchair having one or both of the vertical and horizontal pivot locations described herein, which will be referred in this and the following two paragraphs as a low pivot and a forward pivot, respectively. In general, low pivots may have been disfavored because of the need for clearance over the ground, even when the ground is uneven. Further, the pivot must clear an obstacle, such as a curb, during climbing, which may require lifting the frame at the pivot by a change in height that is greater than if the pivot was at a higher location. Further, considering lifting of the front pivot, forward pivot locations may have been disfavored because of diminished mechanical advantage of forward pivot positions.

For configurations in which the pivot axis C-P is below the caster axis C-FC, a force applied through the wheelchair via front caster 66 onto vertical obstacle face 22 creates an upward component of the force vector by the nature of the orientation of the pivots C-P and C-FC. This upward component of force may be helpful for ascending especially high obstacles, as explained above. The low pivot also aids even in circumstances in which the pivot axis C-P is at the same height or slightly higher than caster axis C-FC by keeping the downward component of the force near zero or small, such that motor torque may be used to climb the obstacle.

The configuration described herein, with any combination of low pivot, forward pivot, rigid coupling together of the drive assembly and front arm, transverse drives, and rear battery location provides a combination of beneficial wheelchair stability and curb climbing capabilities. The configuration shown naturally has good forward stability (that is, wheelchair 10 does not easily tip forward), and the rear articulating transverse beam enhances rearward stability (especially backwards tipping) compared with separately sprung rear arms.

Some aspects of the present invention depend on neither the low pivot nor the forward pivot, and the present invention should not be construed to require either or both of a low pivot or forward pivot unless the structure is explicitly stated in the claim. Nor should the present invention be construed to require any other feature disclosed herein, even if the specification emphasizes its advantages, unless the structure is explicitly stated in the claim.

FIGS. 7A, 7B, 8A, 8B, and 9 illustrate the second embodiment, in which a wheelchair 10' includes a frame assembly 12', a chair assembly 14', a drive assembly 16', a front pivot assembly 19, and a rear wheel assembly 20'. Structure of wheelchair 10' that corresponds to structure of the first embodiment wheelchair 10 is designated with a prime (') symbol after the reference numeral. Chair assembly 14' is essentially the same as the chair assembly 14 shown in FIGS. 1-5 and 11-13, and rear wheel assembly 20' is essentially the same as rear wheel assembly 20 shown in FIGS. 1-5. Accordingly, descriptions of chair assembly 14' and rear wheel assembly 20' are omitted from the description of second wheelchair embodiment 10'.

Frame assembly 12' in the embodiment shown in FIGS. 7A and 7B is a rigid, box-like structure that is formed of welded and/or bolted square and round tubing and formed plates. The frame structure, which is generally referred to herein by reference numeral 24', includes a central support 25a', a rear support 25b', a T-shaped support 25c', a pair of pivot supports 25d', and a footrest support 25e'.

Central support 25a', which is best shown in FIGS. 8A, 8B, and (schematically in dashed lines) FIG. 9, is disposed along a horizontal centerline of the wheelchair 10'. Rear support 25b', which is shown in FIG. 9, extends upwardly from a rear portion of central support 25a' and includes a mounting plate 25f'. T-shaped support 25c' is disposed above and forward of central support 25a' and includes a longitudinal portion 25g' and a pair of transverse supports 25h'. Pivot supports 25d' preferably are substantially vertical plates that extend generally upwardly from transverse supports 25h'. Footrest support 25e' is disposed at a forward end of longitudinal portion 25b of T-shaped support 25c. A footrest 80' is coupled to footrest support 25e'. A housing 26' for holding batteries 82' and a support post 27' are generally the same as described above with respect to first embodiment wheelchair 10.

Drive assembly 16' of second embodiment wheelchair 10' includes a pair of drives 50', each of which includes a motor 52' and a gearbox 54', a mounting plate 56', and a pair of drive

US 8,408,343 B2

13

wheels **58'**. Motor **52'** preferably is oriented with its centerline (that is, the central axis of its output shaft) parallel to the output shaft of gearbox **54'**, which is coupled to a drive wheel **58'** as shown in the figures. A longitudinal centerline of the output shaft of gearbox **54'** is collinear with the drive wheel rotational axis, which is designated C-DW. Motor **52'** may be oriented such that its centerline is collinear with or—as shown in the figures—is parallel to, but offset from, drive wheel rotational axis C-DW and the output shaft of gearbox **54'**. Accordingly, drives **50'** preferably are mounted transverse to the direction of translation of the wheelchair. The forward direction of wheelchair translation is indicated in FIG. 8A by arrow F. Also, the present invention encompasses motors **52'** having a centerline (that is, the central axis of its output shaft) that is not parallel to the drive wheel rotational axis C-DW unless such relationship is explicitly set forth in the claims.

Drive **50'** is rigidly affixed to mounting plate **56'**. Mounting plate **56'** is pivotally connected to support **25d'** by pivot **29'**, as best shown in FIGS. 7A and 7B. Mounting plate **56'** preferably is planar and oriented perpendicular to rotational axis C-DW of drive wheels **58'**. Mounting plate **56'** includes a motor-mounting portion **57a'** to which drive **50'** is bolted, a front projection **57b'** that extends forward from mounting portion **57a'**, and a rear projection that extends rearward from mounting portion **57a'**. As explained more fully below, front projection **57b'** provides a surface for the attachment of the arm of pivot assembly **19**; rear projection **57c'** provides a surface for attachment of a bracket to which a spring is mounted.

Pivot assembly **19** includes a forward-extending front arm, such as fixed wheel or anti-tip wheel arm **90**, and a suspension assembly **91**. Arm **90** includes a front end **92a** to which an adjustment plate **102** is connected and a rear end **92b** that is affixed to front projection **57b'**.

Adjustment plate **102** includes a pivotable connection **120**, holes **122** formed through plate **102**, and a bearing mounting **124** to which a front wheel **108** is attached. A bolt or pin **126** extends horizontally through arm front end **92a** and through one of holes **122**. The height of wheel **108** may be adjusted by removing pin **126**, pivoting plate **102** up or down to a desired position, and replacing pin **126** into another one of holes **122**. The height of wheel **108** may be adjusted to be closely spaced apart from ground plane surface **200** or adjusted such that the rotational axis of wheel **108** is higher than an expected curb height. In general, the purpose, procedure, and desired position for adjusting the height of anti-tip wheels **108** will be understood by persons familiar with wheelchair technology. Adjustment plate **102** is shown for illustration, and the present invention is not limited to wheelchairs having a front wheel height adjustment nor to a particular configuration of a height adjustment mechanism.

Suspension assembly **91** preferably includes a front spring **94a** and a rear spring **94b**. Front spring **94a** has an upper end that is pivotally connected to a mounting bracket **96a** that extends from an upper portion of pivot support **25d'**. A lower end of spring **94a** is pivotally connected to an intermediate portion of arm **90** between arm front end **92a** and arm rear end **92b**, and thus spring **94a** acts on arm **90** forward of mounting plate **56'** and rearward of adjustment plate **102**. Rear spring **94b** has an upper end that is pivotally connected to a mounting bracket **96b** that extends rearward from pivot support **25d'** and a lower end that is pivotally connected to a rearward portion **57c'** of mounting plate **56'**. Preferably, front spring **94a** includes a threaded rod and adjustment nut **128** to adjust the spring force and height of spring **94a**.

14

Springs **94a** and **94b** each resist pivoting of mounting plate **56'** because of weight of frame **24'** and thus position mounting plate **56'** and position arm **90**. Also, each spring **94a** and **94b** resists pivoting of mounting plate **56'** in response to contact with an obstacle. In this regard, FIG. **10** illustrates the operation of wheelchair **10'** as it encounters a corner **203** of curb **201**. Because the height of the axis of fixed wheel **108** is greater than the height of curb **201**, wheel **108** rides over curb **201** when urged forward by the wheelchair drive **50'**. Arm **90** and mounting plate **56'** rotate clockwise (as oriented in FIGS. **8**A and **8**B) until wheel **108** overcomes corner **203** to reach upper surface **204**. Wheelchair **10'** continues moving forward until drive wheels **58'** contact and overcome curb **201**.

Upon initially mounting or ascending curb **201**, frame **12'** preferably tilts slightly upward. The position of the pivoting connection **29'** may be chosen to cooperate with the operation of wheel **108** and drive wheels **58'**, as will be understood by persons familiar with wheelchair design and configuration in view of the present disclosure. Also, the position of pivot connection **29'** enhances the capability of arm **90** of wheelchair **10'** to rise relative to the ground in response to an increase in motor torque and/or to wheelchair acceleration. Front casters **66** of first embodiment wheelchair **10** generally remain in contact with the ground surface in response to most applications of motor torque and/or acceleration. The present invention, however, is not limited by the capability or lack of capability of the arms, such as arms **60** or **90**, raising in response to application of motor torque, acceleration, or like operations.

The spatial relationship between support post **27'**, drive motors **52'**, and batteries **82'** is the same as described above with respect to first embodiment wheelchair **10**. Accordingly, the capability of chair **30'** to move forward enables or enhances access to batteries **82'** without fully removing chair **30'** from frame **24'**, as explained more fully above.

The description of wheelchairs **10** and **10'** and their respective subsystems is for illustration purposes, and the present invention is not intended to the particular descriptions provided herein, nor is the designation of parts into particular subsystems intended to limit the scope of the invention in any way. For example, the description of the frame assembly does not limit the scope of the invention to devices having a rigid frame, but rather the invention encompasses all frame structures, including those having flexible or movable structure; describing the hinge assembly as a portion of the chair assembly should not be construed to limit the invention to such structure; and describing components of the wheelchair as part of the pivot assembly is not intending to be limiting. Further, the hinge assembly structure and slide assembly structure for moving the seat, the frame structures, the chair assembly structure, the drive assembly structures, the pivot assembly structures, and rear beam structure are described herein for illustration purposes, and are not intended to limit the scope of the invention except for the particular structure that is explicitly recited in the claim.

What is claimed:
1. A wheelchair comprising:
a frame;
a drive wheel defining a drive wheel axis a mounting plate pivotally coupled to the frame at a pivot axis, the pivot axis being positioned forward of the drive wheel axis; a mounting plate pivotally coupled to the frame at a pivot axis, the pivot axis being positioned forward of the drive wheel axis;
a drive operatively coupled to the drive wheel and affixed to the mounting plate;

US 8,408,343 B2

15

a forward-extending front arm rigidly extending from the mounting plate such that the mounting plate, drive, and front arm are together configured to pivot about the pivot axis;

a front wheel rotatably coupled to the front arm, the front wheel defining a front wheel axis, wherein a vertical position of the pivot axis with respect to the ground plane is spaced from and positioned relatively below a line drawn between the drive wheel axis and the front wheel axis when the drive wheels and front wheels are on level ground,

whereby motor torque biases the front wheel.

**2**. The wheelchair of claim **1**, wherein the forward-extending front arm is void of a biasing member that is configured to provide a downward force on the forward-extending front arm.

**3**. The wheelchair of claim **1**, wherein a centerline of the pivot axis has a vertical height that is approximately less than a vertical height of the front wheel axis when the drive wheel and front wheel are on level ground.

16

**4**. The wheelchair of claim **1**, wherein the front wheel is a castor such that the castor is in contact with a support surface while the wheelchair is at rest.

**5**. The wheelchair of claim **1**, wherein the drive is oriented substantially transverse to the direction of wheelchair translation.

**6**. The wheelchair of claim **1**, wherein the front arm and the drive are pivotable relative to the frame about a single pivot axis.

**7**. The wheelchair of claim **1**, wherein the mounting plate is substantially planar and is oriented perpendicular to the drive wheel axis.

**8**. The wheelchair of claim **1**, wherein motor torque causes the mounting plate, drive, and front arm to pivot about the pivot axis.

**9**. The wheelchair of claim **8**, wherein the frame moves upwardly with respect to the drive wheel axis by an angle when the mounting plate pivots about the pivot axis.

**10**. The wheelchair of claim **1**, wherein motor torque causes the pivot axis to move relative the drive wheel axis.

*   *   *   *   *

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

I certify that I am counsel for Appellant Pride Mobility Products Corporation and that the foregoing CORRECTED BRIEF OF APPELLANT PRIDE MOBILITY PRODUCTS CORPORATION complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The BRIEF contains 11,989 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

Dated:  June 25, 2015                   /s/ Gary H. Levin
                                        Gary H. Levin
                                        Counsel for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing CORRECTED BRIEF OF

APPELLANT PRIDE MOBILITY PRODUCTS CORPORATION with the U.S.

Court of Appeals for the Federal Circuit via CM/ECF and served a copy on

counsel of record via email to:


        Amy K. Wigmore
        Wilmer Cutler Pickering Hale and Dorr LLP
        18975 Pennsylvania Avenue, NW
        Washington, D.C.  20006
        amy.wigmore@wilmerhale.com


Dated:  June 25, 2015        /s/ Gary H. Levin
                                     Gary H. Levin